**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHANE BOSHART, Individually and on Behalf of All Others Similarly Situated, | Case No.  1:24-cv-06132 |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS CLASS ACTION** |
| v. | **CLASS ACTION** |
| SPRINKLR, INC., RAGY THOMAS, and MANISH SARIN, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff Shane Boshart ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Sprinklr, Inc. ("Sprinklr" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Sprinklr's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Sprinklr securities between March 29, 2023 and June 5, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Sprinklr's expected revenue and operations for the 2024 fiscal year ending January 31, 2024. Defendants' statements included, among other things, Sprinklr's continued focus on AI-development, expansion into the Contact Center as a Service ("CCaaS") market, and continued growth from their existing product portfolio.

3.      Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Sprinklr had significantly shifted its focus away from proven growth areas to focus aggressively on scaling a new business venture with CCaaS, resulting in artificially inflated short-term growth. Defendants misled investors by continually providing projections which failed to account for the difficulties in the implementation of scaling their new product and/or otherwise failed to adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

4.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the difficulties in the implementation of scaling in the CCaaS market and the resulting growth slowdown on their existing "go-to-market" initiatives associated

with Sprinklr's core suite of products, which collectively caused Plaintiff and other shareholders to purchase Sprinklr's securities at artificially inflated prices.

5.      The truth emerged on December 6, 2023, during Sprinklr's earnings call following a same day press release announcing its strong third quarter earnings. In pertinent part, Defendants announced a sequential decrease in the total number of customers spending more than $1 million, attributing it to macroeconomic conditions. Additionally, Sprinklr reduced its estimated growth for the fourth quarter and fiscal year 2025 (ending January 31, 2025).  In particular, Defendants reduced the outlook for fiscal 2025 from consensus expectations of 16% growth down to only 10%.

6.      Investors and analysts reacted immediately to Sprinklr's revelation. The price of Sprinklr's common stock declined dramatically. From a closing market price of $16.70 per share on December 6, 2023, Sprinklr's stock price fell to $11.11 per share on December 7, 2023, a decline of more than 33% in the span of just a single day.

7.      Notwithstanding the December 6, 2023 disclosures, Defendants continued to mislead investors. Defendants continued to create the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In reality, the decision to focus on aggressively scaling CCaaS caused more damage than Defendants were disclosing, subjecting the company to more downturn in the existing "go-to-market" venture.  During the following earning call on March 27, 2024, Defendants continued to mislead investors by further narrowing these inflated projections, suggesting they had increased confidence in their projections, despite an apparent need for significant leadership and operational changes that occurred in the following quarter.

8.    Reality came into view on June 5, 2024 when Sprinklr again announced significantly reduced growth expectations, this time cutting fiscal year 2025 projections another three percent, down to a mere 7% annual growth, again attributing the losses to reduced customer retention in Sprinklr's core business and macro headwinds.

9.    Investors and analysts again reacted promptly to Sprinklr's revelations. The price of Sprinklr's common stock declined dramatically. From a closing market price of $10.84 per share on June 5, 2024 Sprinklr's stock price fell to $9.20 per share on June 6, 2024, a decline of more than 15% in the span of one day

## JURISDICTION AND VENUE

10.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

11.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Sprinklr is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

14.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

15.     Plaintiff purchased Sprinklr common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Sprinklr is attached hereto.

16.     Sprinklr, Inc. is a New York corporation with its principal executive offices located at 429 West 35th Street, New York, NY 10001. During the Class Period, the Company's common stock traded on the New York Stock Exchange ("NYSE") under the symbol "CXM."

17.     Defendant Ragy Thomas ("Thomas**)** was, at all relevant times, the Founder, Chairman, and Chief Executive Officer, of Sprinklr.

18.     Defendant Manish Sarin ("Sarin") was, at all relevant times, the Chief Financial Officer of Sprinklr.

19.     Defendants Thomas and Sarin are sometimes referred to herein as the "Individual Defendants." Sprinklr together with the Individual Defendants are referred to herein as the "Defendants."

20.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Sprinklr's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each

of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

21.    Sprinklr is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

22.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Sprinklr under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

23.    Sprinklr is a software company that provides AI-based "Customer Experience Management" platforms for its client's customer-facing teams. Its products help customers provide customer service across various platforms and in different capacities.

24.    Sprinklr's CCaaS produce suite commenced in earnest in or around the second quarter of 2022 (ending June 30, 2021). Over the following two fiscal years, Spinklr invested heavily in the CCaaS segment. Unbeknownst to investors, the Company's investment in CCaaS was at the expense and/or to the detriment of Spinklr's other business.

