## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SPRINKLR, INC. SECURITIES LITIGATION | **Case No. 1:24-cv-06132**<br><br>**CLASS ACTION**<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Honorable Lorna G. Schofield<br><br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Anthony Marcheschi ("Lead Plaintiff"), and additional plaintiff Naveed Nawaz (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for their Amended Complaint (the "Complaint") against Sprinklr, Inc. ("Sprinklr" or the "Company"), Ragy Thomas ("Thomas"), and Manish Sarin ("Sarin"), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, interviews with former employees, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Sprinklr Class A common stock between March 29, 2023 and June 5, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants, former and current officers and directors of Sprinklr, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

2.    Throughout the Class Period, Defendants misled investors about secretly diverting needed resources from the Company's core business and primary driver of its revenue – its Core Suite business – to its new contact center as a service ("CCaaS") business, Sprinklr Service; the risks and tradeoffs involved with that new strategy; and the impact of its new strategy. Specifically, Defendants concealed: (i) significant known risks in its new CCaaS business, Sprinklr Service; (ii) that Sprinklr had secretly diverted needed resources and manpower from its Core Suite business to its new CCaaS-focused Sprinklr Service business; (iii) the diversion of resources and manpower from its Core Suite business to its CCaaS business had known risks to the primary driver of the Company's revenue – risks that started to materialize almost immediately after Sprinklr secretly diverted resources away from Core Suite in early 2023; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

3.    Sprinklr operates as an enterprise software company that sells software by

subscription to large corporations. Founded in 2009, Sprinklr offers two main lines of business. It offers a Core Suite that enables companies to, among other things, manage and analyze social media content, create personalized customer interactions, optimize digital marketing campaigns, and analyze data for marketing purposes. Sprinklr also provides a newer, CCaaS-based offering that provides the capabilities required to route inbound customer interactions to contact center agents. Both Sprinklr's core product offerings and its newer CCaaS offering are available as software-as-a-service ("SaaS"). SaaS is a licensing model in which access to software is provided on a subscription basis.

4.      With its Core Suite business, Sprinklr quickly gained ground as a market leader through its unique and customizable product offerings, which offered many add-on features and bespoke solutions for companies. However, due to the bespoke nature of the Core Suite business, it was more expensive than its competitors. Thus, to sustain its position as a market leader in the SaaS space, Sprinklr had to devote significant resources and manpower to achieve consistent sales and renewals with its customers.

5.      Another drawback to the Core Suite business was that it was a high-priced, mature, low growth product that relied on renewals of existing subscriptions. Consequently, it offered only limited growth prospects. To achieve desired growth, Sprinklr decided to pivot its business to a new line of business – a CCaaS offering, Sprinklr Service. CCaaS is a customer experience solution that routes inbound customer interactions (whether by phone, chat, email, or text) to contact center agents. Importantly for Sprinklr, CCaaS allowed for significantly more growth through service contracts and the use of Artificial Intelligence. Therefore, at the end of 2022 – after taking the year to build up its CCaaS offering – the Company prepared to make a meaningful shift towards entering the CCaaS marketplace.

6.      Defendants did not disclose serious, known risks regarding their entry into the CCaaS marketplace, including the Company's lack of sales contacts or sales staff experienced in CCaaS. More significantly, for its entry into the CCaaS market, the Company diverted significant resources and manpower – including both salespeople and developers – from its Core Suite business to Sprinklr Service, endangering the primary driver of Sprinklr's revenue and damaging prospects for needed renewal business. This was also hidden from investors.

7.      In contrast to these internally known risks, throughout the Class Period, Defendants continued to misleadingly assure investors that Sprinklr's Core Suite business and its Sprinklr Service CCaaS business were performing strongly and had bright futures, without ever disclosing the known risks to both as a result of the Company's secret diversion of resources and manpower away from its Core Suite and towards Sprinklr Service CCaaS business.

8.      Ultimately, those undisclosed risks materialized in significantly less growth for the company due to its admitted diversion of resources and manpower away from its core business and towards Sprinklr Service. Specifically, on December 6, 2023, contradicting almost a year of uniformly positive news about the Sprinklr Service and Core Suite businesses, Defendants admitted that, at the beginning of 2023, Sprinklr had diverted needed resources and manpower from Core Suite to Sprinklr Service, and this damaged sales and renewals of Core Suite products.

9.      On this news, Sprinklr's stock price plummeted from a December 6, 2023 closing price of $16.70 by $5.74, or 34%, before rebounding to close at $11.11 per share on December 7, 2023. To stem the decline, Defendants characterized their decision to starve Sprinklr's Core Suite business in order to feed Sprinklr Service as a mere "overrotation" and promised investors its impact would only be short term. To that end, during the Company's December 6, 2023 earnings call, Sprinklr re-affirmed that it remained on track to achieve $1 billion in subscription revenue for

Fiscal Year 2027, which ran from February 2026 to January 2027.

10.    Over the ensuing months, Defendants continued to downplay the real impact that diverting resources from Core Suite to Sprinklr Service was having on the Company's sales and growth.

11.    On June 5, 2024, the Company finally disclosed that the impact of its failed strategy to focus on Sprinklr Service over Core Suite was significantly larger than it had previously disclosed and would persist. As a result, Defendants withdrew as unrealistic their previously highly-touted promise of $1 billion in subscription revenue for Fiscal Year 2027. On this news, Sprinklr's stock price fell from a June 5, 2024 closing price of $10.84 by $2.51, or 23.15%, before rebounding to close at $9.20 per share on June 6, 2024.

12.    As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Sprinklr's principal office is located in this District at 441 9th Avenue, New York, New York. Moreover, pursuant to Sprinklr's most recently filed quarterly report, as of November 29, 2024, the Company had 138,048,271 shares of Class A

common stock outstanding. Sprinklr's securities trade on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands of investors in Sprinklr securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

17.    Lead Plaintiff Anthony Marcheschi purchased Sprinklr Class A common stock at artificially inflated prices during the Class Period as set forth in his previously-filed certification, ECF No. 36, and was damaged by the conduct alleged herein.

18.    Plaintiff Naveed Nawaz, as set forth in the certification filed herewith, purchased Sprinklr Class A common stock at artificially inflated prices during the Class Period and was damaged by the conduct alleged herein.

19.    Defendant Sprinklr, Inc. is a Delaware corporation with principal executive offices located at 441 9th Avenue, 12th Floor, New York, New York 10001. Sprinklr common stock trades in an efficient market on the NYSE under the ticker symbol "CXM."

20.    Defendant Ragy Thomas is the founder of Sprinklr and served as Sprinklr's Chief Executive Officer at all relevant times. As Chief Executive Officer, Thomas had access to, ultimate authority, and oversight over Sprinklr's business. Moreover, Thomas had access to Sprinklr's Core Suite and Sprinklr Service monthly and quarterly sales numbers via Salesforce throughout the Class Period. Thomas was also, by his own admission, extremely hands-on with Sprinklr's operations and in constant communication with Sprinklr's clients. Thomas also spoke to Sprinklr

investors in earnings calls about the Company's operations and through Sprinklr's press releases, including about the status of the Core Suite and the burgeoning Sprinklr Service businesses.

21.    Defendant Manish Sarin has served as Sprinklr's Chief Financial Officer at all relevant times. As Chief Financial Officer, Sarin had access to, and authority and oversight over Sprinklr's business. Moreover, Sarin had access to Sprinklr's Core Suite and Sprinklr Service monthly and quarterly sales numbers via Salesforce throughout the Class Period. Sarin also spoke to Sprinklr investors in earnings calls about the Company's operations, including about the status of the Core Suite and the burgeoning Sprinklr Service businesses.

22.    Defendants Thomas and Sarin are sometimes referred to herein collectively as the "Individual Defendants."

23.    The Individual Defendants possessed the power and authority to control the contents of Sprinklr's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Sprinklr's press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Sprinklr, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.    Sprinklr and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.    Sprinklr's History and Business

25.    Sprinklr was founded in 2009 by Thomas who, after building an email marketing platform, saw the potential to build something in the burgeoning social media space.

26.    When it was first founded, Sprinklr its business focused primarily on social media management, including engagement, publishing, and advertising.

27.    According to Sprinklr, the Company enables a large business enterprise to more efficiently navigate all customer-facing functions. Prior to entering the CCaaS market, Sprinklr sold four product lines that it called Core Suite, which could be purchased individually or collectively: Sprinklr Insights, Sprinklr Service, Sprinklr Marketing, and Sprinklr Social.

28.    Sprinklr Insights is a social media tool that allowed users to listen to what customers, competitors, and the public were saying on various social media platforms. This includes analyzing the performance of posts, engagement of audiences, and key characteristics of content against competitors.

29.    Sprinklr Service is a contact center tool that allowed users to listen to, route, resolve, and analyze customer service issues.

30.    Sprinklr Marketing allowed users to plan, create, publish, optimize and analyze their organic/owned marketing content and paid advertising campaigns across Internet channels, including Facebook, Instagram, Twitter, LinkedIn, Pinterest, Snapchat, TikTok, Nextdoor, Google Search, and YouTube.

31.    Sprinklr Social allowed users to triage, engage, and analyze social media conversations with customers. For example, users could utilize Sprinklr Social to respond to

customer engagement in a marketing campaign or capture reviews from trusted buyers to influence customers.

32.    Sprinklr's offerings are geared towards large customers: in its IPO prospectus, it noted that of its 1,021 customers, more than 50 were members of the Fortune 100, and the Company had 69 customers that were responsible for nearly half (47%) of its subscription revenue.

33.    On June 23, 2021, Sprinklr went public under the ticker symbol "CXM".

**II.    Sprinklr's Core Business and its Drawbacks**

34.    Sprinklr's Core Suite offerings are sold as software-as-a-service ("SaaS"). SaaS is a licensing model in which access to software is provided on a subscription basis. The software is located on external servers rather than on servers located in-house. The user can access the program via the Internet rather than having to install the software on their own computer. Sprinklr, like other SaaS providers, charges a fee for accessing its products, generally on a per-user level.

35.    SaaS products are generally easier to implement, update, and debug compared to traditional software licenses because they do not require hardware set up and installation, and are easily accessible through the Internet.

36.    Sprinklr Service was also a SaaS product. However, at all relevant times hereto, the Company's Core Suite business centered on Sprinklr Social, Sprinklr Marketing, and Sprinklr Insights – the key driver of revenue and results.

37.    Sprinklr employed Confidential Witness 1 ("CW1") from May 2018 through August 2024. CW1 served as a senior director of technology & contact center ecosystems from May 2018 to January 2022; global vice president of cloud, tech & contact center ecosystems from February 2022 to February 2023; and as vice president of global partnerships from February 2023 to August 2024. CW1 reported to Chief Revenue Officer Paul Ohls, and later to Chief Customer

Officer Scott Harvey. CW1 was part of a sales leadership team that worked directly with Defendant Thomas, and had job responsibilities that included managing relationships with large brokers to help Sprinklr secure deals with potential customers.

38.     According to CW1, Sprinklr Social underpinned the entire Core Suite platform. The Core Suite contributed to – and was the main source of – the Company's primary revenue stream, which it referred to as "Subscription Revenue." The Core Suite amounted to approximately 72.1% of the Company's total revenue and 81.2% of the Company's Subscription Revenue for Fiscal Year 2023. For the fiscal years 2021, 2022, and 2023, Subscription Revenue represented 88%, 87%, and 89% of the Company's overall revenue, respectively.