*The Defendants Materially Misled Investors Concerning*

*Sprinklr's Revenue Outlook for Fourth Quarter of Fiscal Year 2024 and Fiscal Year 2025*

<u>March 29, 2023</u>

25.     On March 29, 2023, Sprinklr issued a press release announcing its fourth quarter

and fiscal year 2023 financial results. The press release also provided Sprinklr's first quarter and

full year financial outlooks for fiscal year 2024, stating in pertinent part:

**Financial Outlook**

Sprinklr is providing the following guidance for the first fiscal quarter ending April 30, 2023:
- Subscription revenue between $153 million and $155 million.
- Total revenue between $168 million and $170 million.
- Non-GAAP operating income between $3 million and $5 million.
- Non-GAAP net income per share between $0.00 and $0.01, assuming 268 million weighted average shares outstanding.

Sprinklr is providing the following guidance for the full fiscal year ending January 31, 2024:
- Subscription revenue between $644 million and $648 million.
- Total revenue between $710 million and $714 million.
- Non-GAAP operating income between $41 million and $45 million.
- Non-GAAP net income per share between $0.13 and $0.15, assuming 273 million weighted average shares outstanding.

26.     Defendants held their quarterly earnings call that evening, including Thomas and

Sarin on behalf of Sprinklr. During the call, the Individual Defendants provided analysts with

detailed information concerning the Company's success in the CCaaS. In pertinent part, Thomas

stated:

Next, let's take a deeper dive into Sprinklr Service and why we are seeing success as a radical disruptor in the CCaaS space … Our pace of innovation in this space continues as highlighted in our recent announcement of over 100 features that we have added to our service offering, notably predictive intelligence, AI-based quality management and outbound voice dialing. According to a recent Gartner report, $800 billion is going to be spent annually on contact center labor costs – technology and labor. We all know that AI is going to optimize this fairly dramatically. Now it

might surprise you to know that today, Sprinklr supports on our platform, 75,000 call center agencies with 30 new deployments happening with large brands around the world as we speak

. . .

Let's start with Sprinklr Service, our omni-channel customer service solution. Last year, we were chosen to support the large scale CCaaS transformation of one of the largest banks in the world HDFC. We've replaced more than 10 point solutions and onboarded over 10,000 agents, including inbound and outbound voice, text, social, and messaging.

. . .

Last quarter, we shared a big win in the CCaaS space with one of the world's leading global streaming media companies. This quarter, I'm pleased to announce that they've expanded the partnership with Sprinklr Marketing.

. . .

In closing, I'd like for you to have three clear takeaways. Number one, we're going to be a disruptive player in CCaaS. That's a pretty 30, 40-year old industry. We are a digital native company who has created a modern omni-channel approach to integrating 30 plus digital channels that now includes voice, and we're challenging some of the well-known legacy players with an entirely different approach omni-channel and AI base for customer service.

### *September 6, 2023*

27.     On September 6, 2023, Sprinklr issued another press release, this time announcing its second quarter results for fiscal year 2024, along with further guidance for the remainder of the year, notably stating:

**Financial Outlook**

Sprinklr is providing the following guidance for the third fiscal quarter ending October 31, 2023:
- Subscription revenue between $164 million and $166 million.
- Total revenue between $179 million and $181 million.
- Non-GAAP operating income between $15 million and $17 million.
- Non-GAAP net income per share between $0.06 and $0.07, assuming 274 million basic weighted-average shares outstanding.

Sprinklr is providing the following guidance for the full fiscal year ending January 31, 2024:

- Subscription revenue between $658 million and $660 million.
- Total revenue between $719 million and $721 million.
- Non-GAAP operating income between $65 million and $67 million.
- Non-GAAP net income per share between $0.30 and $0.31, assuming 273 million basic weighted-average shares outstanding.

28.    On an earnings call later that same day, CEO Ragy Thomas stated that Sprinklr's focus on its AI development and its continued push for a "unified CXM" system, inclusive of CCaaS, were main contributors to its customer growth:

> Our key focus areas continue to be creating a new category that we call unified CXM, innovating faster than our competitors by harnessing the power of AI and improving our operational efficiencies, while focusing on measurable value for our customers
>
> . . .
>
> In my travels around the world last quarter, the best brands in the world are continuing to ask us to help consolidate front-office technologies, reduce their operating costs, help reduce risk, all while bringing people and data together to create better customer experiences. For large and complex enterprise brands, seamless experiences are impossible to create across a multitude of channels, functions, business units and markets that are traditionally operating in silos.
>
> . . .
>
> The second topic on every customer's mind is AI . . . We believe that every company will embrace AI eventually. Our [indiscernible] is that companies that approach AI as a foundational strategy will win against AI adoptive and AI-enabled companies in the long run.
>
> . . .
>
> Third, as we all know, the macro environment continues to be uncertain. ***However, we are diligently managing within our control with our go-to-market strategy, productivity improvement and execution.*** This past quarter, we made a few more key hires in the service specialist team to add expertise and depth to selling our contact center offerings.  And we continue to provide verticalized solutions to enable quicker time to value and faster deployment.
>
> . . .