39.     Importantly, Subscription Revenue is predictable. As explained by CW1, since the product offerings underlying Subscription Revenue are SaaS-based, the revenue from a contract can usually be accurately forecasted a year ahead of time. Accordingly, if there is a significant fall off in existing customer spend, or a drop in renewals, the Company was likely to know well in advance.

40.     The Company's only other revenue stream, "Professional Services," paled in comparison to Subscription Revenue, representing only 12%, 13%, and 11% of the Company's revenue for the fiscal years 2021, 2022, and 2023 years. Professional services revenue consisted of fees associated with providing services related to the configuration and optimization of Sprinklr's product offerings. These fees also include managed services fees where the Company's consultants work as part of customers' teams using Sprinklr products.

41.     Professional services revenue was never a primary driver for the Company. For example, from fiscal year 2023 to 2024, subscription revenue jumped 22%, from $548.6 million to $668.5 million, but professional services revenue actually *decreased* 8%, from $69.5 million to

$63.8 million. The Company claimed the reason for this decline was "primarily due to decreases in implementation and managed services performed in the year ended January 31, 2024 compared to the prior year period."

42.    Sprinklr employed Confidential Witness 2 ("CW2") from March 2021 to June 2024. CW2's title at the time CW2 left Sprinklr was senior sales enablement product specialist. CW2's job responsibilities included educating customers who had signed contracts with the Company and assisting with building out Sprinklr's services for these customers, and then teaching the customer's end-users how to use Sprinklr's service. While at Sprinklr, CW2 dealt with both Sprinklr customers and Sprinklr sales personnel, and with both the Core Suite and its newer Service CCaaS offering.

43.    Sprinklr employed Confidential Witness 3 ("CW3") from September 2022 to April 2024 as a global strategic account executive and reported to Sprinklr's AVP of Sales. CW3's job responsibilities included developing business opportunities and selling Sprinklr's products, including both the Core Suite and its newer Sprinklr Service CCaaS offering.

44.    Despite its outsized influence at Sprinklr and for the Company's Subscription Revenue, the Core Suite had two interrelated problems. First, it was (and remains) incredibly expensive, even relative to other SaaS offerings from competitors such as Sprout Social and Hootsuite. Several former employees echoed this sentiment. According to CW2, Sprinklr's sales force were trained to tell customers who complained about high prices that while the Company may have higher upfront costs, it lacked "hidden fees" common to competitors. CW3 explained that the Company justified its higher price because the Core Suite had better features like AI training based on social media data. Thus, according to CW1, the Core Suite was a Cadillac compared to competitor's SaaS offerings, which were akin to Hondas.

45.    The Core Suite's higher price was in part because, to differentiate itself from its lower-priced competitors, Sprinklr's Core Suite was frequently highly customized for the needs of a particular client. According to CW1, Thomas encouraged bespoke features for clients. Often, these customized offerings lead to an overly complex product that could do many things but became difficult to navigate, implement, and use.

46.    Consequently, because of its high price and unique nature, the Company required significant resources and manpower to sell the Core Suite.

47.    Second, as Sprinklr's Core Suite matured in the years leading up to the Class Period, growth slowed. This related to Thomas' approach of creating customized and bespoke products for its SaaS customers. According to CW1, Thomas prided himself on these highly customized solutions because he is an engineer and developer who wished to be highly involved in products like a Chief Technology Officer. CW1 explained that Thomas would build out bespoke features for a client that could not be re-used. For example, Sprinklr spent tens of millions of dollars building a particular product specifically for Nike, only eventually to be replaced by a different SaaS provider. This type of customized-SaaS offering eventually became a gilded cage for the Company, as it was its calling card and main source of revenue, but also prevented the Company from obtaining the type of outsized growth available with off-the-rack SaaS products deployed without customization.

48.    As a result, the Company sought a new way to drive growth outside of the Core Suite.

### III.    Sprinklr's Expansion into CCaaS

49.    In an attempt to achieve growth no longer available in its Core Suite, Sprinklr decided to launch a contact center as a service ("CCaaS") solution, Sprinklr Service, and secretly

diverted Core Suite resources and manpower towards it in 2023.

50.     The "contact center" in CCaaS refers to a customer service contact center, such as when an airline passenger calls the airline's help desk to change a flight during a delay, or when an Amazon shopper messages with customer service in the Amazon app about a missing package. At its most basic, CCaaS is a customer experience solution that provides the capabilities required to route inbound customer interactions to contact center agents.

51.     In order to move into this space, Sprinklr created a new CCaaS offering by transforming its fledgling "Modern Care" offering into a full CCaaS product suite.

52.     Until 2023, Sprinklr Service was an afterthought. Modern Care was so unimportant to Sprinklr prior to 2023 that it was only briefly mentioned in Sprinklr's IPO prospectus, where it was not referred to as a "Contact Center as a Service" solution. Similarly, in its annual report for the fiscal year ending January 31, 2022, filed with the SEC on April 11, 2022, Sprinklr mentioned "CCaaS" only once.

53.     Sprinklr's Form 10-Q for the fiscal quarter ending April 30, 2022, filed with the SEC on June 14, 2022, also did not mention "CCaaS." Neither did the Form 10-Q for the fiscal quarter ending July 31, 2022, filed with the SEC on September 8, 2022, nor did the Form 10-Q for the fiscal quarter ending October 31, 2022, filed with the SEC on December 6, 2022.

54.     However, during its earnings call held on December 6, 2022, Thomas previewed that the Company was beginning to emphasize CCaaS: "While we continue to win deals across all our four product suites across a variety of industries, more than 1/3 of our bookings in Q3 came from our customer service suite or our Modern Care suite, where voice-led CCaaS was a key driver for us. We're pleased with our momentum in this space and are confident that technology and our pace of innovation will further differentiate us in this very interesting marketplace. We believe

that you can have great customer experience management with our great customer service."

55.    By the next quarter, the Company had decided to rebrand Modern Care as "Sprinklr Service" to specifically position this offering as a CCaaS solution. On an earnings call on March 29, 2023, Thomas announced: "Modern Care is now Sprinklr Service aligned with the CCaaS market . . . Sprinklr Service is a comprehensive AI-powered contact center as a service platform. We are transforming the contact center from an old voice-based cost center to an omni-channel revenue center by unifying marketing and sales for more efficient service and growth for the business."

56.    Through Sprinklr Service, users could create surveys and gather real-time feedback after customers dealt with customer service agents; provide live capabilities for agents to deal with common customer inquiries; or provide automated bots that could address simple, routine tasks or questions that were common with customers.

57.    Like the Core Suite, Sprinklr Service is a SaaS cloud-based service that can reduce a business's need to invest in hardware and related resources. As such, the service can reduce a business's overhead expenses while also providing flexibility to scale up (or down) without needing to add additional hardware or data storage.

58.    For accounting purposes, Sprinklr Service was included in the Company's Subscription Revenue, although it contributed a much smaller percentage compared to the Core Suite. Sprinklr Service contributed to approximately 16.7% of the Company's total revenue and 18.8% of Subscription Revenue for Fiscal Year 2023.

59.    Aside from their cloud-based attributes, Sprinklr Service and the Core Suite were (and remain) remarkably different. For one, the Core Suite centered around social media monitoring and advertising. The Core Suite's tools allowed Sprinklr customers to monitor what

their product users were saying about the customer's products on social media and manage advertising campaigns for the customer's products. For example, the marketing department at an airline could see how an advertising campaign was performing across Instagram or Facebook, and whether users were particularly excited about some experience they had with the airline. Sprinklr Service, on the other hand, would not be used by the marketing department at the same airline. Instead, the department responsible for customer service (*i.e.*, Operations) could use Sprinklr Service to run the airline's call center handling reservations, weather related delays, lost baggage system, or some other customer service use. Thus, the Core Suite's tools allowed Sprinklr customers to reach and engage with potential users, while Sprinklr Service could help Sprinklr customers deal with problems users faced. Not only did the Core Suite and Sprinklr Service solve completely different problems for the enterprise customers that deployed them (marketing and advertising vs. customer service), but as explained by confidential witnesses, the Company had to sell these services to completely different departments within each client company (marketing and advertising vs. IT or operations).

60.     Further, the sales cycles for the Core Suite and Sprinklr Service were completely different and altered how quickly the Company could see a return on its investment in each market space. For the Core Suite, the sales cycle was generally one to three years. *See* David Skok, *2016 Pacific Crest SaaS Survey – Part 2*, FOR ENTREPRENEURS, https://www.forentrepreneurs.com/2016-saas-survey-part-2/ (the median SaaS contract length is 1.3 years). However, in the CCaaS market, sales cycles were generally five to ten years. *See* Tim Proctor, *5 Considerations for Purchasing a UCaaS/CCaaS Solution*, NO JITTER, July 6, 2021, https://www.nojitter.com/customer-experience/5-considerations-for-purchasing-a-ucaas-ccaas-solution ("these [CCaaS] systems are only purchased once every five to 10 years[.]").

61.     Below is a chart of the main differences between the Core Suite and Sprinklr Service:

|  | **Core Suite** | **Sprinklr Service** |
|---|---|---|
| Sales Cycle Length | 1-3 years | 10 years |
| Primary Customer | A Company's Marketing Department | A Company's Customer Service or IT Department |
| Product Users | Marketing Managers, Analysts | Customer Service Agents |
| Primary Competitors | Sprout Social, Hootsuite | RingCentral, Avaya, Vonage |
| Type of Service | Marketing, Advertising, Social Media | Contact Center/Call Center |
| Age of Industry | 15 Years | 40 Years |
| Total Addressable Market | $51 Billion | $800 Billion |

62.     The reason for this shift to the CCaaS market and transformation of Sprinklr Service into a primarily CCaaS-based offering was simple: Sprinklr sought growth.

63.     Sprinklr employed Confidential Witness 4 ("CW4") from December 2022 to June 2024 as director of global partnerships, reporting at one point to Chief Customer Officer Scott Harvey. CW4's job responsibilities included working with partners who sold Sprinklr products and facilitate those relationships, primarily focusing on Sprinklr's CCaaS offerings.

64.     According to CW4, Sprinklr pushed into the CCaaS space through its newly transformed Sprinklr Service because the Core Suite did not allow for the explosive growth the Company wanted, while the CCaaS market was much larger.

65.     This was eventually confirmed by Sarin, who on December 7, 2023 at the Barclays Global Technology Conference stated that the Company shifted towards Sprinklr Service because the CCaaS space was a much bigger market, saying:

> [I]t's a huge replacement market . . . . When I look at that market compared to our core market for core product, it's much, much bigger. There is a huge technological evolution happening in that market. We've looked at third-party reports that talk about an $800 billion spend, but a lot of it is labor cost. As the software spend increases in that market, we should be a natural beneficiary of that. So, I think that's

16

a reasonable one. And reason number two is there is a big sort of leap in how a contact center is viewed now.

## IV.    The Undisclosed Risks of Sprinklr's Expansion into CCaaS

66.    Sprinklr's move into the CCaaS space came with significant risks. Most notably, to speed the launch, Sprinklr decided to forego building out a sales team for the new product, and instead diverted sales and development resources that were needed for its Core Suite.