> **With respect to Sprinklr service, we have continued our momentum as a disruptor in the contact center as a service space**. Our vision to help customers -- is to help customers transform the contact center from a legacy voice focused cost center to a more efficient AI-powered omnichannel revenue center by unifying it with marketing and sales. Sprinklr's AI-first Unified CCaaS provides its customers and prospects with: one, more seamless, consistent customer experience across channels; two, a lower agent attrition rate; and three, a lower total cost of ownership. During the second quarter, we once again saw several meaningful CCaaS deals closed across all 3 of our primary theaters and the majority of our service deals won were with new logos.

(Emphasis added).

29.     Defendant Sarin then highlighted Sprinklr's expectations for the third quarter of fiscal year 2024 and beyond stating, in pertinent part:

> As you heard today, long-term demand trends and engagement for Sprinklr remains strong. However, we recognize that the macroeconomic environment continues to be uncertain.  And our current assumption is that the broader macro trends from the last few quarters are likely to continue throughout FY'24.  For Q3 FY '24, we expect total revenues to be in the range of $179 million to $181 million, representing 14% growth year-over-year at the midpoint.  Within this, we expect subscription revenue to be in the range of $164 million to $166 million, representing 18% growth year-over-year at midpoint
>
> . . .
>
> For the full year FY '24, we are raising and tightening both our subscription and total revenue outlook for the year. We now expect subscription revenue to be in the range of $658 million to $660 million, representing 20% growth year-over-year at the midpoint.

30.     The question-and-answer portion of the call followed, wherein the Individual Defendants were asked about the Company's reported growth and continued guidance for the remainder of the fiscal year:

> <Q: Arjun Rohit Bhatia - William Blair & Company LLC - Research Div> [W]hat's supporting your growth and how you're able to manage and run the business, drive growth differently now that implementation is easier and time to value is quicker? What does that enable from a growth perspective incrementally?
>
> <A: Ragy Thomas> Sure. So there are 2 factors that are helping us.  One is obviously strategy to add voice and get into the broader CCaaS space, which, as

you know, is a huge market, right, $800 billion market, which technology is not going to just replace technology. I think it's going to replace and scale the human labor. So I think for the first time, a bigger chunk of that $800 billion, which includes human labor is also applied. So that's obviously, I think, as we disrupt that market, that puts us in a good place to grow. Two is we've been very consistent in articulating that we have a focus on our go-to-market side just fixing the fundamentals and making it easier for our salespeople in the field to understand and sell the solution better. And that's going to take a few more quarters to completely roll out, but we're pretty pleased with the results we're seeing so far.

. . .

<Q: Michael H Berg - Wells Fargo Securities, LLC - Research Division> Congrats on the [quarter]. I just wanted to have more of a philosophical view on your guidance. You obviously had a very strong quarter and being raised by more than the -- like you said, and more than the Q3 rate. So maybe what's providing that confidence? Is there anything outside of the strong renewal activity and large deals you saw in the quarter? Maybe just help us parse through what gives you the confidence in the guidance?

<A: Manish Sarin> Yes. Thank you for the question. So I don't think it's any more complex than what you articulate. At the end of the day, if you leave the professional services line item aside, subscription business, it's all driven by the strength in the renewal business, when we do have multiyear renewals, we call it out, and that shows up in our view like it did this time. And it's all driven by the linearity within the quarter. So we have been seeing stronger linearity for the last couple of quarters and what we had modeled, which is part of the reason you're seeing strength in the beats in the quarter and that's giving us more confidence as we look out over the next 2 quarters. And I think that's captured in the guide

. . .

<Q: Tyler Maverick Radke - Citigroup Inc - Research Div> … you saw some really good large deal activity in Q2. I know there's been a lot of noise around RPO and current RPO because of the multiyear renewal cycle. So I'm just curious if there's any things to call out in terms of RPO volatility and just how your overall large deals you're expecting those to land in Q3, Q4? Just anything that would be noteworthy to call out as we're building our models.

<A: Manish Sarin> … [T]here's nothing that I would call out at this stage. We -- as I look at the quantum of business that we're booking, it sort of seems in line with what we would expect. It's -- like any enterprise software company, we are pretty back-end loaded. So I wouldn't make any broad assumptions on how Q3 and Q4 would land, but there's nothing that we are seeing today that would give us any cause for concern. It's sort of along the lines that we would expect. So steady is what I would say.