67.    Sprinklr employed Confidential Witness 5 ("CW5") from February 2022 to August 2023 as a lead solutions consultant. CW5's job responsibilities included working with salespeople to demo Sprinklr products and services for potential clients, and tailor Sprinklr's products and services to fit customers' needs, including the Core Suite and Sprinklr Service.

68.    According to CW5, the shift in focus from the Core Suite to Sprinklr Service was abrupt and required employees to quickly push Sprinklr Service without much preparation or experience. CW5 elaborated that Sprinklr directed its employees, who previously only sold the Core Suite, to sell Sprinklr Service with no experience or training to do so, and failed to provide any leadership on how to break into the CCaaS market. This was echoed by CW1, who stated that Sprinklr's pivot to Sprinklr Service was sudden and dramatic because, unlike in the social media SaaS market, Sprinklr lacked name recognition and had not cultivated relationships on which Sprinklr's salespeople could rely. Further, according to CW1, Sprinklr's salespeople were not equipped to sell CCaaS-based products and lacked knowledge about things like uptime availability, call routing. As a result of this lack of training or established relationships on which its salespeople could rely, Sprinklr's salespeople selling Sprinklr Service lacked the skills necessarily to effectively complete sales.

69.    Worse yet, Sprinklr simply told its salespeople to try and sell Sprinklr Service to their existing Core Suite customers. This made little sense because Sprinklr's Core Suite products

have no relation to Sprinklr Service, and are purchased by entirely different customers. According to CW1, Sprinklr's salespeople sold the Core Suite to a customer's marketing division, while a CCaaS product was generally purchased by a customer's contact center or IT division. Consequently, few actual sales resulted from this strategy, since businesses marketing departments have little-to-no contact with the divisions that would purchase a CCaaS product, and thus Sprinklr was unable to leverage their existing Core Suite contacts to sell its Sprinklr Service.

70.    In CCaaS, Sprinklr faced entrenched competition. According to CW1, Sprinklr had no name recognition compared to established CCaaS companies like Vonage and others, and therefore could not establish itself in the CCaaS market quickly. This problem was compounded by the fact that Sprinklr Service was undifferentiated. According to CW5, Sprinklr Service lacked the disruptive features that CW5 believed were needed to break into the already-crowded CCaaS market. This sentiment was echoed by CW1, who stated that, while capable, Sprinklr Service was not as mature as Sprinklr's other offerings, and therefore did not allow the Company to effectively break into the already-crowded CCaaS market.

71.    Sprinklr also faced a long sales cycle in the CCaaS market, which prevented it from immediately producing the type of results that the Company promised investors. In the SaaS field, contracts generally last one to three years. Conversely, in the CCaaS field, contracts generally span ten years. This presented a significant roadblock to immediate results, because even when Sprinklr employees were able to make the right contacts to sell Sprinklr Service, they would have to wait years before that potential customer would be at a contract break where it could consider switching providers. According to CW5, Sprinklr did not account for this delay. Moreover, according to CW1, the longer sales cycle for CCaaS products exacerbated the delays in obtaining revenue from this product line, even when a deal was eventually made. Further, many of the Sprinklr Service

contracts that the Company was touting throughout 2023 were success-based contracts, where revenue was dependent upon all the seats being live – *i.e.*, active agents logged in. Consequently, according to CW1, because it took time to get all the seats live, Sprinklr could not immediately recognize full revenue from their success-based contracts, and not as much as touted to investors.

72.     Defendants concealed these significant and known risks when touting Sprinklr's burgeoning CCaaS business to investors.

### V.     Sprinklr Depleted Resources from its Core Suite Business to Promote Sprinklr Service

73.     Sprinklr's expansion into the CCaaS space was not just risky in terms of Sprinklr's ability to compete with larger, more established CCaaS businesses, but it also came at a known cost to its Core Suite business – the core driver of its Subscription Revenue.

74.     Core Suite was a pricier, premium alternative to cheaper companies like Sprout Social and Hootsuite. *Supra* at ¶¶44-46. Consequently, Sprinklr needed to employ significant resources to generate new sales and renewal sales. *Supra* at ¶46.

75.     However, once Sprinklr decided to focus its efforts on Sprinklr Service, it secretly diverted most of its resources and salespeople towards selling Sprinklr Service at the cost of servicing Core Suite renewal customers and selling Core Suite to new customers.

76.     Sprinklr employed Confidential Witness 6 ("CW6") from October 2021 to August 2023 as a large enterprise relationship manager. CW6's job responsibilities included selling the Core Suite and Sprinklr Service to large companies.

77.     According to CW6, Sprinklr chose to shift focus towards Sprinklr Service and neglect the Core Suite. Specifically, Sprinklr invested fewer resources into selling the Core Suite than it had previously, and instead invested heavily into marketing Sprinklr Service.

78.     CW6's account is corroborated by CW3, who stated that the Company specifically

told its sales employees to concentrate on selling Sprinklr Service over the Core Suite.

79.    According to CW2, Sprinklr neglected the Core Suite and diverted development resources towards Sprinklr Service. Moreover, Sprinklr trained its customer service agents to focus predominantly on Sprinklr Service.

80.    Sprinklr's new focus on Sprinklr Service at the cost of the Core Suite was especially risky because by diverting salespeople from selling Core Suite to instead focus on Sprinklr Service, the Company knowingly risked renewals and new sales of Core Suite products that contributed the bulk of its revenue. According to CW5, Sprinklr did not have separate teams selling Sprinklr Service and the Core Suite, but instead employed the same people to do both. Consequently, when Sprinklr told its salespeople to focus on selling Sprinklr Service, it was, by necessity, reducing sales efforts for the Core Suite.

81.    In addition to depleting Core Suite sales efforts to sell Sprinklr Service, Sprinklr also allocated development resources to Sprinklr Service that otherwise would have improved the Core Suite. According to CW2 and CW6, during the Class Period, Sprinklr failed to provide any big new improvements to the Core Suite because it was more focused on building up Sprinklr Service. This is confirmed by CW1, who stated that the Company pulled developers who were previously working on building out bespoke features for Core Suite customers away to work on building out Sprinklr Service. This alienated existing customers of Sprinklr's Core Suite, as Sprinklr's already pricey Core Suite became less and less differentiated from cheaper competitors. Indeed, according to CW1, this directly caused the cancellation of multi-million dollar Core Suite contracts.

82.    Critically, Sprinklr did not just instruct its employees to push Sprinklr Service over the Core Suite, but also financially incentivized them to do so, effectively ensuring that Sprinklr's

salespeople would fail to push its main driver of revenue. Defendants knew at the time that the sales force would respond to this financial incentive by pushing Sprinklr Service rather than Core Suite, as Sarin confirmed in a December 7, 2023 interview at the Barclays Global Technology Conference:

> ***So, at the beginning of the year***, given the success we were having in CCaaS, ***we were very comfortable telling the sales team that this is the new product to go push.*** We did feel there is ample opportunity and we still do, by the way.

> What that does is because all our comp plans are structured where it's all driven by new ARR, whether it's selling core product or whether it's selling CCaaS. And with CCaaS in particular, we were successful in hiring a group of specialists from the existing vendors in that market. So, the whole idea was that these specialists would work with the generalist sales team and go prosecute CCaaS deals in those accounts. ***And I think what you realize over time is salespeople are largely coin operated. You incent them to go do something and that's what they will go do.***

> And I think in the process, what happened is they probably weren't spending enough time in their accounts trying to figure out upsell opportunities or cross-sell opportunities that weren't related to CCaaS. ***And so ordinarily, the flywheel that we have going for our core products didn't function the way we wanted it to***.

83.     Consequently, Defendants' strategy implemented at the beginning of 2023 to divert focus to Sprinklr Service had exactly the risk they anticipated – less sales efforts for the main driver of Sprinklr's revenue, the Core Suite.

84.     These risks were not hypothetical, but began to materialize almost immediately after Sprinklr secretly diverted its resources away from the Core Suite and towards Sprinklr Service. According to CW1, in early 2023, Sprinklr experienced multi-million dollar Core Suite contract cancellations because it pulled developers working on bespoke Core Suite customer features requested by loyal customers to work instead on Sprinklr Service. Further, the Company saw failed Core Suite sales and failed Core Suite renewals soon after it diverted resources away from the Core Suite in early 2023 because it did not have the resources needed to close those deals.

85.     Nevertheless, when communicating with investors throughout 2023 and 2024 about

both Sprinklr Service and the Core Suite, Defendants never disclosed any of these risks, failed

sales, or cancellations.

## VI.    Defendants Make Materially False and Misleading Statements During the Class Period

### A.    Defendants begin to conceal Sprinklr's strategy to divert resources and manpower from Sprinklr's Core Suite to Sprinklr Service

86.    The Class Period begins on March 29, 2023, when Sprinklr announced its Q4 FY23

and Fiscal Year 2023 results and held an earnings call with investors. In that earnings call, Thomas

talked about both Sprinklr's CCaaS and Core Suite businesses. Specifically, Thomas misleadingly

reassured investors about the promise of Sprinklr Service and the Company's continued focus on

the Core Suite, stating:

> In closing, I'd like for you to have three clear takeaways. Number one, we're going to be a disruptive player in CCaaS. That's a pretty 30, 40-year-old industry. We are a digital-native company, who has created a modern omni-channel approach to integrating 30-plus digital channels that now includes voice. And we're challenging some of the well-known legacy players with an entirely different approach omni-channel and AI base for customer service. ***Number two, we will continue to innovate and win in social. It's where we started as a company, and that foundation has enabled us to build disruptive new opportunities like we are doing in CCaaS.*** And lastly, number three, we are well positioned to begin mainstreaming our solutions and AI for customer-facing functions. We have a five-year head-start, an advantage in building proprietary AI that's integrated into all products across our entire platform, a platform that's built on a highly open, scalable and flexible architecture.

87.    The above statements identified in Paragraph 86 were materially false and

misleading when made because the statements omitted to disclose the following material adverse

information necessary to make the statements made not misleading: (1) Sprinklr secretly diverted

significant resources and manpower – including both salespeople and developers – from Core Suite

to Sprinklr Service; (2) this diversion of resources and manpower away from the Core Suite risked

the Subscription Revenue that the Core Suite brought to the Company; (3) those risks had already

started to materialize in the form of multi-million dollar Core Suite contracts cancelled, failed Core Suite sales, and failed Core Suite renewals; and (4) Sprinklr Service had significant undisclosed risks of its own – including inexperienced salespeople, poor sales strategy, an unremarkable product, longer sales cycles, and entrenched competition – which impeded prospects for replacing Core Suite losses with Sprinklr Service gains.

88.    When speaking with analysts, Thomas expanded on Sprinklr Service, painting a misleading picture of its ability to garner immediate results, the company's preparation to enter the CCaaS market, and the risks posed by Sprinklr's diversion of resources:

> **Q –Tyler Radke:** Yes. Thank you. And hi, Ragy. I wanted to ask you about just contact center, you talked about some interesting milestones on the seat count and the recognition in some of the Gartner Magic Quadrant, which is just great to see. Wondering if you could just kind of contextualize that a bit more just in terms of how big of a mix of that in your business it is today and what you're seeing in the pipeline. And is that an area that you're really leaning into in terms of hiring specialists just given that's a bit of a different market than where traditionally Sprinklr's focused? Thank you.