31.     The above statements were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Sprinklr had significantly shifted its focus away from proven growth areas to focus aggressively on scaling a new business venture with CCaaS, resulting in artificially inflated short-term growth. Defendants misled investors by continually providing projections which failed to account for the difficulties in the implementation of scaling their new product and/or otherwise failed to adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

***Sprinklr Reveals Third Quarter Earnings and***

***Reveals Weak Revenue Outlook for Fourth Quarter 2024 and Fiscal Year 2025***

***December 6, 2023***

32.     On or about December 6, 2023, Sprinklr issued a press release, here announcing their fiscal 2024 quarter 3 results. The press release, as typical, also provided guidance for the next quarter and the entirety of the fiscal year:

**Financial Outlook**

Sprinklr is providing the following guidance for the fourth fiscal quarter ending January 31, 2024:
- Subscription revenue between $172.5 million and $174.5 million.
- Total revenue between $187.5 million and $189.5 million.
- Non-GAAP operating income between $20.3 million and $22.3 million.
- Non-GAAP net income per share between $0.08 and $0.09, assuming 275 million basic weighted-average shares outstanding.

Sprinklr is providing the following guidance for the full fiscal year ending January 31, 2024:
- Subscription revenue between $664 million and $666 million.
- Total revenue between $725.5 million and $727.5 million.
- Non-GAAP operating income between $80 million and $82 million.

- Non-GAAP net income per share between $0.36 and $0.37, assuming 273 million basic weighted-average shares outstanding.

33.    Sprinklr hosted an earnings call later on December 6th which again included Defendants Thomas and Sarin. During the call, the Individual Defendants discussed third quarter results, stating, in pertinent part:

> ***As we've diversified the business and focused on scaling our CCaaS business, we'd like to acknowledge that we have made slower progress on some of our other go-to-market initiatives focused on our core product suites. We expect this will have a near-term impact on growth, which Manish will review in more detail in his remarks as he shares initial framework for FY '25.***
>
> . . .
>
> [W]e're pleased with this quarter's results which exceeded the high end of our guidance range on the top and bottom line.  For the third quarter, total revenue was $186.3 million, up 18% year-over-year.  This was driven by subscription revenues of $170.5 million, which grew 22% year-over-year.  Subscription revenue benefited by $1 million from new business being booked earlier than expected in the quarter. Professional services revenue for the quarter came in at $15.9 million … As of the end of the third quarter, we had 123 customers contributing $1 million or more in subscription revenue over the preceding 12 months, an increase of 3 customers sequentially and a 15% increase year-over-year.
>
> . . .
>
> We had a decent quarter. We reported revenue of $726 million, shipped approximately 4.8 million microinverters and 102-megawatt hours of batteries and generated free cash flow of $223.8 million. Approximately 65% of our Q1 microinverter shipments were IQ8. We exited Q1 at 46% gross margin, 14% operating expense and 32% operating income, all as a percentage of revenue on a non-GAAP basis.
>
> . . .
>
> Turning to gross margins for the third quarter.  On a non-GAAP basis, our subscription gross margins came in at [83%] as we continue to drive efficiencies in our cloud operations with total non-GAAP gross margins of 75%.  Non-GAAP gross margins for professional services were slightly negative, coming in at minus 2%. As we have discussed in the past, we continue to invest in CCaaS delivery capabilities and build out our expertise in that area.
>
> . . .

For the third consecutive quarter, we posted positive GAAP net income totaling $17 million or $0.06 per basic share. In terms of free cash flow, we generated $15.9 million during the third quarter compared to a cash burn of $1.7 million in the same period last year. With this result in Q3, our free cash flow generation during the first 9 months of this year now stands at $38.9 million. Our balance sheet has become stronger each quarter, now standing at $656.4 million in cash and marketable securities with no debt outstanding.

(emphasis added).

34.    The Individual Defendants then provided guidance for the fourth quarter and beyond:

Our Q4 guidance assumes the go-to-market dynamics Ragy mentioned and the renewal headwinds I discussed earlier will have an impact on revenue growth in the quarter. As a reminder, Q4 is our biggest book of business for both new business and renewals … As such, we are mindful that this cycle of renewals may be one of the more challenging quarters to get through and is factored into the guidance numbers.

Given these dynamics for Q4, we expect total revenues to be in the range of $187.5 million to $189.5 million, representing 14% growth year-over-year at the midpoint. Within this, we expect subscription revenue to be in the range of $172.5 million to $174.5 million, representing 17% growth year-over-year at the midpoint.

. . .

***Before moving into Q&A, I would like to provide some high-level commentary on fiscal year 2025 … As Ragy mentioned, our focus on succeeding in our CCaaS business slowed progress with some of our other go-to-market initiatives in our core product suites much more than we had anticipated.***

***Now that Sprinklr Service is at scale, we have developed a consistent and repeatable selling motion to that buying persona and built an enviable collection of reference customers. We're in a position to refocus our go-to-market efforts to better align our resources across all product suites. We expect it will take several quarters for the full impact of these changes to work its way through the P&L.***

***To put some numbers around these dynamics, if you adjust for the $1 million linearity benefit I mentioned for Q3, Q4 subscription revenue is expected to grow approximately 2.5% sequentially. At this time, based on what I just outlined, coupled with an unforgiving macro environment, we expect a sequential quarterly increase of 2.5% for each quarter of FY '25. This equates to***

> *approximately a 10% total revenue growth for the full year, which we believe is*
> *the appropriate starting point for FY '25.*
>
> . . .
>
> But I think that whole sequence of moving the sales teams around, we probably
> didn't see at least till now that we were not getting the level of market momentum
> in our core products or traction in the core products that we should have had, so I
> think that's a bit of a new element

(emphasis added).