> **A – Ragy Thomas:** Yes. So I can confirm that it is a big focus for the company. ***In fact, internally, we say this is the year of our contact center business. I can confirm that this is something that was very intentional and we have been doing steadily for the last several quarters, I would say, for the last probably even 18 months. So we have been hiring people from traditional contact center companies. We have -- we're building out and have built out a team of dedicated specialists. So it's very important to have that domain knowledge and vocabulary in addition to the technology. So we have staffed everything from the product organization to the sales organization and support organization people who have been doing it, in some cases, for like 20-25 years, who are also equally elated to see a very modern approach to this whole space.***

89.    The above statements identified in Paragraph 88 were materially false and misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (1) while Sprinklr may have hired a few people from traditional contact center companies, Sprinklr principally just diverted significant salespeople and developers from Core Suite to Sprinklr Service; (2) these people were

largely new to CCaaS and had not "been doing it…for like 20-25 years"; (3) Sprinklr's decision to divert resources and manpower away from the Core Suite risked the Subscription Revenue that the Core Suite brought to the Company; (4) those risks had already started to materialize in the form of multi-million dollar Core Suite contracts cancelled, and failed Core Suite renewals; and (5) Sprinklr's inexperienced salespeople did not have the domain knowledge and vocabulary that Thomas described as "very important."

90.     These positive statements about both the Company's core business and its new CCaaS business had their intended effect, as analysts covering Sprinklr sang the Company's praises. *See* Matt VanVliet & William McNamara, *4Q Beats With Stronger Than Expected FY24 Outlook on CCaaS Momentum. Raise PT to $16*, BTIG, Mar. 29, 2023, at 1 ("We believe the near-term opportunities in Service around the growing CCaaS modernization story in the market, coupled with deep AI-powered Social and Marketing tools, should continue to drive the upside in the story."); Arjun Bhatia, Rachel Ayotte & Chris Madison, *Outperforming Expectations on All Fronts; More to Come From the Contact Center and AI Capabilities*, WILLIAM BLAIR, Mar. 30, 2023, at 1-2 (touting the "strong traction" that Sprinklr was seeing with its CCaaS business and its "solid retention trends" for its SaaS business).

91.     As the year progressed, Sprinklr continued to divert resources and manpower away from the Core Suite and towards Sprinklr Service. However, when speaking with investors, Defendants continued to hide this reallocation, and instead projected a positive outlook for both businesses.

92.     On June 5, 2023, Sprinklr released its Q1 FY24 results. In an earnings call with investors held the same day, Thomas commented on the macro environment and the progress of Sprinklr Service's CCaaS business, stating:

So, despite the macro environment, ***we are very pleased with how we're managing, what's in our control with our go-to-market strategy, productivity and execution. Specifically, we're excited about the progress we're making to make it easier to sell, which has been a top priority for the company.*** This past quarter, we made several key hires in the service overlay team to add expertise and depth to our CCaaS offering go-to-market, and we continue to verticalize to enable quicker time-to-value and faster deployments. ***We are now up and running for CCaaS, with a couple of more key industries, including financial services and airlines.***

***

***I'd love to provide a brief update on Sprinklr Service and our continued momentum as a disruptor in the CCaaS space.*** Our vision is to help customers transform the contact center from a voice-focused cost center to a more efficient and effective AI-powered omnichannel revenue center by unifying it with marketing and sales. ***IT buyers find Sprinklr to be a great fit for their needs, as they consolidate point solutions in the contact center stack to a platform that's built on a single code base with a very extendable architecture.***

93.    The above statements identified in Paragraph 92 were materially false and misleading when made because the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (1) Sprinklr Service had become "easier to sell" at a very high cost: the Company diverted significant resources and manpower – including both salespeople and developers – from Core Suite Sprinklr Service; (2) this diversion of resources and manpower away from the Core Suite risked the Subscription Revenue that the Core Suite brought to the Company; (3) those risks had already started to materialize in the form of multi-million dollar Core Suite contracts cancelled, failed Core Suite sales, and failed Core Suite renewals; and (4) Sprinklr was not a "disruptor in the CCaaS space" but rather sold an undifferentiated product.

94.    In response to a pointed question about customers renewing their business with Sprinklr, instead of admitting the risks to customers' renewing Sprinklr, Thomas again omitted significant facts that painted a misleading portrait of the Company's Core Suite business:

**Q – Tyler Radke:** Yes. Thank you. Good evening. I wanted to just ask you about

how you're seeing some of the large renewals shape up. I think you've talked about some large renewals expected here in Q2. Some of the other larger front front office players have talked about some renewal pressure. We've heard anecdotes of shelf ware and seats that have gone undeployed. How are you expecting your renewal rates to trend? And if you could just remind us on the composition of your revenue base that's seats-based versus usage or interactions-based? Thank you.

**A – Ragy Thomas:** Okay. So, there are two questions there. ***The first one is what are we seeing in our larger deals in terms of renewal. I'll tell you, once you buy into the Sprinklr approach, we keep growing.*** And two-story now, we have customers, who call us first before they go put out an RFP or open it up to a point solution, hey, do you guys do it, because they've bought into, they've tuned the AI model, they've set up the governance, they've got the analytics. I'll give you an example of a very, very large, I'd say top five, probably top three tech company that expanded their marketing services with us. And the idea was there was an agency breach that happened and issue that resulted in ad spend that was not governed and approved. So, they just paused spending till everybody got on Sprinklr, so that they can be compliant, right? And so they can have governance and visibility and they can have a global editorial calendar. So, I can confirm to you and you know we had one customer that paid us over $15 million, and if you count the number of customers that are paying over $10 million, that's going up as well.

95.     The above statements identified in Paragraph 94 were materially false and misleading when made because: (1) Sprinklr was then experiencing setbacks rather than success in Core Suite renewals; (2) Sprinklr secretly diverted significant resources and manpower – including both salespeople and developers – from Core Suite to Sprinklr Service; (3) this diversion of resources and manpower away from the Core Suite risked the Subscription Revenue that the Core Suite brought to the Company; and (4) those risks had already started to materialize in the form of multi-million dollar Core Suite contracts cancelled, failed Core Suite sales, and failed Core Suite renewals.

**B.      Defendants tell investors to expect $1 billion in sales for Fiscal Year 2027**

96.     On July 12, 2023, the Company held its 2023 Investor Day conference, during which Defendants touted Sprinklr as firing on all cylinders and made a big announcement for the future of the Company.

97.     During the Investor Day conference, Sarin spoke about the state of Sprinklr's CCaaS and Core Suite businesses, and spoke directly to and misleadingly refuted concerns from investors about slowing growth in its Core Suite business, stating:

> *Second takeaway; all product suites are growing at a very healthy rate. I bring this out because many a times investors are of the – have some concerns that is it the case that one product suite is making up for declining growth or tepid growth on another product suite and that isn't the case here.*

98.     The above statements identified in Paragraph 97 were materially false and misleading when made because the Core Suite was not growing at a "healthy rate," but instead was already experiencing multi-million dollar contract cancellations, failed Core Suite sales, and failed Core Suite renewals as a result of the Company's secret diversion of resources and manpower away from the Core Suite and towards Sprinklr Service.

99.     Most notably, Sarin announced that the Company was setting guidance for $1 billion in subscription revenue as not just a goal but the "floor" for Fiscal Year 2027 (ending in January 2027):

> *What we are comfortable doing is at this point setting $1 billion in subscription revenue as floor for FY 2027. Now, that would compute to roughly an approximate 16% CAGR between now and then. And just so that we are clear, FY 2027 is really calendar year 2026. That ends in January 2027. So it really is three years from now.* So what is baked into these numbers?
>
> What we have taken into account is the current environment persists. I have no way of projecting is there going to be a recession? Is there not going to be a recession? There is any number of pundits you find on CNBC talking about what's going to happen next? I didn't feel it was the right forum for me to make one of those statements. So we feel, given what we know right now, if the current environment persists, *we are comfortable setting $1 billion in subscription revenue as floor*. Said differently, should the environment improve, should sales cycles become shorter; all of that would be upside to these numbers.
>
> Now you'll notice I am not specifically talking about professional services revenue here. And I think that goes back to the earlier point that I made, that we fully expect that professional services mix to morph quite considerably over the next few years. We believe it's going to become a lot more targeted, a lot of it driven by CCaaS

delivery and managed services, but the quantum of it may not be very much different than where we are today. So I think if you look at the broader picture, it seems to be a much smaller proportion of overall revenues than where we are today. And it just felt like in terms of setting the stage, subscription revenue is what we need to be measured against and ***we are comfortable putting down $1 billion as the floor for subscriptions***[.]

100.    The above statements identified in Paragraph 99 were materially false and misleading when made because they omitted to disclose: (1) that the Company lacked a reasonable basis for asserting that they would reach a $1 billion floor for Subscription Revenue by the Fiscal Year ending January 31, 2027; and (2) that the Company had already jeopardized, and was experiencing renewal cancellations and failed sales in the business that comprised the overwhelming majority of Subscription Revenue, Core Suite, largely as the result of its intentional diversion of sales and development resources from that business to Sprinklr Service.

101.    Additionally, as Thomas did throughout the Class Period, he repeated Sprinklr's commitment to constant communication with customers, making clear to investors that they check in with customers "every month" on whether they are happy with Sprinklr's product:

> But you learn that we obsess about customers. I did 300 meetings last year, and every customer meet, I give them my cell phone number, and I say, call me if you're ever, ever upset. If you think we bullshitted you, call me. If you want to buy, our team will take care of it. My CTO flies over. We have AKA one of my engineers should be here. We've own him with a one way ticket to one of our customers early on and we told him, don't come back until the customer is happy. If you know other enterprise software companies that do that, buy their stock, right, but they learn it.

***

> And for us, customer obsession starts when, after the sale, right. Checking in, making sure they get value. They're consuming the software. And we have a price. We don't do NPS. The reason we don't do NPS is we don't want to know whether you would recommend this. We ask you every customer, every quarter, every month, depending on the size of the customer, we ask them, how happy are you at Sprinklr, that's it.

> If you give us a 10. It means you're so happy that you're telling your kids about Sprinklr and they go mommy I don't know why you bother me with this stuff. And

28

zero means you red us and we didn't know it. And if you don't give us a 10, we ask you, what are the three things we can x? Three things we get to prioritize, go to a product development process every week regionally it gets escalated. Early days at Sprinklr, I would say there's only one meeting you cannot miss in Sprinklr, it's called CDAP. Well, you could miss if you're attending your funeral you can miss the meeting, otherwise you're on. If your customer is unhappy, you're on. I'm not, I don't get upset at most things, most of you know that, I only curse out of excitement. But if a customer is unhappy and you're not jumping up and down to x it, I will get upset. That's baked into Sprinklr.

102.    Defendants' grandiose announcements had their intended effect. The day before Sprinklr's Investment Day conference, the Company's stock price closed at $14.30, and the day after Sprinklr's Investment Day Conference, the Company's stock price rose to a high of $15.50 – an increase of over 8%.