35.    The following day, on December 7, 2023, Sprinklr's CFO, Manish Sarin, spoke

more on the reduced outlook in an interview with Barclays Bank:

> So 2 big things. *One is there's a set of onetime really unique idiosyncratic*
> *situations, companies that are going through fairly fundamental structural*
> *changes. That probably accounts for 2% to 3% of the downdraft for next year.*
> *And these are not things we could have predicted, so they are really unique*
> *situations.*
>
> And then we are *seeing a heightened level of down sell here in Q4*. And again, we
> have inspected all of these accounts. It's not really lower churn, but I suspect
> companies that have been going through a restructuring earlier in the year, as their
> contracts are coming up for renewal here in Q4, they're just renewing for a lower
> seat count.
>
> . . .
>
> We, of course, don't have any more visibility than this. And in order to construct at
> least an initial look into next year, not the formal guide, our view was let's just look
> at the sequential growth from Q3 to Q4, not having any further visibility, and let's
> assume a conservative tone. That would equate to circa 10-ish percent for next year.
> So I think that's the approach we took. I can understand it probably isn't sitting well
> with many folks, but there was at least some talk behind it.
>
> . . .
>
> *So at the beginning of the year, given the success we were having in CCaaS, we*
> *were very comfortable telling the sales team that this is the new product to go*
> *push. We did feel there is ample opportunity, and we still do by the way.*
>
> What that does is because all our comp plans are structured where it's all driven by
> retiring new ARR whether it's selling core products or whether it's selling CCaaS.
> And with CCaaS in particular, we were successful in hiring a group of specialists

from the existing vendors in that market. So the whole idea was these specialists would work with the generalist sales team and go prosecute CCaaS deals in those accounts.

And I think what you realize over time is salespeople are largely coin operated. You incent them to go do something, and that's what they will go do. And I think in the process, what happened is they probably weren't spending enough time in their accounts trying to figure out upsell opportunities or cross-sell opportunities that weren't related to CCaaS, and so ordinarily, the flywheel that we have going for our core products didn't function the way we wanted it to.

***And it took us a little bit of time to sort of figure that out because we've seen tremendous success in CCaaS over the last 9 months***. And we've been fairly open in talking about it in all the earnings calls. So I think on the one hand, that was a great one. On the other hand, maybe it was too much of an over rotation as Ragy was calling it towards just one product line, which probably have a dedicated set of CCaaS sort of sales specialists instead of having the entire sales team go after that.

. . .

***So now what has happened is we've taken a little bit our eye off the ball on the core product and are finding that the flywheel is taking a little bit longer to kick up in CCaaS***.

So I think what we are concluding is we don't need to make any structural changes. We do have exactly the sales team. There is a bunch of reps that are super comfortable selling the core product. All we have to do is really point them back to what they were always comfortable doing, keep the specialists that we hired for CCaaS and have them go after the CCaaS opportunities.

(Emphasis added).

36.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the March 29 and September 6, 2023 earnings calls. On those calls, Defendants continually praised their recent broadening into the CCaaS market along with the robustness of their existing go-to-market initiatives as the keys to their success and moreover minimized any speculative risk from the existing macro environment.

37. Investors and analysts reacted immediately to Sprinklr's revelation. The price of Sprinklr's common stock declined dramatically. From a closing market price of $16.70 per share on December 6, 2023, Sprinklr's stock price fell to $11.11 per share on December 7, 2023, a decline of more than 33% in the span of just a single day.

38. A number of well-known analysts who had been following Sprinklr lowered their price targets in response to Sprinklr's disclosures. For example, William Blair, while reiterating its outperform rating, noted the Company "is expecting a tough fourth-quarter renewal cycle, where it expects churn and downsell to be larger than previously expected" and will further need to "undergo a go-to-market transition over the coming quarters that is likely to have an adverse impact on growth rate." The analyst further cautions that Sprinklr "will have to lay out and execute a go-to-market plan that clears a path back to durable midteens growth in order to regain investor confidence."

39. Similarly, while JMP retained its price target, it did not spare Sprinklr management in doing so: "[W]e think Sprinklr would be the first to acknowledge that this *'over-rotation'* represents sub-par execution at the leadership level, as well as in the field" (emphasis in original). JMP emphasizes that the prior "big wins" in the CCaaS space "simply did not land in F3Q and pipeline progression on those CCaaS deals may not have been up to expectations either." At the same time JMP highlights major losses in the subscription renewal space as X, formerly Twitter, and an unnamed global media company that, in JMP's view, each "represents upward of a point of growth for next year."