103.    Analysts covering Sprinklr's Investor Day Conference parroted Defendants' grandiose promise of a $1 billion floor for Fiscal Year 2027 subscription revenue, with one analyst stating that "in a worst-case scenario, management expects subscription revenue of $1bn and FCF of $200m in FY27E, targets that we believe the company is positioned to meaningfully exceed . . . the market is underappreciating Sprinklr's contact-center-as-a-service (CCaaS) offering, which, when coupled with other product suites, is an extremely compelling product that we believe will be responsible for a majority of growth over the coming years[.]" Brett Knoblauch, *Positive Investor Day; Upside to Growth and Margin Outlook; Reiterate OW and Raise PT to $20*, CANTOR FITZGERALD, July 12, 2023, at 1; *see also* Arjun Bhatia, Rachel Ayotte & Chris Madison, *Investor Day Highlights: Not Your Father's Front-Office Platform; Sets Fiscal 2027 Floor of $1 Billion Subscription Revenue*, WILLIAM BLAIR, July 13, 2023, at 1 ("We came away from the event with increased confidence in the long-term story for Sprinklr. We see a meaningful opportunity for the company in the contact center, which is in its very early days; it has the platform foundation to drive more cross-sell and expansion in the enterprise; execution is improving; and there is solid

margin expansion to come over the next few years"); Brian Schwartz, Ari Friedman & Camden Levy, *Key Inaugural Investor Day Event Takeaways*, OPPENHEIMER, July 13, 2023, at 1-2 ("we believe Sprinklr is widening its leadership position in CCaaS end-markets . . . . We believe Sprinklr will deliver above-SaaS industry growth over a multi-year horizon as the company exerts an enterprise market leadership position in experience management, an increasingly important software layer that enables companies to gather real-time intelligence for improving engagement, service, and ROI.").

### C. Defendants continue to mislead investors about Sprinklr's SaaS and CCaaS businesses through the fall and into the winter

104.    By September 2023, it became clear internally that the failed shift towards Sprinklr Service was going to have terrible consequences for the Company's growth. According to CW1, it was internally known in September 2023 that Sprinklr's diversion of resources and manpower from Core Suite to Sprinklr Service had caused significant failed sales and renewals for Core Suite products. Nevertheless, the Company continues to portray its Core Suite and Sprinklr Service businesses as unmitigated successes.

105.    On September 6, 2023, Sprinklr announced its Q2 FY24 results and held an earnings call for investors. In response to a question from an analyst about renewals, Sarin spoke positively and misleadingly about the renewals that the Company was seeing for its Core Suite business, stating:

> **Q – Pinjalim Bora:** … You talked about some early -- or some renewals as well and some large deals. But is there -- I want to ask you if there's a meaningful expansion in the contract durations, which is kind of inflating the year-over-year growth rate, any way to think about that?
>
> **A – Manish Sarin:** Yes. And I -- I think, we did call out the fact that, look, our growth in RPO is because several large customers renew on a multi-year basis. But those are the ones you'd remember from even a few years ago, we had them do multi-year billings. So that hasn't happened this time, where we are sticking to

annual billings. When I called out on the billing side that there were select customers that renewed early, that was only to make sure that, as you think about your Q3 billings, you do take that into account. ***But I think macro, if you just step back, we're seeing strength in renewal activity, as shown in the multi-year RPO renewals, RPO numbers, as well as our sense around overall billings for the year.***

106.    The above statements identified in Paragraph 105 were materially false and misleading when made because: (1) Sprinklr was not seeing "strength in renewal activity," but instead had been experiencing failed Core Suite renewals as a result of the Company's secret diversion of resources and manpower away from Core Suite and towards Sprinklr Service since the start of 2023; and (2) it was known internally at this time that the failed renewals, failed sales, and cancelled multi-million dollar contracts in Sprinklr's Core Suite business would have significant negative consequences for the Company.

107.    Similarly, in response to a pointed series of questions from an analyst about Sprinklr's Core Suites renewal rates, both Thomas and Sarin stated:

**Q – Tyler Radke:** Yes. Hi. Thanks for taking the question. Wanted to just hear how you're seeing things trend so far in Q3. Sounded like some really good execution in the quarter on the renewals and the large eight-figure transaction. But have things been consistent in Q3 versus Q2? What are you just expecting in terms of the large deal potential in the second half? Thank you.

**A – Ragy Thomas:** Well, I'll take the first part of it, and maybe Manish can talk about the next quarter. Look, the macroenvironment is just about as uncertain as it was, and it has been. So we -- ***we're not seeing any different behavior this quarter or last quarter than we saw before.*** Budgets are tight, there's more CFO scrutiny and all the good things that come with people being not very sure where the market's going, right, and interest rates are going to be. ***But I think what you're seeing is, like a consistent trickling impact of our better execution and focus on go-to-market.***

**A – Manish Sarin:** Yes. And just to make sure I understand, was your question, Tyler, are we seeing anything different in the month or so of Q3 that we've been in compared to Q2? Was that what you were trying to ask?

**Q – Tyler Radke:** Yes. Sorry. So I guess, I'll rephrase the question slightly to make it more specific, and apologies for the background noise. But really, the question was just, you saw some really good, large deal activity in Q2. I know there's been

a lot of noise around RPO and current RPO because of the multi-year renewal cycle. So I'm just curious if there's any things to call out in terms of RPO, volatility? And just how your overall large deals, you're expecting those to land in Q3, Q4, just anything that would be noteworthy to call out as we're building our models? Thank you.

**A – Manish Sarin:** Hey, yes, thank you for that clarification, Tyler. But there's nothing that I would call out at this stage. We -- as I look at the quantum of business that we are booking, it sort of seems in-line with what we would expect. It's -- like any enterprise software company, we're pretty back-end loaded, so I wouldn't make any broad assumptions around how Q3 and Q4 would land. But *there is nothing that we are seeing today that would give us any cause for concern. It's sort of along the lines of what we would expect. So -- so steady is what I would say.*

108.    The above statements identified in Paragraph 107 were materially false and misleading when made because: (1) Sprinklr was not seeing "consistent trickling impact of our better execution and focus on go-to-market," but instead was failing at both execution and go-to-market for both its Core Suite and Sprinklr Service; (2) Sprinklr had been seeing "cause for concern" since the beginning of 2023 in the form of multi-million dollar Core Suite contracts cancellations, failed Core Suite sales, and failed Core Suite renewals, and the impacts of those failures on the Company's growth were known internally at this time; and (3) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) Sprinklr secretly diverted significant resources and manpower – including both salespeople and developers – from Core Suite to Sprinklr Service; and (b) Sprinklr Service relied on salespeople inexperienced with CCaaS, pushed an undifferentiated product, and was impaired by longer sales cycles.

109.    The next day, on September 7, 2023, Sarin attended the Citi Global Technology Conference. There, when talking with an analyst about Sprinklr selling the Core Suite and Sprinklr Service, Sarin stated:

**Q – Tyler Radke:** So, talking about the go-to-market, there are a couple of areas I wanted to hit on. First, just as you think about your success in CCaaS, I mean,

certainly CCaaS and social, there is some synergies, right? Because to be able to serve customers, you got to ingest all this omni-channel information. But in terms of the buyer at organization, especially in the enterprise where you sit, it often can be different departments and different organizations. So, I guess what have you had to do on the go-to-market side to really have that success in CCaaS.

**A – Manish Sarin:** Yeah, *I think that's a fantastic question because we were acutely aware that the buyer for our traditional set of products, our core products, was somebody in the marketing team. And as we are outselling CCaaS, in some companies, social care is still with marketing. So that's an easier sell. When you're obviously trying to do a full stack replacement, that is sitting with the CIU as an example. So, what we have done is two things. One is there is a specialist overlay team today, so that we started hiring, I'd say, about 9, 12 months ago. And they've come from your big CCaaS vendors. They sort of know the lingo. They know how to go about selling the product. They know where the bodies are buried. So, they've been a tremendous addition to the sales team. And so, we have aligned them by, what we call, sort of divisional leaders. So, in the US, there'll be, several of them, same in EMEA same in APJ. And the idea there is they worked hand in glove with the individual reps in the territories to unearth new CCaaS opportunities. So, that's something that's working really well.*

110.    The above statements identified in Paragraph 109 were materially false and misleading when made because: (1) there were minimal synergies between Sprinklr Service and the Core Suite; (2) the Company's strategy to sell Sprinklr Service to Core Suite customer contacts was failing; (3) Sprinklr was not using a specialized team "hir[ed]…from big CCaaS vendors" to sell Sprinklr Service, but instead mainly diverted Core Suite salespeople experienced in traditional SaaS not CCaaS; and (4) the statements omitted to disclose the following material adverse information necessary to make the statements made not misleading: (a) Sprinklr secretly diverted significant resources and manpower – including both salespeople and developers – from Core Suite to Sprinklr Service; (b) this diversion of resources and manpower away from the Core Suite risked the Subscription Revenue that the Core Suite brought to the Company; and (c) those risks had already started to materialize in the form of multi-million dollar Core Suite contracts cancelled, failed Core Suite sales, and failed Core Suite renewals.

111.    When questioned about the tradeoff of growth versus margins, Sarin misleadingly

denied the premise of the question and omitted the known tradeoff the Company was making with its shift towards Sprinklr Service at the expense of the Core Suite business, stating:

> **Q – Tyler Radke:** Great. So, shifting a little bit to the cost side, you mentioned, Manish, and when you joined you – relative to when you joined, margins are considerably higher. Maybe just frame for us what were some of the efficiencies that you were able to unlock at the company? I know you're never done finding efficiencies as a CFO, but are we kind of mostly through those initial things you've identified and how should we just think about the tradeoff of growth versus margins as we go forward?

> **A – Manish Sarin:** Yeah, I think that's a fantastic question, because one of the things we've been very clear in saying is maybe in the past, investments in the company were not entirely thought through the lens of what is unit economics or is productivity per rep improving. And I think we're now just applying a little bit more careful analysis, if you will, before we make any more investments, right? ***So, I don't think one should view it in the lens of is this a cost versus growth trade off because we believe we have enough investments in place that should allow us to grow at the rate that we are growing.*** So, where are we getting all these efficiencies from? Even things like when I said technology, solution brokers for CCaaS, that obviously means I don't need that many direct reps selling CCaaS because I have partners doing it for me, right?

112.    The above statements identified in Paragraph 111 were materially false and misleading when made because: (1) there was a "cost versus growth trade off"; (2) because the Company had chosen to constrain costs by diverting Core Suite resources rather than building out specialized resources for the new division, it had imperiled the Company's Core Suite business; and (3) as a result of the secret diversion, Sprinklr had been seeing the "cost versus growth trade off" materialize since the beginning of 2023 in the form of multi-million dollar Core Suite contracts cancelled, failed Core Suite sales, and failed Core Suite renewals, and the impacts of those failures on the Company's growth were known internally at this time.