40. The fact that these analysts, and others, discussed Sprinklr's shortfall and below-expectation projections shows that the investing public placed great weight upon Sprinklr's prior

statements of confidence in their growth plan. The frequent, in-depth discussion of Sprinklr's

guidance confirms that Defendants' statements during the Class Period were material.

### *The Defendants Continued to Mislead Investors Concerning*

### *Sprinklr's Revenue Outlook for Fiscal Year 2025*

### <u>March 27, 2024</u>

41.    In the evening of March 27, 2024, published its fourth quarter and fiscal year 2024

results; notably providing the following projections:

> Sprinklr is providing the following guidance for the first fiscal quarter ending April
> 30, 2024:
> • Subscription revenue between $177.5 million and $178.5 million.
> • Total revenue between $194 million and $195 million.
> • Non-GAAP operating income between $19.5 million and $20.5 million.
> • Non-GAAP net income per share of approximately $0.07, assuming 289
>   million diluted weighted-average shares outstanding.
>
> Sprinklr is providing the following guidance for the full fiscal year ending January
> 31, 2025:
> • Subscription revenue between $740.5 million and $741.5 million.
> • Total revenue between $804.5 million and $805.5 million.
> • Non-GAAP operating income between $104 million and $105 million.
> • Non-GAAP net income per share between $0.38 and $0.39, assuming 291
>   million diluted weighted-average shares outstanding.

42.    Sprinklr held an earnings call shortly after posting the results.  During the call, CEO

Ragy Thomas and CFO Manish Sarin largely stayed the course with their existing plans, detailing

reductions in projected spreads as the Individual Defendants appeared very confident in their plans:

> As we shared in our prepared remarks on our Q3 call in December, we anticipated
> that the decline in our FY 2025 revenue growth rate will be driven by a combination
> of execution that needed to be improved, particularly on the go-to-market front as
> we over rotated to CCaaS and a difficult macro and economic condition that drove
> elevated churn. We believe, we now have the clarity on how to best position this
> company for our next phase of growth and has made several substantive changes
> across the organization.
>
> . . .

As we shared in our prepared remarks on our Q3 call in December, we anticipated that the decline in our FY 2025 revenue growth rate will be driven by a combination of execution that needed to be improved, particularly on the go-to-market front as we over rotated to CCaaS and a difficult macro and economic condition that drove elevated churn. We believe, we now have the clarity on how to best position this company for our next phase of growth and has made several substantive changes across the organization

. . .

Moving now to our Q1 and full year FY 2025 guidance and business outlook. We recognize that the macroeconomic environment continues to be cautious. And our current assumption is that the broader macro trends from last year are likely to continue throughout FY 2025. Before we walk through FY 2025 guidance, I would like to point out that our guidance range for next year is deliberately a tighter range than what we have done in the past. For Q1, FY 2025, we expect total revenue to be in the range of $194 million to $195 million, representing 12% growth year-over-year at the midpoint. Within this, we expect subscription revenue to be in the range of $177.5 million to $178.5 million, representing 13% growth year-over-year at the midpoint.

. . .

For the full year FY 2025, we expect subscription revenue to be in the range of $740.5 million to $741.5 million, representing 11% growth year-over-year at the midpoint.

. . .

We expect total revenue to be in the range of $804.5 million to $805.5 million, representing 10% growth year-over-year at the midpoint.

43.     The individual Defendants were asked to further elaborate both the Company's new narrow growth projections and its progress on reorganizing the sales division to refocus on the Company's core products:

<Q: Raimo Lenschow - Barclays - Analyst> Thank you. Congrats from me as well. Two questions. Manish, if you think about guidance for the next year, the thing that puzzles me a little bit is like you still have all the uncertainties, you have the go-to-market changes, but you're narrowing the ranges that you're giving. Can you just talk me through that logic? In theory, I would think it's a broader range rather than a smaller range. I'm just trying to understand that. And then I had one follow-up.

<A: Manish Sarin> Yes, hi Raimo. So, I think what's driving it is, as we look at, again, what's happening in the broader macro environment and obviously, a lot of our peers, they certainly felt that given the visibility that we have, at least for the quarter, we could tighten the range. You'd also note, last couple of years, we have had a broader range for the full year and then we have had to adjust the range as we got into the second half of the year. That added a little bit more confusion as analysts were trying to figure out what was happening to the range. And I just felt entering this year — I ended our prepared remarks by saying we're looking to get into a lot more operating discipline. It just felt the right time for us to introduce a much tighter range for the full year as well.

. . .