113.    As a result of these misleading statements, analysts came away from Sprinklr's earnings call impressed, without suspecting any problems with either Core Suite Sprinklr Service. *See*, *e.g.*, Patrick Walravens & Aaron Kimson, *Beats with 23% Sub Rev Growth, Down from 24%*

*Last Q; Stock Falls 1% in Aftermarket*, CITIZENS JMP, Sept. 7, 2023, at 1-2 ("We maintain our Market Outperform rating and $24 price target on Sprinklr after the company executed well again . . . A major focus for Sprinklr in 2Q was ease of implementation and use, particularly within CCaaS. We believe that with this focus, CCaaS will continue to be a growth driver in the long-term for Sprinklr's unified platform."); Arjun Bhatia, Rachel Ayotte & Chris Madison, *The Best of Both Worlds; Strong Execution Driving Robust Growth and Margin Upside*, WILLIAM BLAIR, September 7, 2023, at 1 ("Given the positive market trends, its improving margin profile, and durable growth, we remain optimistic on the stock and reiterate our Outperform rating . . . . Sprinklr Service continues to be a key area of investment and driver of growth for the company. Management emphasized its disruption of traditional CCaaS players for three reasons: its unified platform approach, AI being embedded throughout the platform, and its ability to prove out ROI through lower total cost of ownership and improving metrics like NPS.").

## VII. The Truth Emerges Through a Series of Disclosures

### A. Defendants start to reveal their diversion of resources and manpower towards Sprinklr Service and its impact on the Core Suite

114.    On December 6, 2023, the impact of Sprinklr's diversion of resources and manpower towards Sprinklr Service at the expense of Core Suite began to be acknowledged. That day, on the Q3 FY24 earnings call, Thomas told investors:

> ***The investments we've been making over the last 18 months are enabling us to Mainstream our product suites into large replacement markets starting with establishing ourselves as a disruptor in CCaaS. As we've diversified the business and focused on scaling our CCaaS business, I would like to acknowledge that they've made slower progress on some of our other go-to-market initiatives focused on our core product suites.***

115.    Sarin followed up, stating:

> ***Our primary strategic focus in FY '24 has been to rapidly scale our Sprinklr service product suite. We are very pleased with the results, having made***

*significant demonstrable progress with Sprinklr service, gaining market share and customer momentum in the CCaaS market.*

As Ragy mentioned, *our focus on succeeding in our CCaaS business slowed progress with some of our other go-to-market initiatives in our core product suites, much more than we had anticipated.*

116.    When discussing the issue with analysts, Thomas and Sarin expanded on the decision to divert resources and manpower from the Core Suite to Sprinklr Service, or as Defendants described it, "overrotate," and made clear that Sprinklr's reduction in growth, including in reduced sales and renewals for its Core Suite products, was caused not by any macro conditions outside of the Company's control, but directly a result of the Company's shift towards Sprinklr Service, stating:

> **Q – Michael Vidovic:** Hi, this is Michael Vidovic on for Michael Turits and thanks for taking my question. On the headwinds you talked about seeing this quarter with the over-rotation the down sell pressure. I guess, were you not seeing those same dynamics in Q2 and Q3 and like a similar frequency? Or is that still relatively new for this quarter? Thanks.
>
> **A – Ragy Thomas:** It's kind of consistent, right? But because as Manish said, we have a much bigger base coming up in Q4. So we're not seeing the macro environment get better or get worse. And so I wouldn't characterize it something changed in Q4.
>
> ***
>
> **A – Ragy Thomas:** But I would, again, to reconcile the two, right, the macro, we don't think is what's changing. *It's really our over-rotation that's causing the change that, where Manish has articulated.*

117.    Acknowledging that the adverse impact of management's planned "over-rotation" lowered growth expectations for FY 2025, Sarin told investors:

> At this time, based on what I just outlined, coupled with an unforgiving macro environment, we expect a sequential quarterly increase of 2.5% for each quarter of FY '25. *This equates to approximately a 10% total revenue growth for the full year, which we believe is the appropriate starting point for FY '25.*

118.    On this news, Sprinklr's stock price fell from a December 6, 2023 closing price of

$16.70 by $5.74, or a statistically significant 34% decline, before rebounding to close at $11.11 per share on December 7, 2023.

119.    Despite this initial disclosure, in that same Q3 FY24 earnings call – and in an effort to stem any ill effects to Sprinklr's share price – Defendants misleadingly claimed that the issues that led to the reduced growth in their Core Suite business had been resolved and failed to reveal the full scope of the problems caused by the Company's failed diversion of Core Suite resources to Sprinklr Service. Specifically, in response to questions from analysts, Thomas elaborated on the impact of their strategy to focus on Sprinklr Service at the expense of the Core Suite and misleadingly told investors that the problem had been fixed, stating:

> **Q – Arjun Bhatia:** Okay. Got it. And then, just as we look to the other side of this, when you think about the go-to market revamp, what are some of the steps that you need to take to, you know, I guess, refocus on the broader suite? Is there incremental hiring that needs to happen? Or is it more a matter of, you know, internal resource allocation enablement, et cetera?
>
> **A – Ragy Thomas:** *It's more of an internal resource allocation. In hindsight, I think the most obvious explanation for this is the fact that we, and I don't know whether we would have, knowing everything we know, done it differently. We kind of overrotated a little bit more on the CCaaS side. And so we took our field and we incented them strongly to go sell CCaaS.* And essentially there's a lot of people who jumped in and really are happy and we're thrilled with the results.
>
> And there are some that jumped but didn't quite -- jump -- didn't quiet [sic], make it on the other side. ***And the the [sic] fix is quite obvious to all of us. You've got to take the field folks in sales and support and service that came from the social suite background or the marketing suite background or the research inside suite background, and we got to let them go back and focus on it.***
>
> So what we are doing now, as we think and plan for the next year is we are adjusting quotas and we are just bifurcating or trifurcating the field to just -- so you can fix the overrotation. We did, and we're pretty hopeful that in one or two quarters, we'll begin to see some data that would allow us to just update you further.

120.    The above statements identified in Paragraph 119 disclosed part of the truth concealed by prior Class Period misrepresentations but did not disclose the whole truth, remained

materially false and misleading when made because: (1) Sprinklr had not fixed the problems caused by the Company's push towards Sprinklr Service at the expense of the Core Suite; and (2) the statements omitted to disclose that it would take a significant amount of time, effort, and resources to undo the damage of Sprinklr's failed push towards Sprinklr Service, and therefore the Company's Subscription Revenue and growth would continue to be negatively impacted moving forward.

121.    Sarin continued Thomas' clean-up effort and falsely claimed that the $1 billion subscription "floor" promised for the Fiscal Year ending January 2027 remained intact:

> **Q – Noah Herman:** Got it. No. Thanks so much for that answer. And then maybe just focusing a little bit more on the model as we sort of contemplate the preliminary 2025 guidance. You know, how does that, if anything, does that change at all the long-term model that you had outlined during your Analyst Day? How should we really think about that going forward?
>
> **A – Manish Sarin:** Yeah. ***It does not change our FY '27 long-term plan.*** And again, just to be clear, this is not our guide for '25. I will do that in our March earnings call. Just given the some of the renewal pressures we are seeing here in Q3. And as I said Q4, we expect it to be, you know, quite intense. Given the visibility that we have, and we just wanted to be clear that we laid out what we are seeing right now, it might change substantially when we talk in March, and we talk about the full year guide. ***But sitting where we sit today, we don't feel any difference about FY '27 than we did six months ago.***

122.    The above statements identified in Paragraph 121 were materially false and misleading when made because: (1) Sprinklr had not fixed the problems caused by the Company's push towards Sprinklr Service at the expense of the Core Suite; (2) the effects of Sprinklr's failed push towards Sprinklr Service would continue to be felt for the immediate and medium term future, negatively impacting the Company's Subscription Revenue and reducing the Company's growth, thus making the Company's plans for Fiscal Year 2027 extremely unlikely; and (3) as a result, Defendants Sprinklr and Sarin lacked any reasonable basis to maintain that the prior $1 billion projection remained intact.

123.    Defendants' clean-up efforts worked, as analysts believed Defendants when they claimed that the "overrotation" problem would not have lasting effects and would not impact Fiscal Year 2027 guidance. *See*, *e.g.*, Pinjalim Bora, Noah R. Herman, Rachit Agrawal & Jaiden R. Patel, *Hits an "Air Pocket" Heading Into End of the Year*, J.P. MORGAN, Dec. 7, 2023, at 1 ("We think some of the pressure on renewals might be one-off instances, likely contributing to a few points of headwind. Given these dynamics, which are partially macro driven and partially related to execution, heading into its largest quarter of the year, the company is taking a prudent approach to guidance for the new year. *Overall, while we are disappointed, especially by the mis-execution on the GTM side, we see this as more of an 'air-pocket' created by a perfect storm of events*[.]" (emphasis in original)).

124.    Thus, despite this decline in the Company's stock price, Sprinklr's securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning Sprinklr's failed strategy to focus on Sprinklr Service and its overall impact on the Core Suite.

**B.    Defendants continue to mislead investors about the full scope of problems, while making personnel moves to address those very same problems**

125.    In the beginning of 2024, Sprinklr began to do what it had told investors it had already accomplished: hiring a significant number of CCaaS-experienced salespeople. According to CW1, after the initial disclosure of the Company's unsuccessful attempt to launch Sprinklr Service CCaaS with resources diverted from Core Suite, Sprinklr finally made a significant investment in hiring salespeople with actual CCaaS experience, instead of simply asking its prior salespeople to sell Sprinklr Service despite having no experience in the CCaaS market.

126.    Despite these internal moves, Defendants continued to reassure investors that its diversion of resources and manpower towards Sprinklr Service was a problem that it already

handled.

127.    On March 27, 2024, issued its press release for its Q4 FY24 and Fiscal Year 2024. In that press release, the Company provided the following guidance for the full fiscal year ending January 31, 2025 – guidance that would later need to be sharply revised approximately two months later:

- Subscription revenue between $740.5 million and $741.5 million.
- Total revenue between $804.5 million and $805.5 million.
- Non-GAAP operating income between $104 million and $105 million.
- Non-GAAP net income per share between $0.38 and $0.39, assuming 291 million diluted weighted-average shares outstanding.

128.    According to CW1, Sprinklr would have known a year ahead of time what the actual subscription revenue projections should have been due to how Sprinklr recognized SaaS revenue. Therefore, by this time it would have known of the impact of Sprinklr's fall off in existing customer spend and decrease in renewals, and had no reasonable basis for the inflated guidance provided.

129.    That same day, the Company held its Q4 FY24 earnings call for investors where, in response to an analyst's question about renewals, Thomas discussed Sprinklr's attempts to address its diversion of resources and manpower towards Sprinklr Service, stating:

**Q – Jackson Adler:** Okay. Alright. Gotcha. And then on the renewals pressure, so expecting it kind of to persist here in the first half and then maybe start to go away. I'm just curious, like, how do we know that the pressure will end. Is there something -- is there some cohort or is there something specific about the renewals that are going to be happening over the next couple of quarters that you can point to and say like, they are different from what the renewals will look like after we get past this first half.

**A – Ragy Thomas:** Okay. So I think, first off, I got to tell you, we put a lot of energy behind understanding what is going on. ***And what I can confirm, as we've done in the past, is we think the majority of it is self-inflicted. And what we're finding that is that the best execution of our team versus the best execution of any competitor in our core markets and the CCaaS frankly we win. So what we're finding is -- and I say it's self-inflicted because weak execution on our side,***

*meeting strong execution of the competitor is when we are losing. And so it gives us a lot of confidence that these are fixable things and it's a part of this big set of initiatives that we have outlined. And like we said, it's going to take a few quarters, but right now we're pretty optimistic that we should see a retention go back to our historic norms once our execution and what we can control is addressed.*

130.   Defendants' attempts to assuage investors' concerns about Sprinklr's shift in focus and resources towards Sprinklr Service succeeded, as its stock price jumped from $12.89 at the start of March 27, 2024 to a high of $14.31 at the start of March 28, 2024. Nevertheless, Defendants could not stall the full impact of the Company's failed strategy to focus on its CCaaS business.