<Q: Elizabeth Porter - Morgan Stanley - Analyst> Great. Thank you so much. And just as a follow-up on the go-to-market changes, you made the fix and kind of the overcorrection into CCaaS and refocusing on the core. Any update on the progress you can share that drives confidence that these changes are getting you back to balance? Or any metrics as it relates to sales and efficiency in your pipeline that you can speak to?

<A: Ragy Thomas> I mean, look, I think the leadership changes are the most important ones. I'd start there. I mean no plan is going to work unless you have great leaders. So this is — I can tell you, this is the most direct, most focused, most substantive set of changes that we've made. I can tell you that, in every area, we've brought in leaders who've been there and done that. You can go look them up on LinkedIn. Second, we've spent a lot of time getting everyone on the same page mapping out our 16 stages of the customer's journey with us, all the teams. And we've been leveraging an external consulting firm to bring all of us together and get on the same page. And the plans are being formulated and we've got ownership in a way that this company has never done before.

So, I'm very optimistic, but I can also tell you, this is going to take several quarters to roll out. And then these leadership changes are cascading, and it takes — even just to flow through and get the team that we want everywhere, it's going to take us a couple of quarters. And so — but we feel very good about where we're going and how we're approaching this. I can tell you, this was always a priority. Right now, this is the priority. So, that's all I can tell you about what's different.

**_June 5, 2024_**

44.     On or about June 5, 2024, Sprinklr issued yet another press release, this time

walking back their previous narrowed guidance and further reducing future outlooks:

> Financial Outlook
>
> Sprinklr is providing the following guidance for the second fiscal quarter ending
> July 31, 2024:
> *   Subscription revenue between $177.5 million and $178.5 million.
> *   Total revenue between $194 million and $195 million.
> *   Non-GAAP operating income between $16.5 million and $17.5 million.
> *   Non-GAAP net income per share between $0.06 and $0.07, assuming 277
>     million diluted weighted-average shares outstanding.
>
> Sprinklr is providing the following guidance for the full fiscal year ending January
> 31, 2025:
> *   Subscription revenue between $714 million and $716 million.
> *   Total revenue between $779 million and $781 million.
> *   Non-GAAP operating income between $104 million and $105 million.
> *   Non-GAAP net income per share between $0.40 and $0.41, assuming 276
>     million diluted weighted-average shares outstanding.

45.     That same evening, after the market closed, Sprinklr conducted its customary

associated earnings call wherein Thomas and Marin both spoke at length about the Company's

woes:

> As we have shared on recent earnings calls, we've been experiencing lower net
> bookings over the past few quarters as we transition the company to better support
> our two distinct market opportunities in our core business and in CCaaS. To address
> this, we continue to make broad changes to our go-to-market strategy and hiring
> leaders to help grow and scale the business.
>
> . . .
>
> This quarter, we made good progress with these leadership changes and operational
> improvement. However, these changes are significant and will take time to show
> measurable improvements. Furthermore, implementing these changes during what
> has become a more challenging macro environment has created more short-term
> volatility than we expected.
>
> . . .

And as you saw with today's press release, we are excited to announce that Trac Pham has been appointed as the Co-CEO of Sprinklr. In the time Trac has been with us, he's already made a solid impact in establishing a consistent operating rhythm, fostering strong alignment across our executive team, and leveraging his operational expertise to set us up for our next phase of growth.

. . .

In addition, we continue to experience higher churn in our core product suites, driven by reduced marketing spend, elimination of programs, and seat reductions. As such, we now estimate this elevated level of churn to continue for the full-year FY25.

. . .

***Moving now to Q2 and full-year FY25 non-GAAP guidance and business outlook. We continue to see elevated churn, and our current assumption is that the macro softness that we are experiencing will continue through the entirety FY25. Related to some of these market dynamics and performance challenges, we recently concluded an internal review across product areas, regions, and support functions to ensure our resources are best aligned with Sprinklr's priorities.***

. . .

As a result of this review, we restructured our global workforce by approximately 3% in May. Expenses related to this action were approximately $4 million and will be booked here in Q2 FY25. These expenses are included in the guidance figures for both Q2 and the full-year FY25.

. . .

***For the full-year FY25, we now expect subscription revenue to be in the range of $714 million to $716 million, representing 7% growth year over year at the midpoint. This implies a modest sequential quarterly increase for the remainder of the year. We expect total revenue to be in the range of $779 million to $781 million, representing 7% growth year over year at the midpoint.***

. . .

Given everything just discussed, ***we are also withdrawing the FY27 financial targets.*** To be clear, we have conviction that we can achieve the financial targets we set out at Investor Day. However, we believe this may now take longer than originally planned

(emphasis added).

46.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the December 6, 2023 and March 27, 2024 earnings calls. On those calls, the Defendants portrayed an understanding of the issues surrounding their core 'go-to-market' suite of products including a planned reorganization of the sales force to refocus their efforts on the product to fix an "over-rotation" to their new CCaaS venture, as well as making and subsequently narrowing projections that factored in risks associated with the existing macro landscape.