**C.    The full impact of Sprinklr's decision to strip resources from Sprinklr's Core Suite is disclosed**

131.   On June 5, 2024, issued its press release for its Q1 FY25. In that press release, the Company provided the following guidance for the full fiscal year ending January 31, 2025, admitting that the inflated projections provided to investors just two months earlier on March 27, 2025 could not be met:

- Subscription revenue between $714 million and $716 million.
- Total revenue between $779 million and $781 million.
- Non-GAAP operating income between $104 million and $105 million.
- Non-GAAP net income per share between $0.40 and $0.41, assuming 276 million diluted weighted-average shares outstanding.

132.   This decline represented a material drop in guidance which was noted by analysts at the time. *See* Pinjalim Bora, Noah R. Herman, Rachit Agrawal & Jaiden R. Patel, *Deterioration in Macro Due To AI-Led IT Budget Reprioritization & Disruption From Broad GTM Changes Drives Step Down in Growth*, J.P. MORGAN, June 6, 2024, at 1 ("As a result of the slower start to the year, the company materially lowered its FY revenue and billings guidance, resetting the growth glidepath to +6.5%, vs. +10% prior, while the company maintained the PF operating income guidance for the full year, implying margins of +13%.").

133.    The same day, the Company held its Q1 FY25 earnings call for investors. On that call, Thomas finally disclosed the full extent of Sprinklr's failed push towards Sprinklr Service and the fact that remedying the problems brought on by Sprinklr's failed push towards Sprinklr Service over the Core Suite would take more time than it initially led investors to believe, stating:

> This quarter, we made good progress with these leadership changes and operational improvements. ***However, these changes are significant and will take time to show measurable improvements. Furthermore, implementing these changes during what has become a more challenging macro environment has created more short-term volatility than we expected. In the first quarter, buying behavior was more measured, sales cycles were longer, and budget scrutiny on renewals increased as well. As a result, Q1 performance reflects lower net new bookings and increased customer churn. Based on the current outlook for the year, we are lowering our revenue guidance for FY '25, but are committed to diligently managing the business and maintaining our non-GAAP operating income guidance.*** Manish will provide more details in his remarks.

***

> Look, there are three things that are super clear to us. One is, as we said, the macro is we're experiencing a pronounced change. ***Second, our go-to-market motion and the transition to the level of maturity that we need to have for a business of this scale and size, we are not there and it's taking us longer.*** And I'm not going to go through all of it. I'm sure we can follow up in the actions. ***But with the kind of people that we have around us and inside the company, what [we] needed to do was fairly clear. And what we realized as we went late last year and looked at our own progress, needless to say, no one, including myself, was happy with the pace of progress.*** And what we decided to do was to upgrade and make significant upgrades to the leadership, starting at the very top, right? That's what the investors and the Board would love to see.

***

> ***I'll acknowledge that we're seeing increased pressure on the core, which is everything outside of CCaaS the way we see it. And what we're finding is more price compression.*** We're not seeing like a crazy amount of logo churn. We're not seeing, I'm sure there'll be a question, we're not seeing the competitive dynamics shift. What we're finding is CIOs and CMOs looking at their top spend and looking to find money. And we're a premium provider. We were able to command premium prices. ***And we're just getting squeezed. And that I see as the primary driver.*** And a lot of these as, Arjun, I'm making more calls than you would ever expect someone like me to be doing to these customers. ***And I can tell you firsthand, a lot of it is***

42

*our own execution* . . . .

134.    Similarly, Sarin admitted that Sprinklr ***"continue[d] to experience higher churn in our core product suites, driven by reduced marketing spend, elimination of programs, and seat reductions,"*** which he said would continue throughout Fiscal Year 2025.

135.    Most notably, Sprinklr withdrew its claim that $1 billion subscription revenue would be a "floor" for Fiscal Year 2027, thereby conceding that the impact of its failed decision to divert resources and manpower towards Sprinklr Service would have long-lasting consequences on the Company.

136.    On this news, Sprinklr's stock price fell from a June 5, 2024 closing price of $10.84 by $2.51, or 23.15%, before rebounding to close at $9.20 per share on June 6, 2024.

137.    That same day, in a direct response to the disclosure of Sprinklr's downgraded guidance and the impact of Defendants' failed decision to divert resources and manpower from Core Suite to Sprinklr Service, the Company announced that Thomas would be demoted to co-Chief Executive Officer rather than sole CEO, and would share duties with Trac Pham. Thomas conceded this was an "upgrade": "And what we decided to do was to upgrade and make significant upgrades to the leadership, starting at the very top, right? That's what the investors and the Board would love to see. And we brought in Trac [Pham]".

138.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VIII.    Additional Allegations of Scienter

### A.    Defendants' actual knowledge of the omitted diversion of resources

139.    Defendants' own admissions that they had decided at the start of 2023 to and

intentionally did divert resources and personnel from its Core Suite business to Sprinklr Service shows that Defendants had actual knowledge of the concealed risks.

140.     On December 6, 2023, the Company held an earnings call to discuss its results from the third quarter of the 2024 fiscal year. When asked by an analyst about Sprinklr's decision to revamp its go-to-market strategy for its CCaaS solution, and whether the initial strategy failed because of internal resource allocation or other factors, Thomas admitted the Company had made "an internal resource allocation" to "overrotate[]" from Core Suite to Sprinklr Services, and did so intentionally: "we took our field" sales force that had been selling Core Suite "and we incented them strongly to go sell CCaaS."

141.     On December 7, 2023, Sarin also admitted knowing and planning that, at the start of 2023 to incentivize its sales team to push Sprinklr Service at the expense of the Core Suite: "*at the beginning of the year, given the success we were having in CCaaS, we were very comfortable telling the sales team that this is the new product to go push . . . . And I think what you realize over time is salespeople are largely coin-operated. You incent them to go do something and that's what they will go do.*"

142.     These admissions, straight from Defendants Thomas and Sarin, show that they were aware of a strategy to push salespeople away from selling the Core Suite and towards selling Sprinklr Service, but failed to tell that to the investing public.

143.     Defendants also admitted having actual knowledge that renewals were the key to maintaining and growing subscription revenue. During an earnings call on September 6, 2023, after an analyst asked Sarin if anything other than "strong renewal activity and large deals" gave him confidence in the Company's ability to achieve its guidance, Sarin stated: "So I don't think it's any more complex than what you articulate. At the end of the day, if you leave the professional

services line item aside, **subscription business, it's all driven by the strength in the renewal business.**"

### B.     Defendants' access to information about the diversion and its adverse impact on sales and renewals

144.    Besides having actual knowledge, Defendants had access to information about the diversion of resources and manpower from the Core Suite to Sprinklr Service. They also knew of the risks involved with that shift, both in establishing a foothold in the CCaaS market and the impact on the continued sales and renewals with the Core Suite, and therefore knew or recklessly ignored that their statements were materially misleading.

145.    As outlined in ¶¶20-21, Thomas and Sarin occupied executive positions at Sprinklr, which would have provided them full access to, and the ability to direct, any shift in plans, priorities, and resources from one aspect of Sprinklr's business to another. Further, through their positions, Thomas and Sarin would have had access to and received information about the impacts of Sprinklr's shift in business plan on their existing revenue and relationships with customers.

146.    Thomas' access to information is bolstered by multiple confidential witnesses confirmed that Thomas was an extremely hands-on executive at the Company. CW2 stated that it was broadcast throughout the Company that Thomas regularly visited customers personally to check in and learn about their respective experiences with Sprinklr's products. CW1 went so far as to describe Thomas as acting like a Chief Technology Officer throughout his tenure at the Company who was aware of every technological hurdle, issue, and challenge facing the Company's product offerings, including the problematic rollout of Sprinklr Service. CW1 further described Thomas as an engineer and developer who ran a very engineering-led company and, as such, took a hands-on approach to his position.

147.    Thomas himself affirmed his access to the information contradicting his public

statements, as he touted throughout the Class Period that he routinely met with customers, personally, year after year, to specifically discuss Sprinklr's products and services. *See* ¶101.

148.    For example, on June 5, 2023, Thomas reiterated that he was visiting customers regularly and speaking with them closely. When asked by an analyst on an earnings call that day about these customer conversations, Thomas referenced the "20 or 30" large customers that he had recently spoken with himself.

149.    On an earnings call on September 6, 2023, Thomas explained that he was continuing to meet personally with Sprinklr customers: "In my travels around the world last quarter, the best brands in the world are continuing to ask us to help consolidate front office technologies, reduce their operating costs, help reduce risk, all while bringing people and data together to create better customer experiences." He did so again on an earnings call on December 6, 2023, stating that he "***met with more than 70 customers around the world this quarter***."

150.    As affirmed by CW1, Sprinklr had already began to experience the cancellations of multi-million dollar contracts, failed renewals, and failed sales with its Core Suite business almost immediately after the Company secretly diverted its resources and manpower towards Sprinklr Service at the beginning of 2023.

151.    Consequently, all of these customer interactions provided Thomas additional access to information about the issues with Core Suite leading to non-renewals and cancellations, including the diversion of developer resources and the slowdown in developing differentiating features that had allowed competitors to catch up with Core Suite.

152.    Additionally, Sprinklr uses the Salesforce platform to track its sales and growth, giving Defendants access to timely updates about the status of each deal. *See* Robots & Pencils, *How Salesforce Automation Changed Sprinklr's Way of Doing Things*, Sept. 9, 2022,

https://robotsandpencils.com/how-salesforce-automation-changed-sprinklrs-way-of-doing-things/. According to CW1, monthly and quarterly sales reports were made available via Salesforce to all members of Sprinklr's senior leadership, including Thomas and Sarin. Further, there was tremendous scrutiny within the Company on the accuracy of Sprinklr's sales numbers. Consequently, Defendants had real-time access to the Company's sales and renewals, or lack thereof, throughout the Class Period.

### C. Defendants held themselves out as knowledgeable about the concealed information

153. Defendants' own statements show that they repeatedly held themselves out as extremely knowledgeable about Sprinklr's business strategy, sales cycle, customers, go-to-market approach, sales status, competitive environment for the Core Suite and Sprinklr Service, and ability to meet the $1 billion subscription "floor" promised to investors.

154. For example, at the beginning of the Class Period, Thomas affirmed the importance of domain knowledge and vocabulary when breaking into the CCaaS market (despite, according to CW1, not hiring people with those skills). *See* ¶88. Thomas and Sarin also routinely discussed with investors (i) Sprinklr's move into the CCaaS market with Sprinklr Service; (ii) the status of the Company's Core Suite, (iii) the importance of sales and renewals on the Core Suite business; and (iv) the priorities and feelings of Sprinklr's Core Suite and Sprinklr Service customers. *See* ¶¶82, 86, 88, 92, 94, 97, 99, 101, 105, 107, 109, 111, 114-17, 119, 121, 129.