47.     Investors and analysts again reacted promptly to Sprinklr's revelations. The price of Sprinklr's common stock declined dramatically. From a closing market price of $10.84 per share on June 5, 2024 Sprinklr's stock price fell to $9.20 per share on June 6, 2024, a decline of more than 15% in the span of one day.

48.     A number of well-known analysts who had been following Sprinklr lowered their price targets in response to Sprinklr's disclosures. Ahan Analytics, for example, noted that the decline in December at the time "looked excessive given the encouraging long-term narrative from the company, especially reassurances like sticking to 2027 guidance despite acknowledging macro headwinds," whereas now "[n]ot only did management acknowledge ongoing macro headwinds but also talked of worsening operational issues and stepped away from 2027 guidance. Another analyst, May Investing Ideas, noted that Sprinklr Management's "decision to reduce its FY25 guidance further cements the fact that underlying demand remains poor."

49.     The fact that these analysts, and others, discussed Sprinklr's shortfall and further reduced projections suggests the public placed significant weight on Sprinklr's statements of prior confidence in their new growth plans. The frequent, in-depth discussion of Sprinklr's guidance confirms that Defendants' statements during the Class Period were material.

*Loss Causation and Economic Loss*

50.    During the Class Period, as detailed herein, Sprinklr and the Individual Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sprinklr's common stock and operated as a fraud or deceit on Class Period purchasers of Sprinklr's common stock by materially misleading the investing public. Later, when Sprinklr and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Sprinklr's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Sprinklr's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

51.    Sprinklr's stock price fell in response to the corrective event on December 6, 2023, as alleged *supra*. On December 6, 2023, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Sprinklr's forecasting processes and growth guidance

52.    In particular, on December 6, 2023, Sprinklr announced significantly reduced growth expectations of only 2.5% per quarter for the next 5 quarters beginning with the Quarter 4 of fiscal year 2024, resulting in a collectively shallow 10% growth projected for fiscal year 2025.  This projection was well below the market expectations generated by Sprinklr's own previous reports of economic growth and internal growth projections provided throughout fiscal year 2024.

53.    Moreover, additional materially false and misleading statements were made by Sprinklr and the Individual Defendants part and parcel with the corrective disclosures made on December 6, 2023.  Again, Sprinklr's stock price fell in response to a second corrective event on

June 5, 2024, as alleged *supra*.  On June 5, 2024, Defendants again disclosed information directly related to prior misrepresentations and material omissions concerning Sprinklr's forecasting processes and growth guidance.

54.    Specifically, on June 5, 2024, Sprinklr again announced significantly reduced growth expectations, cutting fiscal year 2025 projections another three percent, down to only 7% annual growth. and further withdrew fiscal year 2027 targets. This projection was not only well below market expectations, but well below Sprinklr's own expectations as set and reaffirmed through its previous quarterly reports.

### *Presumption of Reliance; Fraud-On-The-Market*

55.    At all relevant times, the market for Sprinklr's common stock was an efficient market for the following reasons, among others:

(a)    Sprinklr's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Sprinklr communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Sprinklr was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class

Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Sprinklr was reflected in and incorporated into the Company's stock price during the Class Period.

56.    As a result of the foregoing, the market for Sprinklr's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Sprinklr's stock price. Under these circumstances, all purchasers of Sprinklr's common stock during the Class Period suffered similar injury through their purchase of Sprinklr's common stock at artificially inflated prices, and a presumption of reliance applies.

57.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for the difficulties in the implementation of scaling their new product and/or otherwise failed to adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

59.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

60.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Sprinklr who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sprinklr's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

62.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sprinklr's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sprinklr or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 30, 2023, there were more than 151 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

63.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

       (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sprinklr;

(c)     whether the Individual Defendants caused Sprinklr to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Sprinklr's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

67.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

69.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sprinklr common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Sprinklr's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

70.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sprinklr's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

71.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

72.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Sprinklr's internal affairs.

73.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sprinklr's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sprinklr's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Sprinklr's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of

the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

74.     During the Class Period, Sprinklr's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sprinklr's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Sprinklr's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Sprinklr's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

77.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Sprinklr's misstatements.

79.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Sprinklr which had become materially false or misleading.

80.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sprinklr disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sprinklr to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sprinklr's common stock.

81.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised

the same to cause Sprinklr to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

82.    By reason of the above conduct, the Individual Defendants and/or Sprinklr are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 13, 2024                    Respectfully submitted,

                                          **LEVI & KORSINSKY, LLP**


                                          */s/ Adam M. Apton*
                                          Adam M. Apton
                                          33 Whitehall Street, 17th Floor
                                          New York, New York 10004
                                          Tel.: (212) 363-7500
                                          Fax: (212) 363-7171
                                          Email: aapton@zlk.com

                                          *Attorneys for Plaintiff*