155. That the Individual Defendants held themselves out as knowledgeable about the concealed matters allows only two inferences: that Thomas and Sarin actually possessed the knowledge claimed but deliberately chose to withhold material adverse information from investors; or despite holding themselves out as knowledgeable, they chose not to inform themselves of the truth and were reckless to the risk of misleading investors.

47

### D.    The temporal proximity and sharp divergence between Defendants' misleading statements and the disclosure of the truth

156.    The temporal proximity and sharp divergence between Defendants' misleading statements and the disclosures in December 2023 and June 2024 about the Company's failed push towards Sprinklr Service at the expense of the Core Suite further support scienter.

157.    Throughout the Class Period, Defendants constantly told investors about solid growth in the CCaaS market and that the Company was still supporting its Core Suite business. For example, in March 2023, Defendants assured investors that it was prepared to enter the CCaaS market with Sprinklr Service, while also affirming its commitment to the Company's Core Suite. *See* ¶¶86, 88. In June 2023, in a direct response to an analyst question about renewal pressures, Thomas steadfastly claimed that all was well. *See* ¶94. As late as September 2023, Defendants were assuring investors that both Core Suite and Sprinklr Service were in good shape without any hint of issues. *See* ¶¶105, 107, 109, 111. However, just three months later, Defendants sharply changed course, conceding that it had shifted its focus and "overrotated" towards Sprinklr Service, and this shift had materially and negatively impacted its Core Suite business. *See* ¶¶114-17.

158.    Nevertheless, from December 2023 until late March 2024, Defendants reassured investors that it had addressed the problems caused by the Company's shift towards Sprinklr Service, going as far as to reaffirm on multiple occasions its $1 billion "floor" for Fiscal Year 2027 Subscription Revenue. *See* ¶¶119, 121, 127-30. Then, a little over two months after its last reassurance, the Company admitted that it had not remedied its diversion of resources and manpower towards Sprinklr Service, admitted that Sprinklr's growth had been severely impacted and remedying the issue was not a quick fix, and withdrew its Fiscal Year 2027 guidance. *See* ¶¶131-35.

159.    Notably, according to CW1, because SaaS deals are booked upfront with the

revenue recognized thereafter, Defendants would have known about any material decline in revenue long before it occurred. Moreover, CW1 affirmed that the Company actually saw the damage done to its Core Suite business almost immediately after it diverted resources towards Sprinklr Service at the beginning of 2023.

160.    Consequently, the temporal proximity between Defendants' assurances and change of course, along with the sharp divergence between Defendants' Class Period reassurances and the truth, make it inconceivable that Defendants would not know, or did not recklessly disregard, that the transition to Sprinklr Service was not working during the Class Period and as a result, their statements to the contrary throughout the Class Period misled investors.

### E.    Sprinklr's personnel moves demonstrate internal understanding of the problems concealed from investors

161.    In early 2024, Sprinklr finally hired a significant number of CCaaS-specific salespeople, as they had told investors about a year earlier had already been done. According to CW1, this was a direct reaction to the failed strategy of diverting Core Suite salespeople, who only had experience selling the Core Suite, to attempt to sell Sprinklr Service to their existing Core Suite customers. This hiring spree was done to address the problems that materialized from the undisclosed risks that came with Defendants' secret diversion of resources and manpower towards the CCaaS market.

162.    Also, on June 5, 2024—the same day that Defendants disclosed the full impact of the previously undisclosed risks that materialized from the Company's shift towards CCaaS—the Company announced that Trac Pham was appointed as Co-Chief Executive Officer effective immediately, effectively demoting Thomas. Notably, when responding to an analyst's question about changes Sprinklr was making to address the negative effects of its shift towards CCaaS and having "things … starting to get better instead of still getting worse[,]" Thomas stated that, among

other things, Pham's appointment represented a "significant upgrade[] to the [Sprinklr] leadership[.]" *Supra* at ¶¶133, 137.

163.    On November 5, 2024, the Company announced the appointment of Rory Read to its board of directors and as the new President and Chief Executive Officer of Sprinklr As part of this appointment, Pham left both is role as co-CEO and on the board of directors of the Company. The Company also announced that Thomas would no longer serve as co-CEO, although he would remain as Chairman of the Company's board of directors.

### F.    Defendants' misrepresentations involved Sprinklr's core operations

164.    Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned Sprinklr's core operation: its Core Suite business and burgeoning CCaaS business, Sprinklr Service.

165.    Indeed, during the Class Period, Sprinklr's subscriptions constituted ***approximately 91.2% of its overall revenue*** for Fiscal Year 2024, and the overwhelming majority of that came from subscriptions to Sprinklr's Core Suite.

### G.    Defendants' insider sales

166.    During the Class Period, Sarin took advantage of Sprinklr's artificially inflated stock price and earned approximately $2,842,491.31 from sales of Sprinklr common stock on the open market[1]:

---

[1] Excluded from this chart are sales made to cover statutory tax withholding obligations.

| Defendant | Date | Shares Disposed | Price | Proceeds |
|---|---|---|---|---|
| Sarin | 9/20/2023 | 20,000 | $14.74 | $294,800.00 |
| Sarin | 11/14/2023 | 10,800 | $15.00 | $162,000.00 |
| Sarin | 11/15/2023 | 9,200 | $15.03 | $138,276.00 |
| Sarin | 12/01/2023 | 20,000 | $16.02 | $320,400.00 |
| Sarin | 12/06/2023 | 20,000 | $17.01 | $340,200.00 |
| Sarin | 1/11/2024 | 60,651 | $12.01 | $728,418.51 |
| Sarin | 3/19/2024 | 66,388 | $12.93 | $858,396.80 |
| **Total** | | **207,039** | | **$2,842,491.31** |

167.    Notably, these sales were pursuant to trading plans entered into ***after*** the start of the Class Period when Defendants began misleading investors.

168.    Sarin's sales were so notable that media overseeing the Company published multiple reports on Sarin's sales, the lack of insider buys over the past year, how it might provide insight on the future of Sprinklr. *See* GuruFocus Research, *Insider Sell: CFO Manish Sarin Sells 20,000 Shares of Sprinklr Inc (CXM)*, Sept. 22, 2023, https://www.gurufocus.com/news/2090872/insider-sell-cfo-manish-sarin-sells-20000-shares-of-sprinklr-inc-cxm ("On September 20, 2023, Manish Sarin, the Chief Financial Officer (CFO) of Sprinklr Inc (CXM, Financial), sold 20,000 shares of the company. This move is part of a series of transactions made by the insider over the past year, during which Sarin has sold a total of 101,778 shares and made no purchases . . . . The insider's recent sell-off is part of a broader trend within Sprinklr Inc. Over the past year, there have been 58 insider sells and no insider buys."); GuruFocus Research, *Insider Sell Alert: CFO Manish Sarin Sells 20,000 Shares of Sprinklr Inc (CXM)*, Dec. 8, 2023, https://finance.yahoo.com/news/insider-sell-alert-cfo-manish-040455156.html ("A recent transaction that has caught the attention of investors is the sale of 20,000 shares of Sprinklr Inc (NYSE:CXM) by the company's Chief Financial Officer, Manish Sarin . . . . [o]ver the past year, Manish Sarin has sold a total of 161,778 shares and has not made any purchases . . . . [t]he insider transaction history for Sprinklr Inc shows a notable absence of

insider buys over the past year, with 71 insider sells recorded during the same period.").

### PLAINTIFFS' CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities other than Defendants that purchased or otherwise acquired Sprinklr Class A common stock between March 29, 2023 and June 5, 2024, both dates inclusive (the "Class"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants, former and current officers and directors of Sprinklr, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

170.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sprinklr securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are several hundreds if not thousands of members in the proposed Class. Sprinklr's most recent Form 10-K indicates that as of January 31, 2024, there were 389 stockholders of record of its Class A common stock. Because most stock is held in "street name" by brokers, Plaintiffs are informed and believe the actual number of impacted shareholders to be several times higher. Record owners and other members of the Class may be identified from records maintained by Sprinklr or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

171.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

173.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sprinklr;
- whether the Individual Defendants issues false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Sprinklr securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

174.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

175. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud- on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Sprinklr securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Sprinklr securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

176. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

177. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the claims alleged herein sound primarily in omission of material information rather than affirmative misrepresentation.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

178. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

179. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

180.    During the Class Period, Defendants omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and made material affirmative misrepresentations, *inter alia*, (a) concealing Sprinklr's diversion of resources and manpower from its Core Suite business to its Sprinklr Service business; (b) concealing the fact that this diversion risked the Subscription Revenue that the Core Suite brought to the Company; (c) concealing the fact that those risks had already started to materialize in the form of multi-million dollar Core Suite contracts cancelled, failed Core Suite sales, and failed Core Suite renewals; (d) concealing significant risks regarding Sprinklr Service – including inexperienced salespeople, poor sales strategy, an unremarkable product, longer sales cycles, and entrenched competition – that made success and the proposition that Sprinklr Service gains would make up for Core Suite losses unlikely; (e) misleading investors, once Defendants finally disclosed its strategy to shift its business towards Sprinklr Service, that it had fixed the problems that caused a drop in growth and revenue in its Core Suite business; and (f) misleading investors that the damage done by the Company's failed shift towards Sprinklr Service was an easily remedied, short term fix, when in fact, the damage to the Company's Subscription Revenue and long-term growth was a protracted concern that was not easily or quickly remedied. Such misrepresentations were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sprinklr securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Sprinklr securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

181.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, that were designed to influence the market for Sprinklr securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sprinklr's finances and business prospects.

182.    By virtue of their positions, responsibilities and control at Sprinklr, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

183.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives and/or directors of Sprinklr, the Individual Defendants had knowledge of the details of Sprinklr's internal affairs.

184.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their control and authority over Sprinklr, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Sprinklr. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sprinklr's

businesses, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading statements, the market price of Sprinklr securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Sprinklr's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Sprinklr securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

185.    During the Class Period, Sprinklr securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sprinklr securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Sprinklr securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Sprinklr securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

186.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

187.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

### **(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

188.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

189.    During the Class Period, the Individual Defendants participated in the operation and management of Sprinklr, and conducted and participated, directly and indirectly, in the conduct of Sprinklr's business affairs. Because of their senior positions, they knew the adverse non-public information about Sprinklr's misstatement of income and expenses and false financial statements.

190.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sprinklr's financial condition and results of operations, and to correct promptly any public statements issued by Sprinklr which had become materially false or misleading.

191.    Because of their control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sprinklr disseminated in the marketplace during the Class Period concerning Sprinklr's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sprinklr to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Sprinklr within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sprinklr securities.

192.    Each of the Individual Defendants, therefore, acted as a controlling person of Sprinklr. By reason of their senior management positions and/or being directors of Sprinklr, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sprinklr to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Sprinklr and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

193.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sprinklr.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  January 24, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Christopher P.T. Tourek*

Joshua B. Silverman
(admitted *pro hac vice*)
Christopher P.T. Tourek
(admitted *pro hac vice*)
Diego Martinez-Krippner
(admitted *pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
ctourek@pomlaw.com
dmartinezk@pomlaw.com

*Counsel for Plaintiffs and Lead*
*Counsel for the Class*

**PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East Suite
600 Los Angeles, CA 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorney for Plaintiffs*