UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SPRINKLR, INC. SECURITIES LITIGATION | Case No. 1:24-cv-06132-LGS |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

COOLEY LLP
Aric H. Wu
Sarah M. Topol
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
stopol@cooley.com

Koji F. Fukumura (*pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121
Tel: (858) 550-6000
kfukumura@cooley.com

*Attorneys for Defendants*

March 17, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ... iii

TABLE OF ABBREVIATIONS ... viii

INTRODUCTION ... 1

FACTUAL BACKGROUND ... 2

I. Sprinklr And The Individual Defendants ... 2

II. In FY2022, Sprinklr Reports Increasing Growth Rates, But Cautions Investors That Its Future Growth Rate May Not Match Its Recent Growth Rate ... 3

III. In FY2023, Sprinklr Reports Declining Growth Rates And A Reduction In Workforce, But Increasing Customer Interest In Its CCaaS Offering ... 4

IV. In FY2024, Sprinklr Prioritizes Growing The CCaaS Business, But Cautions Investors About The Challenges It Faced In The CCaaS Market ... 5

V. On March 27, 2024, Sprinklr Cautions Investors That It Anticipates A Further Decline In Growth Rates In FY2025 And Provides Guidance For FY2025 ... 6

VI. On June 5, 2024, Sprinklr Reports A Significant Decline In Growth Rate For 1Q FY2025, A Reduction In Workforce, And Revised Guidance For FY2025 ... 7

VII. This Lawsuit ... 7

LEGAL STANDARDS ... 8

ARGUMENT ... 9

I. Plaintiffs' 10(b) Claim Should Be Dismissed Because The Amended Complaint Fails To Plead Any False Or Misleading Statement Or Omission ... 9

A. Sprinklr Disclosed Challenges It Faced In The CCaaS Market ... 10

B. Sprinklr Disclosed Its Allocation Of Existing Resources To Sprinklr Service ... 11

C. Sprinklr Accurately Reported Its Data Regarding Ongoing And Future Subscription Revenues ... 13

D. Sprinklr Never Stated That It Had "Fixed The Problems" With Its Business ... 15

II. Plaintiffs' Section 10(b) Claim Should Be Dismissed Because The Challenged Statements Are Inactionable As A Matter Of Law ... 16

**TABLE OF CONTENTS**
**(continued)**

**Page**


A. Forward-Looking Statements ..... 16

B. Opinion Statements ..... 22

C. Statements Of Corporate Optimism Or "Puffery" ..... 23

III. Plaintiffs' Section 10(b) Claim Should Be Dismissed For Failure To Plead Particularized Facts Giving Rise To A Strong Inference Of Fraudulent Intent ..... 24

A. The AC Does Not Adequately Plead A Motive To Defraud ..... 25

B. The AC Does Not Plead Particularized Facts Showing Conscious Misbehavior Or Recklessness On The Part Of Any Defendant ..... 26

C. Any Inference of Scienter Is Not As Compelling As The Opposing Inference ..... 30

IV. Plaintiffs' Section 10(b) Claim Should Be Dismissed For Failure To Adequately Plead Loss Causation ..... 31

V. Plaintiffs' Section 20(a) Claim Should Be Dismissed ..... 32

CONCLUSION ..... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abely v. Aterna Zentaris*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) ....................15

*Acito v. IMCERA*,
47 F.3d 47 (2d Cir. 1995) ....................25

*In re Advanced Battery Techs.*,
781 F.3d 638 (2d Cir. 2015)....................26

*In re Anheuser-Busch Sec. Litig.*,
2020 WL 5819558 (S.D.N.Y. Sept. 29, 2020)....................20

*In re AOL Time Warner Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007)....................31

*Ark. Pub. Empls. Ret. Sys. v. Bristol-Myers Squibb*,
28 F.4th 343 (2d Cir. 2022) ....................25

*Ashland v. Morgan Stanley*,
652 F.3d 333 (2d Cir. 2011)....................9

*ATSI Commc'ns v. Shaar Fund*,
493 F.3d 87 (2d Cir. 2007)....................2, 24

*In re Bank of America AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)....................2, 12, 18

*In re Barrick Gold Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)....................27

*In re Bristol-Myers Squibb Sec. Litig.*,
658 F.Supp.3d 220 (S.D.N.Y. 2023)....................9, 26, 30, 32

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................9

*In re Carter-Wallace Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000)....................18

*In re CRM Holdings Sec. Litig.*,
2012 WL 1646888 (S.D.N.Y. May 10, 2012) ....................25

*In re Curaleaf Holdings Sec. Litig.*,
519 F. Supp. 3d 99 (E.D.N.Y. 2021) ....................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Dempsey v. Vieau*,
130 F. Supp. 3d 809 (S.D.N.Y. 2015)....25

*Denny v. Canaan*,
2023 WL 2647855 (S.D.N.Y. Mar. 27, 2023)....29

*Diabat v. Credit Suisse*,
2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)....12

*Eden Alpha CI v. Polished.com*,
2025 WL 296998 (E.D.N.Y. Jan. 24, 2025)....20

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)....28

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)....2, 26

*In re Gen. Elec. Sec. Litig.*,
844 F. App’x 385 (2d Cir. 2021)....24

*Gissin v. Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010)....21

*Glaser v. The9*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)....25, 29, 30

*Glidepath Holding v. Spherion*,
2010 WL 1372553 (S.D.N.Y. Mar. 26, 2010),
*aff'd*, 425 F. App'x 76 (2d Cir. 2011)....20

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec.*,
445 F. App'x 368 (2d Cir. 2011)....27

*Janbay v. Canadian Solar*,
2012 WL 1080306 (S.D.N.Y. 2012)....31

*In re Jiangbo Pharm., Sec. Litig.*,
884 F. Supp. 2d 1243 (S.D. Fla. 2012)....29

*Kavanagh v. Zwilling*,
578 F. App’x 24 (2d Cir. 2014)....9

*Lefkowitz v. Synacor*,
2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019),
*aff'd*, 832 F. App'x 54 (2d Cir. 2020)....16, 19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Lentell v. Merrill Lynch*,
396 F.3d 161 (2d Cir. 2005).....31

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010),
*aff'd*, 430 F. App'x 63 (2d Cir. 2011).....28

*In re Longtop Fin. Techs. Sec. Litig.*,
939 F. Supp. 2d 360 (S.D.N.Y. 2013).....2

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014).....27, 28

*Maloney v. Ollie's Bargain Outlet Holdings*,
518 F. Supp. 3d 772 (S.D.N.Y. 2021).....27

*Menaldi v. Och-Ziff Cap. Mgmt. Grp.*,
277 F. Supp. 3d 500 (S.D.N.Y. 2017).....24

*In re Mindbody Sec. Litig.*,
489 F. Supp. 3d 188 (S.D.N.Y. 2020).....24

*In re Nokia Sec. Litig.*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006).....12, 13, 24

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).....27

*Okla. Firefighters Pension & Ret. Sys. v. Xerox*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018).....16

*Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).....23

*In re Omnicom Grp. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010).....8

*In re Omnicom Grp. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008).....31

*Pearlstein v. BlackBerry*,
93 F. Supp. 3d 233 (S.D.N.Y. 2015).....29

*In re PetroChina*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015).....25

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Pfizer Sec. Litig.*,
538 F. Supp. 2d 621 (S.D.N.Y. 2008)....................2

*In re QLT*,
312 F. Supp. 2d 526 (S.D.N.Y. 2004)....................20

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................23

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris*,
75 F.3d 801 (2d Cir. 1996)....................29

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)....................14

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)....................22

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011)....................23

*Schaffer v. Horizon Pharma PLC*,
2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ....................22

*Sec. & Exch. Comm'n v. Rio Tinto*,
41 F.4th 47 (2d Cir. 2022) ....................24

*Singh v. Schikan*,
106 F. Supp. 3d 439 (S.D.N.Y. 2015)....................11, 28

*Slayton v. Am. Express*,
604 F.3d 758 (2d Cir. 2010)....................17, 21

*Tellabs v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................8, 9, 24

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ....................22

*Venkataraman v. Kandi Techs. Grp.*,
2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022)....................32

**Statutes, Rules and Regulations**

15 U.S.C. § 78j(b) .................... *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

15 U.S.C. § 78t(a) ....................................................................................................................7, 32

15 U.S.C. § 78u-4(b)(1)(B)..........................................................................................................8

15 U.S.C. § 78u-4(b)(2)(A)..........................................................................................................8

15 U.S.C. § 78u-5(c) ..................................................................................................................16

15 U.S.C. § 78u-5(i)(1)(A)-(D)...................................................................................................16

17 C.F.R. § 240.10b-5(b) ..............................................................................................................9

Fed. R. Civ. P. 9(b) .......................................................................................................................8

Fed. R. Civ. P. 12(b)(6).................................................................................................................2

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **AC** | Plaintiffs' Amended Complaint (Dkt. 42) |
| **¶ __** | Paragraphs of the Amended Complaint |
| **CCaaS** | Contact-center-as-a-service |
| **Company or Sprinklr** | Sprinklr, Inc. |
| **cRPO** | Current remaining performance obligation |
| **CW** | Confidential witness |
| **Defendants** | Sprinklr, Inc., Ragy Thomas, and Manish Sarin |
| **Ex. __** | Exhibit to the Declaration of Sarah M. Topol, dated March 17, 2025 |
| **Exchange Act** | Securities Exchange Act of 1934, as amended |
| **FY** | Sprinklr's Fiscal Year (February 1 to January 31) |
| **FY2022** | Sprinklr's Fiscal Year 2022 (February 1, 2021 to January 31, 2022) |
| **FY2023** | Sprinklr's Fiscal Year 2023 (February 1, 2022 to January 31, 2023) |
| **FY2024** | Sprinklr's Fiscal Year 2024 (February 1, 2023 to January 31, 2024) |
| **FY2025** | Sprinklr's Fiscal Year 2025 (February 1, 2024 to January 31, 2025) |
| **FY2027** | Sprinklr's Fiscal Year 2027 (February 1, 2026 to January 31, 2027) |
| **Individual Defendants** | Ragy Thomas and Manish Sarin |
| **IPO** | Initial public offering |
| **Plaintiffs** | Anthony Marchesi and Naveed Nawaz |
| **PSLRA** | Private Securities Litigation Reform Act of 1995, as amended |
| **RPO** | Remaining performance obligation |
| **SaaS** | Software-as-a-service |
| **SEC** | U.S. Securities and Exchange Commission |
| **Section 10(b)** | 15 U.S.C. § 78j(b) |
| **Section 20(a)** | 15 U.S.C. § 78t(a) |
| **YoY** | Year-over-year |

# INTRODUCTION

Companies cannot see the future, and securities laws do not expect them to. Sprinklr made good-faith projections, then revised them when conditions changed. That is not securities fraud—it is how public companies *should* operate.

Sprinklr sells cloud-based software-as-a-service ("SaaS") products. Since its initial public offering in June 2021, it steadily increased subscription revenue, reporting double-digit year-over-year increases every quarter before and during the putative class period. Like any business, Sprinklr adjusted its strategy over time, identifying new opportunities and adapting to market conditions. It was transparent with investors about its business priorities and repeatedly warned of the associated risks—entrenched competition, longer sales cycles, and macroeconomic uncertainty. And it issued financial projections reflecting the best information it had at the time. But in 2024, conditions changed. New sales slowed, customer retention weakened, and Sprinklr revised its forecasts accordingly. The stock fell. Plaintiffs sued.

Plaintiffs call Sprinklr's projections fraud and insist Sprinklr concealed risks that, in reality, were repeatedly disclosed. But securities laws do not punish companies for failing to predict the future, nor do they require companies to highlight risks in the precise terms Plaintiffs prefer.

The Amended Complaint fails on its face. *First*, it does not plead a false or misleading statement. Sprinklr disclosed the very risks Plaintiffs claim were concealed, and nothing required it to adopt Plaintiffs' preferred wording. *Second*, most challenged statements are also inactionable as protected forward-looking statements, opinion statements, or statements of corporate optimism. *Third*, the AC does not plead a strong inference of scienter. It offers no plausible motive to defraud and alleges no contemporaneous facts suggesting intentional or reckless deception. *Finally*, it does

not plead loss causation. The purported "corrective disclosures" did not reveal fraud—only updated forecasts to reflect changed conditions.

For these and all the other reasons herein, the AC should be dismissed with prejudice.

## FACTUAL BACKGROUND

### I. Sprinklr And The Individual Defendants

Founded in 2009 by Ragy Thomas, Sprinklr develops SaaS, including contact-center-as-a-service ("CCaaS") offerings. ¶¶3, 25, 27, 34-36.[1] Since June 2021, Sprinklr has been a public company; its common stock trades on the New York Stock Exchange under the symbol "CXM." ¶¶19, 33. Thomas was Sprinklr's CEO until June 2024, co-CEO until November 2024, and is currently serving as Advisor to the CEO and Chair of Sprinklr's Board of Directors. ¶¶20, 160-61. Manish Sarin has been Sprinklr's CFO since January 2022. ¶21.

Sprinklr's unified Customer Experience Management ("CXM") platform provides a full-service system for enterprises, such as corporations and governmental organizations, to manage their customers' experience. ¶¶27-31; *See* Ex. 10 at 4-6. The CXM platform is comprised of four product suites, each of which may also be purchased individually:

1. ***Sprinklr Social*** (f/k/a Social Engagement and Sales).[2] Provides tools for engaging with, and analyzing, customer conversations and interactions across social media channels.

2. ***Sprinklr Service*** (f/k/a Modern Care). Provides digital-first customer service across multiple channels of contact.

[1] Cites to "¶_" refer to AC paragraphs. Cites to "Ex._" refer to the Topol Declaration exhibits, which are documents that may be properly considered on a Rule 12(b)(6) motion to dismiss—*i.e.*, "documents incorporated into the complaint by reference," *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007), as well as "matters of which a court may take judicial notice," *In re Pfizer Sec. Litig.*, 538 F.Supp.2d 621, 627 (S.D.N.Y. 2008), including "public disclosure documents required to be filed with the SEC," *In re Longtop Fin. Techs. Sec. Litig.*, 939 F.Supp.2d 360, 368n.4 (S.D.N.Y. 2013) (cleaned up); and "transcripts of companies' earnings calls," *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs.*, 336 F.Supp.3d 196, 205 (S.D.N.Y. 2018). Page numbers refer to the native pagination of each cited document.

[2] In early 2023, Sprinklr changed the names of its four product suites. ¶55; Ex. 9 at 5. For ease of reference herein, the four product suites are referred to by their current names.

3. ***Sprinklr Insights*** (f/k/a Modern Research). Provides customer behavior insights derived from customer interactions on the CXM platform.

4. ***Sprinklr Marketing*** (f/k/a Modern Marketing and Advertising). Provides tools for improving marketing campaigns.

¶¶27-31; Ex. 4 at 6-10.

Since its IPO in June 2021, the Sprinklr Service product suite has included a CCaaS offering that aims to replace traditional customer service call centers. ¶¶27, 29, 51; Ex. 4 at 8-9.

Most of Sprinklr's revenue is comprised of subscription revenue from sales of CXM product suites. ¶¶34, 38, 165. Sprinklr also derives revenue from fees associated with services that assist customers with the configuration and optimization of Sprinklr's products. ¶40. In addition to reporting subscription revenue and professional services revenue, Sprinklr reports its remaining performance obligation ("RPO"), which reflects expected revenues from multi-year contracts not yet recognized because they will be invoiced and recognized in future periods, ¶105, Ex. 4 at 55, as well as its current remaining performance obligation ("cRPO"), which reflects RPO that will be invoiced and recognized in the next 12 months, Ex. 10 at 57.

Sprinklr's fiscal year begins in February and runs through January; as a result, Sprinklr's 1Q is February through April, 2Q is May through July, 3Q is August through October, and 4Q is November through January. *See* ¶9.

## II. In FY2022, Sprinklr Reports Increasing Growth Rates, But Cautions Investors That Its Future Growth Rate May Not Match Its Recent Growth Rate

In the four quarters following its IPO in June 2021, Sprinklr reported increasing growth in subscription revenue. *See* Ex. 1 at 2 (25% YoY increase in 2Q FY2022); Ex. 2 at 2 (29% YoY increase in 3Q FY2022); Ex. 3 at 4 (31% YoY increase in 4Q FY2022); Ex. 5 at 2 (32% YoY increase in 1Q FY2023).

But Sprinklr cautioned its investors: "Our recent rapid growth may not be indicative of our future growth. Our rapid growth also makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful." Ex. 1 at 46; Ex. 2 at 45; Ex. 4 at 16; Ex. 5 at 33. Sprinklr explained that the market in which it operates was "new and rapidly evolving," and that its revenue "depends on our customers renewing their subscriptions and on us expanding our sales to existing customers." Ex. 1 at 46; Ex. 2 at 45; Ex. 4 at 16; Ex. 5 at 33.

## III. In FY2023, Sprinklr Reports Declining Growth Rates And A Reduction In Workforce, But Increasing Customer Interest In Its CCaaS Offering

After reporting a 32% YoY increase in subscription revenue for 1Q FY2023, *see* Ex. 5 at 2, Sprinklr reported declining rates of growth in subscription revenue for each remaining quarter in FY2023. *See* Ex. 6 at 2 (29% YoY increase in 2Q FY2023); Ex. 7 at 2 (27% YoY increase in 3Q FY2023); Ex. 9 at 4 (26% YoY increase in 4Q FY2023).

During a December 6, 2022 earnings call for 3Q FY2023, Thomas stated Sprinklr had seen increasing customer interest in CCaaS and over one-third of its bookings in the quarter were for its Sprinklr Service CCaaS product suite:

> Like we said, we saw over 1/3 of our bookings was in our customer service product suite. That's kind of what reflects our focus, but it also reflects where the market is focused. . . . And traditionally, if you're doing it without Sprinklr, you're working with a legacy CCaaS player. And then you're trying to bring a shiny automation or AI company into it, which is fraught with a lot more integration and breakage points inside the infrastructure. And so we're seeing a lot of excitement in automating customer journeys.

Ex. 8 at 12-13; ¶54.

During the March 29, 2023 earnings call for 4Q FY2023, Sprinklr reported the subscription revenue growth rate had continued to decline, Ex. 9 at 4, and Sarin stated Sprinklr had reduced its headcount, including in sales staff, by approximately 4%. *Id.* at 7. While Sprinklr would primarily rely on remaining sales staff to drive growth going forward, *id.* at 15, Thomas stated Sprinklr was

hiring sales personnel from "traditional contact center companies" to help grow the CCaaS business, *id.* at 16-17. And while growing the CCaaS business from Sprinklr Service would be a priority in FY2024, *id.* at 6, Thomas cautioned that Sprinklr was the "new kid on the block with CCaaS" and would be "challenging some of the well-known legacy players" in a "30-, 40-year-old industry," *id.* at 14, 6; *see also* ¶86.

## IV. In FY2024, Sprinklr Prioritizes Growing The CCaaS Business, But Cautions Investors About The Challenges It Faced In The CCaaS Market

In FY2024, Sprinklr continued to report declining subscription revenue growth rates. *See* Ex. 11 at 4 (24% YoY increase in 1Q FY2024); Ex. 15 at 4 (23% YoY increase in 2Q FY2024); Ex. 17 at 4 (22% YoY increase in 3Q FY2024); Ex. 19 at 4 (19% YoY increase in 4Q FY2024).

Sarin noted during a June 5, 2023 earnings call for 1Q FY2024 that "macroeconomic conditions" had moderated subscription renewal rates, Ex. 11 at 7, and Sprinklr projected on July 12, 2023 it would not be until FY2027 that subscription revenue, which totaled $548.6 million in FY2023, would reach $1 billion. ¶99.

During the June 5, 2023 earnings call for 1Q FY2024, Sprinklr reiterated that growing the CCaaS business from Sprinklr Service was a priority, while cautioning investors about the challenges it faced, including that becoming a "serious material CCaaS player" required it to "overinvest" in Sprinklr Service early on, Ex. 11 at 17, and that CCaaS deals take longer to close:

> [A]s you probably know already, CCaaS deals take longer. There are very formal RFP processes and multiple stakeholders outside consultants and lots of people involved. And change management is a huge deal in that space. So as we learn more, you're going to see sales cycles increase a little bit, but we don't think it's a macro thing.

*Id.* at 11; *see also* Ex. 15 at 13 ("[A]s we get into CCaaS, you know deal cycles take longer because it's a very thorough process. . . . CCaaS transition is very hard, and . . . customer service teams are very risk averse. So it's a much more longer thought out, deliberate kind of RFP, RFI process that takes time.").

During the December 6, 2023 earnings call for 3Q FY2024, Sarin reiterated that Sprinklr's "primary strategic focus in FY'24 has been to rapidly scale [the] Sprinklr Service product suite" and reported that it had "made significant demonstrable progress with Sprinklr Service, gaining market share and customer momentum in the CCaaS market." Ex. 17 at 9. Sarin noted, however, that "our focus on succeeding in our CCaaS business slowed progress with some of our other [product suite] go-to-market initiatives," that Sprinklr anticipated a lowered growth in FY2025 (projecting "10% total revenue growth" for FY2025), and it would not be until FY2027 that subscription revenue would reach $1 billion, *id*. at 9, 11; *see also* ¶¶117, 121. Thomas similarly noted Sprinklr anticipated an adverse "near-term impact on growth" due to "slower progress on some of [its] other go-to-market initiatives." Ex. 17 at 7. When asked if the Company needed to add personnel to "refocus on the broader suite" of products, Thomas stated it was "more of an internal resource allocation," explaining that Sprinklr had "overrotated a little bit" to incentivize sales staff to sell Sprinklr Service and would allow those with background experience in the other product suites to "go back and focus" on them. *Id.* at 10.

## V. On March 27, 2024, Sprinklr Cautions Investors That It Anticipates A Further Decline In Growth Rates In FY2025 And Provides Guidance For FY2025

During the March 27, 2024 earnings call for 4Q FY2024, Sprinklr again reported a decline in subscription revenue growth rate. ¶127; Ex. 19 at 4 (19% YoY increase in 4Q FY2024). In addition, Sarin cautioned investors of continuing renewal pressure and macroeconomic headwinds that were likely to persist throughout FY2025, Ex. 19 at 7-8.

Thomas stated that Sprinklr "anticipated" further "decline in FY2025 revenue growth rate" and would undertake "a more structured cross-functional . . . approach" for FY2025 to pursue "growth opportunities" across all product suites. *Id.* at 4-5. He cautioned, though, that these efforts to were a "work in process" that would "take some time to manifest through the P&L." *Id.* at 5.

Sprinklr provided the following guidance for FY2025: (i) subscription revenue between $740.5 million and $741.5 million; (ii) total revenue between $804.5 and $805.5 million; (iii) non-GAAP operating income between $104 million and $105 million; and (iv) non-GAAP net income per share between $0.38 and $0.39, assuming 291 million shares outstanding. ¶127.

## VI. <u>On June 5, 2024, Sprinklr Reports A Significant Decline In Growth Rate For 1Q FY2025, A Reduction In Workforce, And Revised Guidance For FY2025</u>

During the June 5, 2024 earnings call for 1Q FY2025, Sprinklr reported a significant decline in its subscription revenue growth rate. Ex. 20 at 4 (12% YoY increase). Thomas explained that more "measured" customer buying behavior, persistent "scrutiny on renewals," "longer" sales cycles, and a "challenging macro environment" contributed to Sprinklr's weakened growth rate. *Id.* In response to these "market dynamics and performance challenges," Sarin stated that Sprinklr had reduced its headcount by approximately 3%. *Id.* at 7.

Sprinklr revised its guidance for FY2025 to (i) subscription revenue between $714 million and $716 million; (ii) total revenue between $779 and $781 million; (iii) non-GAAP operating income between $104 million and $105 million; and (iv) non-GAAP net income per share between $0.40 and $0.41, assuming 276 million shares outstanding. *Id.*; ¶131. Sprinklr also withdrew its FY2027 projections, including its projection $1 billion in revenue for FY2027. ¶135.

## VII. <u>This Lawsuit</u>

On August 13, 2024, this lawsuit was filed. Dkt. 1. On January 24, 2025, lead plaintiff Anthony Marchesi and "additional plaintiff" Naveed Nawaz, filed the Amended Complaint, Dkt. 42, which asserts claims under Sections 10(b) and 20(a) of the Exchange Act. The putative class period runs from March 29, 2023, when Sprinklr reported results for 4Q FY2023, to June 5, 2024, when Sprinklr reported results for 1Q FY2025. ¶1.

Plaintiffs allege Sprinklr misled investors during the putative class period by failing to disclose "risks" associated with its focus on growing the CCaaS business from Sprinklr Service, including that Sprinklr faced hurdles in the CCaaS market, that Sprinklr had "secretly diverted needed resources and manpower" from other products suites to Sprinklr Service, and that other product suites suffered cancelled contracts and failed renewals and sales. ¶¶66-85.[3]

## LEGAL STANDARDS

The elements of a Section 10(b) claim are: (1) a material misrepresentation or omission ("falsity"), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss causation, and (6) economic loss. *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (cleaned up). Section 10(b) claims are subject to the PSLRA's "exacting pleading requirements" for falsity and scienter. *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PLSRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also* Fed. R. Civ. P. 9(b) ("a party must state with particularity the circumstances constituting fraud"). In addition, for each alleged misstatement, the PSLRA requires that a complaint state with particularity facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A).

[3] As already noted, Sprinklr refers to all of its product suites as components of its unified CXM platform. *See supra* at pp. 2-3. Without referencing any statement or citing any source document, Plaintiffs allege that Sprinklr instead used the term "Core Suite." ¶¶27, 36. Because Sprinklr did not use the term "Core Suite" in its periodic reports during the putative class period and because none of the challenged statements use the term "Core Suite," Defendants refer herein to the CXM platform when discussing the system for all its product suites and to the names of specific product suites (*i.e.*, Sprinklr Social, Sprinklr Service, Sprinklr Insights, and Sprinklr Marketing) when discussing different product suites.

The Court "must consider the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. "The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 555 (S.D.N.Y. 2004). The Court also need "not accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions, or unwarranted inferences." *Kavanagh v. Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014).

## ARGUMENT

### I. Plaintiffs 10(b) Claim Should Be Dismissed Because The Amended Complaint Fails To Plead Any False Or Misleading Statement Or Omission

To plead falsity, Plaintiffs are required to "demonstrate with specificity why and how" each challenged statement was "false *at the time it was made*." *In re Bristol-Myers Squibb Sec. Litig.*, 658 F.Supp.3d 220, 230 (S.D.N.Y. 2023) (cleaned up). Moreover, there is no duty to disclose all material information, and an omission is actionable only if disclosure was necessary "[t]o make . . . statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Here, Plaintiffs challenge statements made by Defendants in March, June, July, September, and December 2023, and one statement made in March 2024. ¶¶86-138. Plaintiffs allege that Sprinklr misled investors by failing to disclose "risks" associated with its focus on growing the CCaaS business from Sprinklr Service. ¶¶66-85. As discussed below, Defendants disclosed each of the "risks" about which Plaintiffs complain. *See Ashland v. Morgan Stanley*, 652 F.3d 333, 338 (2d Cir. 2011) (affirming dismissal where defendant "disclosed the very . . . risks about which [Plaintiff] claim[s] to have been misled").

### A. <u>Sprinklr Disclosed Challenges It Faced In The CCaaS Market</u>

Contrary to Plaintiffs' contention that Defendants failed to disclose "entrenched competition" in the CCaaS market, ¶70, Thomas disclosed on March 29, 2023, the first day of the putative class period, that Sprinklr was "the new kid on the block with CCaaS" and it was "challenging some of the well-known legacy players" in CCaaS, which he described as a "30-, 40-year-old industry." Ex. 9 at 14, 6; *see also* Ex. 11 at 17 (Thomas describing Sprinklr's "hope and aspiration" to become a "material CCaaS player").

Equally baseless is Plaintiffs' contention that Sprinklr failed to disclose that it "faced a long sales cycle in the CCaaS market." ¶71; *see also* ¶¶60-61, 108. For example, during a June 5, 2023 earnings call, Thomas stated:

> What I'd point out is as we get into CCaaS . . . CCaaS deals take longer. There are very formal RFP processes and multiple stakeholders outside consultants and lots of people involved. And change management is a huge deal in that space. So as we lean more, you're going to see sales cycles increase a little bit[.]

Ex. 11 at 11. During a September 6, 2023 earnings call, Thomas reiterated: "[A]s we get into CCaaS, you know deal cycles take longer because it's a very thorough process. It's—CCaaS transition is very hard, and they are very—customer service teams are very risk averse. So it's a much more longer thought out, deliberate kind of RFP, RFI process that takes time." Ex. 15 at 13; *see also* Ex. 17 at 11 (Thomas: "In the CCaaS world, these are very time-consuming transformation[s]. So there are long protracted RFPs.").

Plaintiffs also mistakenly contend that Sprinklr failed to disclose that purchasers of CCaaS products are typically IT personnel, who may be different from employees in marketing who purchase Sprinklr's other products. ¶69. In addition to failing to identify any statements rendered false by the failure to disclose that purchasers of CCaaS products are typically IT personnel, ¶69, Plaintiffs ignore Thomas' disclosure during the June 5, 2023 earnings call that "*IT buyers* find

Sprinklr [Service] to be a great fit for their needs . . . in the contact center[.]" Ex. 11 at 6 (emphasis added). Similarly, during the September 6, 2023 earnings call, in response to an analyst question about "the buyer of the carrier solution" not being "necessarily the same as the CCaaS solution," Thomas stated: "[W]e have been steadily seeing shipped out traditional buyer with the CMO's -- organization of the CMO with our expansion into CCaaS, that's expanded to include the CIO, CTIO organization. So we are more broadly penetrating the C-suite everybody from CMO to a CTO to now the CIO." Ex. 15 at 11.

Plaintiffs ultimately argue that Defendants should have engaged in self-flagellation by disclosing that the "risks regarding Sprinklr Service" included "inexperienced salespeople," "poor sales strategy," and "an unremarkable product." ¶¶87, 89, 108, 180. That is not the law: "[C]ompanies need not depict facts in a negative or pejorative light or draw negative inferences to have made adequate disclosures." *Singh v. Schikan*, 106 F.Supp.3d 439, 448 (S.D.N.Y. 2015) (dismissing securities class action complaint).

**B. <u>Sprinklr Disclosed Its Allocation Of Existing Resources To Sprinklr Service</u>**

Far from "secretly divert[ing]" resources from other products suites to Sprinklr Service, ¶¶2, 68-69, 75-85, 87, 95, 108, 150, Defendants disclosed on the first day of the putative class period that Sprinklr had reduced its headcount; that growing the CCaaS business from Sprinklr Service was a priority; and that Sprinklr would rely primarily on "existing headcount" (*i.e.*, remaining personnel) to drive growth. During the March 29, 2023 earnings call, Defendants disclosed that:

- Sprinklr "recently concluded an internal review across product areas, regions, and support functions" and that, "[a]s a result of this review, we restructured our global workforce by about 4%." Ex. 9 at 7.

- Growing the CCaaS business was a "big focus" for FY2024, and the Company hoped that FY2024 would be "the year of contact center business." *Id.* at 16.

- Sprinklr was hiring sales personnel from "traditional contact center companies" to help grow the CCaaS business, *id.* at 17, but would rely primarily on existing personnel to drive growth: "[W]e anticipate to drive a lot of incremental revenue from existing headcount." *Id.* at 15.

Moreover, during the putative class period (and before any alleged corrective disclosure), Thomas stated that Sprinklr had to "overinvest early on" as part of its efforts to grow the CCaaS business from Sprinklr Service. Ex. 11 at 17.

The AC does not allege any contemporaneous facts contradicting these disclosures. Instead, Plaintiffs admit that "Sprinklr may have hired a few people from traditional contract center companies," ¶89, and entirely ignore Defendants' disclosures that growing the CCaaS business from Sprinklr Service would be a priority in FY2024 and that Sprinklr would rely primarily on "existing headcount" to drive growth, Ex. 9 at 6, 15-16. Any reasonable investor would understand from these disclosures that Sprinklr was allocating existing resources to grow the CCaaS business.[4] *See In re Nokia Sec. Litig.*, 423 F.Supp.2d 364, 397 (S.D.N.Y. 2006) ("Courts are instructed to consider the total mix of information and are supposed to bear in mind that disclosure requirements are not intended to attribute to investors a child-like simplicity.") (cleaned up).

Plaintiffs cannot contrive a claim based on the failure to state that Sprinklr "diverted" resources to Sprinklr Service: "That [Defendants] did not use the words Plaintiff would put in its mouth does not mean that the material facts were not disclosed." *Diabat v. Credit Suisse*, 2024 WL 4252502, at *80 (S.D.N.Y. Sept. 19, 2024); *see also Bank of Am.*, 980 F.Supp.2d at 586 ("[P]ublic disclosures do not need to encompass precisely those facts allegedly omitted from a defendant's statements.").

---

[4] Because any reasonable investor would understand from Defendants' disclosures that Sprinklr was allocating existing resources to grow the CCaaS business, alleged statements from CWs 1-3 and 5-6 that existing personnel were directed to build out and sell Sprinklr Service, ¶¶68, 80-81, add nothing.

### C. Sprinklr Accurately Reported Its Data Regarding Ongoing And Future Subscription Revenues

As Sprinklr disclosed to investors, the vast bulk of its revenue is comprised of subscription revenue from sales of CXM product suites, the amount of which depends on subscription renewals and the addition of new subscription customers:

> We derive, have derived, and expect to continue to derive the substantial majority of our revenue from subscriptions to our Unified Customer Experience Management ('Unified CXM') platform. . . . Our business depends on our customers renewing their subscriptions and on us expanding our sales to existing customers. Any decline in our customer renewals or expansion would harm our business, results of operations and financial condition.

*E.g.,* Ex. 10 at 16.

Despite these disclosures, and although as a matter of logic companies that rely on subscription revenue experience cancellations and non-renewals, Plaintiffs contend that Defendants misled investors by not disclosing that, for Sprinklr Social, Sprinklr Insights, and Sprinklr Marketing, there were "cancelled" contracts and "failed" sales and renewals. ¶¶87, 89, 93, 95, 100, 106, 110, 112, 180. "[D]isclosure requirements are not intended to attribute to investors a child-like simplicity." *Nokia*, 423 F.Supp.2d at 397 (cleaned up).

Moreover, far from concealing any data regarding ongoing or future subscription revenues, Sprinklr disclosed each quarter (i) subscription revenue collected in the quarter;[5] (ii) RPO, *i.e.*, the revenue remaining to be collected over the life of existing multi-year contracts; and (iii) cRPO, the revenue remaining to be collected on existing contracts over the next 12 months. *See, e.g.,* Ex. 10 at 57; Ex. 11 at 7-8; Ex. 15 at 6-7; Ex. 17 at 7-8; Ex. 20 at 6-7.

[5] Sprinklr also reported YoY growth rates in subscription revenue. Plaintiffs challenge Sarin's July 2023 statement that "all product suites are growing at a very healthy rate," ¶¶97-98, but, as of July 2023, Sprinklr had continued to report double-digit YoY growth rates in subscription revenue. *See* Ex. 9 at 7 (26% YoY increase in 4Q FY2023); Ex. 11 at 4 (24% YoY increase in 1Q FY2024); Ex. 15 at 4 (23% YoY increase in 2Q FY2024). There is no allegation, nor could there be, that Sprinklr inaccurately reported its YoY growth rates in subscription revenue.

Plaintiffs do not, and cannot, allege that Sprinklr inaccurately reported any of this data regarding subscription revenues.[6] *See In re Sanofi Sec. Litig.*, 155 F.Supp.3d 386, 404 (S.D.N.Y. 2016) (dismissing Section 10(b) claim based on statements about sales growth because "[a]bsent an allegation that Sanofi reported income that it did not actually receive or sales growth that did not actually occur . . . a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.") (cleaned up).

Instead, Plaintiffs attempt to contrive a claim by conflating anticipated future revenue from existing subscription agreements with projections about future revenue from new agreements. Citing CW 1, Plaintiffs argue that Sprinklr's June 2024 revision of its March 2024 guidance for FY2025 could only be attributed to fraud because "Sprinklr would have known a year ahead of time what the actual subscription revenue projections should have been." ¶128. But there are two components to subscription revenue projections for an upcoming year. The first component is cRPO, which reflects the amount of subscription revenue due over the next 12 months based on existing contracts. cRPO is reported to investors each quarter,[7] and Plaintiffs do not allege that Sprinklr inaccurately reported cRPO. The second component is a projection of additional subscription revenue from new contracts signed in the upcoming year—that is not something that "Sprinklr would have known a year ahead of time." ¶128. There is thus no factual basis for Plaintiffs' contention that Sprinklr's June 2024 revision of its March 2024 guidance for FY2025 could only be attributed to fraud, ¶¶127-28, as opposed to Sprinklr's disclosed reasons for revising guidance: "In the first quarter [of FY2025], buying behavior was more measured, sales cycles were

[6] Absent factual allegations showing that Sprinklr inaccurately reported RPO, Plaintiffs have no factual basis for challenging Sarin's September 2023 statement that Sprinklr was seeing "strength in renewal activity, as shown in the multi-year RPO renewals, RPO numbers." ¶¶105-06.

[7] *See* Ex. 10 at 57 ($485.2 million in cRPO); Ex. 11 at 8 ($478.8 million); Ex. 15 at 7 ($510.4 million); Ex. 17 at 8 ($491.4 million); Ex. 19 at 7 ($587 million); Ex. 20 at 7 ($570.4 million).

longer, and budget scrutiny on renewables increased as well. As a result, Q1 performance reflects lower net new bookings and increased customer churn. Based on the current outlook for the year, we are lowering our revenue guidance for FY'25[.]" Ex. 20 at 4.

There is also no factual basis for Plaintiffs' contention that Sprinklr should have disclosed that the "diversion of resources and manpower" to Sprinklr Service had resulted in "cancelled" contracts and "failed" sales and renewals for other product suites. ¶¶81-84, 180. The AC does not, for example, identify how many contracts were cancelled, what product suites any cancelled contracts were for, or the value of such cancelled contracts, much less how many contracts were cancelled, or how many non-renewals or failed sales there were, due to the "diversion of resources and manpower" to Sprinklr Service.

Moreover, as a matter of law, Sprinklr was not required to further break out the detailed information it already provided about subscription revenues by product suite or to report cancelled contracts, non-renewals, and failed sales. *See Abely v. Aterna Zentaris*, 2013 WL 2399869, *11-12 (S.D.N.Y. May 29, 2013) ("Section 10(b) and Rule 10b-5 do not categorically prohibit statements that . . . report cumulative figures instead of detailed breakdowns of the underlying data or subcategories of data.") (cleaned up).

### D. <u>Sprinklr Never Stated That It Had "Fixed The Problems" With Its Business</u>

There is no basis for Plaintiffs' contention that Defendants told investors in December 2023 that Sprinklr had already "fixed the problems caused by the Company's push towards Sprinklr Service." ¶¶120, 122. When asked in the December 6, 2023 earnings call if the Company needed to add personnel to "refocus on the broader suite" of products, Thomas stated that it was "more of an internal resource allocation," explaining that Sprinklr had "overrotated a little bit" to incentivize sales staff to sell Sprinklr Service and that the "obvious" fix for the overrotation was to allow those

with background experience in the other product suites to "go back and focus" on them. Ex. 17 at 10. Far from stating that Sprinklr had already "fixed the problems caused by the Company's push towards Sprinklr Service," Thomas said he was "hopeful" that "in one or two quarters, we'll begin to see some data that would allow us to just update you further." *Id.*

## II. Plaintiffs' Section 10(b) Claim Should Be Dismissed Because The Challenged Statements Are Inactionable As A Matter Of Law

The statements Plaintiffs challenge also fail because they fall squarely into the PSLRA's safe harbor for forward-looking statements or are inactionable statements of opinion or puffery.

### A. Forward-Looking Statements

The PSLRA protects statements that are identified as forward-looking and ***that are either*** (i) accompanied by meaningful cautionary language; (ii) immaterial; or (iii) made without actual knowledge of their falsity. *See* 15 U.S.C. § 78u-5(c). "Because the statute is written in the disjunctive, [forward-looking] statements are protected by the safe harbor if they satisfy *any one* of these three categories." *Okla. Firefighters Pension & Ret. Sys. v. Xerox*, 300 F.Supp.3d 551, 567 (S.D.N.Y. 2018) (emphasis added), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox*, 771 F. App'x 51 (2d Cir. 2019). Forward-looking statements include those containing "a projection of revenues," "earnings (including earnings loss) per share," "future economic performance," "the plans and objectives of management for future operations," and "the assumptions underlying or relating to" those plans and objectives. 15 U.S.C. § 78u-5(i)(1)(A)-(D).

#### 1. Financial Projections

Sprinklr's FY2025 guidance and subscription revenue projection for FY2027, ¶¶99-100, 121, 127-28, are protected by the PSLRA safe harbor. *See Lefkowitz v. Synacor*, 2019 WL 4053956, at *8 (S.D.N.Y. Aug. 28, 2019) (Schofield, J.) ("Syancor's revenue projections are not actionable for the additional reason that they fall within the scope of the PSLRA's safe harbor.").

Sprinklr identified the challenged projections as forward-looking statements. When Sprinklr provided its guidance for FY2025 on March 27, 2024, it told investors that "[t]his press release contains express and implied 'forward-looking statements' within the meaning of the Private Securities Litigation Reform Act of 1995, including statements regarding our financial outlook for the first quarter and full year fiscal 2025." Ex. 18 at 6. It also cautioned that these financial projections "statements are subject to numerous uncertainties and risks, including factors beyond our control, that could cause actual results, performance, or achievement to differ materially and adversely from those anticipated or implied in the statements." *Id.*

At the outset of the July 12, 2023 presentation providing Sprinklr's FY2027 subscription revenue projection, investors were cautioned that the call would include "forward-looking statements" and shown a slide stating that "[t]hese forward-looking statements include, but are not limited to, statements regarding our financial guidance[.]" Ex. 14 at 2. Moreover, in discussing the FY2027 projection, Sarin noted that it was for "3 years from now." Ex. 13 at 25. Similarly, at the outset of the December 6, 2023 call in which Sarin discussed the projection, investors were told that "we'll be making some forward-looking statements . . . that involve many assumptions, risks and uncertainties, including our guidance[.]" Ex. 17 at 4. Each time, Sprinklr cautioned that "actual results" may "differ materially." Ex. 14 at 2; Ex. 17 at 4 ("[A]ctual results may differ materially" from "our guidance").

The cautionary language accompanying the FY2025 guidance and FY2027 revenue projection easily satisfies the standard for PSLRA safe harbor protection. *See, e.g.*, *Slayton v. Am. Express*, 604 F.3d 758, 771, 773 (2d Cir. 2010) (cautionary language should "convey[] substantive information" but "need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe

harbor"); *Bank of Am.*, 980 F.Supp.2d at 579 ("[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk."); *In re Curaleaf Holdings Sec. Litig.*, 519 F.Supp.3d 99, 107 (E.D.N.Y. 2021) ("There is no requirement that a Company disclose its risk in any magic words preferred by plaintiffs.").

Sprinklr's FY2025 guidance and subscription revenue projection for FY2027 are also protected by the PSLRA safe harbor because the AC does not plead particularized facts showing that Defendants had actual knowledge of their falsity at the time they were made. *See In re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000) ("[E]ven if the defendants turned out to be wrong about predicted financial performance, 'misguided optimism is not a cause of action, and does not support an inference of fraud.'") (cleaned up).

Far from having "no reasonable basis" for the FY2025 guidance it provided on March 27, 2024, ¶128, Sprinklr reported on the same day 22% YoY growth in subscription revenue for FY2024. Ex. 19 at 7. Despite these results, Sprinklr provided conservative guidance for FY2025 that assumed a substantial *decline* in growth rates for FY2025. *Id.* at 8 (projected midpoint YoY subscription revenue growth rate of 11%). As discussed above, *see supra* at p. 14, Plaintiffs improperly conflate future revenue from existing subscription agreements (the cRPO metric reported by Sprinklr each quarter) with projections about unknown future revenue from new agreements signed in the upcoming year when they argue that "Sprinklr would have known a year ahead of time what the actual subscription revenue projections should have been." ¶128. There is thus no factual basis for Plaintiffs' contention that the June 2024 revision could only be attributed to fraud, as opposed to Sprinklr's disclosed reasons for revising guidance.

Nor does the AC plead facts showing that Defendants already knew by December 2023 that "the effects of Sprinklr's failed push towards Sprinklr Service would . . . mak[e] the

Company's plans for Fiscal Year 2027 extremely unlikely." ¶122. On December 6, 2023, Sprinklr reported that it had "made significant demonstrable progress with Sprinklr Service, gaining market share and customer momentum in the CCaaS market" and that personnel with background experience in the other product suites were returning to focus on them. Ex. 17 at 9, 10. Moreover, since its IPO in June 2021, Sprinklr had reported double-digit YoY growth in subscription revenue, *see supra* at p. 13 n.5, and even as of the December 6, 2023 earnings call, Sprinklr reported a 22% YoY increase in subscription revenues for 3Q2024, Ex. 17 at 4. Furthermore, with one quarter still remaining in FY2024, Sprinklr had already reported $491.6 million in subscription revenue, *id.*, Ex. 15 at 4, Ex. 11 at 4, and ultimately reported $668.5 million in subscription revenue for FY2024, Ex. 19 at 7. The AC fails to allege facts showing that Defendants nonetheless knew by December 2023 that its $1 billion subscription revenue projection for FY2027 would be impossible to achieve. *See Lefkowitz*, 2019 WL 4053956, at *9 (dismissing 10(b) claim where complaint "alleges no facts that suggest that . . . Defendants knew that that the projected revenues would never be realized."), *aff'd*, 832 F. App'x 54 (2d Cir. 2020).

**2. Other Forward-Looking Statements**

Many of the other statements Plaintiffs challenge are also squarely protected by the PSLRA safe harbor. *See, e.g.*, ¶86 ("*we're going to be* a disruptive player in CCaaS"; "*we will continue* to innovate and win in social"); ¶88 (stating at beginning of FY2024 "*this is the year* of our contact center business"); ¶107 ("*I wouldn't make any broad assumptions around how Q3 and Q4 would land*"); ¶119 ("what we are doing now, as we think and plan for the next year is we are adjusting quotas and we are just bifurcating or trifurcating the field . . . so you can fix the overrotation . . . *we're pretty hopeful that in one or two quarters*, *we'll begin to see* some data that would allow

us to just update you further" regarding focus on all product suites); ¶121 ("It does not change our *FY'27 long-term plan*"; "we don't feel any difference *about FY'27*").[8]

These statements are quintessentially forward-looking because they are "expressions of optimism or projections about the future" that "concern[] an uncertain future event." *In re Anheuser-Busch Sec. Litig.*, 2020 WL 5819558, at *5 (S.D.N.Y. Sept. 29, 2020). Similarly, the Company's expectations about future sales of its various product lines, ¶86, the Company's prospects in the CCaaS space, ¶92, and future growth and customer satisfaction, ¶¶86, 88, 94, 107, 111, 119, 121, 129, are all prototypical forward-looking statements. *See, e.g.*, *Eden Alpha CI v. Polished.com*, 2025 WL 296998, at *22 (E.D.N.Y. Jan. 24, 2025) (holding that the following forward-looking statement was protected by PSLRA safe harbor: "The backbone of our success will be our fulfillment and logistics systems as well as the other technologies in our supply chain"); *Glidepath Holding v. Spherion*, 2010 WL 1372553, at *9 (S.D.N.Y. Mar. 26, 2010), *aff'd*, 425 F. App'x 76 (2d Cir. 2011) (Defendant's statement that it "envision[ed] a promising market opportunity" for new business line was forward-looking statement protected by PSLRA safe harbor); *In re QLT Sec. Litig.*, 312 F.Supp.2d 526, 534 (S.D.N.Y. 2004) ("Sales forecasts are forward-looking statements.").

These forward-looking statements were accompanied by meaningful risk disclosures. *See, e.g.*, Ex. 10 at 16, 18 (disclosing risk factors that "could materially and adversely affect our business, financial condition, or results of operations," including "Our recent rapid growth may

[8] *See also* Ex. 10 at 3 (explaining that forward-looking statements include statements concerning "our expectations regarding our revenue, expenses and other operating results;" "our ability to achieve and maintain our profitability;" "the costs and success of our marketing efforts and our ability to promote our brand;" "our growth strategies for our Unified-CXM platform;" "the estimated addressable market opportunity for our Unified-CXM platform;" "our ability to effectively manage our growth," and "our ability to compete effectively with existing competitors and new market entrants"); Ex. 9 at 4; Ex. 11 at 4 (referencing press release); Ex. 12 at 6; Ex. 13 at 4 (referencing presentation); Ex. 15 at 4; Ex. 16 at 4 (referencing earnings release); Ex. 17 at 4; Ex. 19 at 4.

not be indicative of our future growth. Our rapid growth also makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful"; "Our business depends on our customers renewing their subscriptions and on us expanding our sales to existing customers. Any decline in our customer renewals or expansion would harm our business, results of operations and financial condition"; "investments require significant expenditures . . . making it difficult to determine in a timely manner if we are efficiently allocating our resources"; "we expect the growth rate of our subscription revenue to fluctuate . . . in the near term, subscription revenue growth rates may be lower compared to comparable periods"); Ex. 10 at 3 (forward-looking statements include statements concerning "expectations regarding our revenue, expenses and other operating results;" "the costs and success of our marketing efforts and our ability to promote our brand;" "our growth strategies for our Unified-CXM platform;" "ability to effectively manage our growth," and "ability to compete effectively with existing competitors and new market entrants"); Ex. 9 at 4; Ex. 11 at 4 (referencing press release); Ex. 12 at 6; Ex. 13 at 4 (referencing presentation); Ex. 15 at 4; Ex. 16 at 4 (referencing earnings release); Ex. 17 at 4; Ex. 19 at 4.

Because the cautionary language "point[ed] to the principal contingencies" that could impact future results, all of the challenged forward-looking statements are protected by the PSLRA safe harbor. *Gissin v. Endres*, 739 F.Supp.2d 488, 509 (S.D.N.Y. 2010).

These statements are also protected by the PSLRA safe harbor because the AC does not plead particularized facts showing that Defendants had actual knowledge of their falsity at the time they were provided. *See supra* at pp. 10-15; *Slayton*, 604 F.3d at 776 ("defendants' allegedly misleading [forward-looking] statement is protected by . . . the safe harbor because the plaintiffs did not plead facts demonstrating that the statement was made with actual knowledge that the statement was false or misleading") (cleaned up).

### B. Opinion Statements

Plaintiffs also challenge several opinion statements that convey subjective views regarding Sprinklr's business outlook and growth prospects. *See, e.g.*, ¶86 ("we're going to be a disruptive player in CCaaS"; "we will continue to innovate and win in social"); ¶92 ("we are very pleased with how we're managing what's in our control"; "we're excited about the progress we're making"); ¶94 ("once you buy into the Sprinklr approach, we keep growing"); ¶105 ("strength in renewal activity"); ¶109 (Sprinklr Service sales strategy is "working really well"); ¶119 ("I think the most obvious explanation for this is the fact that we . . . kind of overrotated a little bit"); ¶121 ("we don't feel any difference about FY'27 than we did six months ago"); ¶129 ("we think that the majority of it is self-inflicted").[9] These statements are not assertions about "presently existing, objective facts." *In re Sanofi Sec. Litig.*, 87 F.Supp.3d 510, 528, 531 (S.D.N.Y. 2015), *aff'd*, 816 F.3d 199 (2d Cir. 2016).

"In contrast to objective statements of material fact, subjective statements of opinion are generally not actionable as fraud." *Id.* at 528. An opinion statement is only actionable if a plaintiff pleads facts showing that the speaker (i) did not honestly believe the statement or supplied an untrue supporting fact; or (ii) omitted information that made the opinion statement misleading to a reasonable investor. *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

The AC alleges no facts showing that Defendants did not sincerely believe their stated views at the time they were made. *See In re Adient Sec. Litig.*, 2020 WL 1644018, at *15-17 (S.D.N.Y. Apr. 2, 2020) (dismissing claims challenging opinion statements where plaintiffs failed to plead facts showing that "[d]efendants did not believe" their "expectations" about business

[9] Many of these statements are prefaced with opinion language like "I think" or "we think" (¶¶105, 107, 119, 129), "I would say" (¶107), and "we believe" (¶111). *See Schaffer v. Horizon Pharma*, 2018 WL 481883, at *10 (S.D.N.Y. Jan. 18, 2018) ("I think" and similar language signals inactionable opinion statements.).

prospects). And it is "no small task" for Plaintiffs to plead the falsity of opinion statements via an omissions theory. *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189-90, 194 (2015). An opinion statement is not actionable merely because "some fact cutting the other way" is not disclosed. *Id.* at 189-90. Rather, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. Here, the AC does not "identify particular (and material) facts going to the basis" of a challenged opinion statement that would render it misleading, and Plaintiffs cannot make out a false statement by showing that an opinion turned out to be incorrect. *Id.*

### C. <u>Statements Of Corporate Optimism Or "Puffery"</u>

Generalized statements of "corporate optimism," or "puffery," cannot give rise to liability under the securities laws, *Rombach v. Chang*, 355 F.3d 164, 174-75 (2d Cir. 2004), because they "make[] no specific claims on which [reasonable persons] can rely." *In re Sanofi-Aventis Sec. Litig.*, 774 F.Supp.2d 549, 565 (S.D.N.Y. 2011).

Here, Plaintiffs challenge a number of statements that convey generalized optimism about Sprinklr's business. *See, e.g.*, ¶86 ("we're going to be a disruptive player in CCaaS"; "we are well positioned"); ¶92 ("we are very pleased with how we're managing what's in our control"; "we're excited about the progress we're making"; "we continue to verticalize to enable quick time-to-value and faster deployments"; "IT buyers find Sprinklr to be a great fit for their needs"); ¶94 ("once you buy into the Sprinklr approach, we keep growing"); ¶97 (product suite growth rates are "very healthy"); ¶105 ("strength in renewal activity"); ¶109 (Sprinklr Service sales strategy is "working really well"); ¶ 111 ("we believe we have enough investments in place that should allow

us to grow at the rate that we are growing"); ¶119 ("we're pretty hopeful that in one or two quarters, we'll begin to see some data that would allow us to just update you further").

These generalized statements of optimism are textbook examples of inactionable puffery. *See, e.g.*, *Nokia*, 423 F.Supp.2d at 371, 397-99 (finding inactionable as puffery statements that "[w]e expect to see continued momentum," "we want to be present in all the key segments," "the product road map is a very exciting one," and "[o]ur distribution strategy is bearing fruit").[10]

## III. Plaintiffs' Section 10(b) Claim Should Be Dismissed For Failure To Plead Particularized Facts Giving Rise To A Strong Inference Of Fraudulent Intent

Plaintiffs' Section 10(b) claim should also be dismissed for failure to adequately plead scienter. For each alleged misstatement or omission, the PSLRA requires a plaintiff to plead particularized facts giving rise to a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 314, 324. Rather than drawing all inferences in a plaintiff's favor, a court "must consider plausible, nonculpable explanations" for a defendant's conduct. *Id.* at 323-24; *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 389 (2d Cir. 2021). To meet its burden, a plaintiff must plead particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Here, Plaintiffs have not come close to meeting their burden.

[10] To the extent Plaintiffs assert a scheme liability claim, *see* ¶¶180-81, it fails because a scheme claim requires "something beyond misstatements and omissions." *SEC v. Rio Tinto*, 41 F.4th 47, 49 (2d Cir. 2022). It does not suffice to "merely repackage the misrepresentation allegations" into a scheme claim. *Menaldi v. Och-Ziff Cap. Mgmt. Grp.*, 277 F.Supp.3d 500, 520 (S.D.N.Y. 2017). Yet, that is what Plaintiffs attempt here. ¶¶180-81. Because the alleged scheme is "indistinguishable from the misstatements and omissions," it fails as a matter of law. *In re Mindbody Sec. Litig.*, 489 F.Supp.3d 188, 217 (S.D.N.Y. 2020).

### A. The AC Does Not Adequately Plead A Motive To Defraud

Plaintiffs' allegations that Defendants were motivated to project "bright futures" or a "positive outlook," ¶¶7, 91, are patently insufficient. *See In re PetroChina*, 120 F.Supp.3d 340, 364 (S.D.N.Y. 2015) ("[G]eneral motives that are common to most corporate officers do not constitute 'motive.' Therefore, the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not suffice to establish a motive.") (cleaned up).

Plaintiffs do not allege that Thomas sold any Sprinklr stock during the putative class period, and are thus reduced to asserting that one, but not all, of the Individual Defendants sold stock during the putative class period. ¶¶166-68. "The fact that the other defendant[] did not sell [his] shares during the relevant class period undermines plaintiffs' claim that defendants" were motivated to defraud. *Acito v. IMCERA*, 47 F.3d 47, 54 (2d Cir. 1995). Moreover, although even "[t]he sale of a large volume of stock . . . is not enough to adequately plead scienter," *In re CRM Holdings Sec. Litig.*, 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012), Plaintiffs merely plead the volume of Sarin's stock sales. ¶166. The AC does not allege any facts showing that the sales were "unusual or suspicious in amount or timing." *Dempsey v. Vieau*, 130 F.Supp.3d 809, 816 (S.D.N.Y. 2015). Furthermore, Sarin's stock sales were made pursuant to a non-discretionary Rule 10b5-1 trading plan. "[I]t is well established that trades under [a] 10b–5–1 plan do not raise a strong inference of scienter." *Glaser v. The9*, 772 F.Supp.2d 573, 592 (S.D.N.Y. 2011) (cleaned up). When stock sales are made pursuant to a 10b5-1 plan entered into during the putative class period, ¶167, a plaintiff must allege facts showing that "the purpose of the plan was to take advantage of an inflated stock price." *Ark. Pub. Empls. Ret. Sys. v. Bristol-Myers Squibb*, 28 F.4th 343, 357 n.4 (2d Cir. 2022). The AC here fails to allege any such facts. *See, e.g.*, ¶¶ 166-68.

Moreover, Plaintiffs conspicuously omit Sprinklr's substantial share repurchases during the putative class period. *E.g.*, Ex. 19 at 7 ($29.6 million in share repurchases in 4Q FY2024); Ex. 20 at 7 ($101.2 million in share repurchases in 1Q FY2025). "[S]ubstantial share repurchases tend to negate a finding of scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Tr.*, 336 F.Supp.3d at 225 (cleaned up).

**B. The AC Does Not Plead Particularized Facts Showing Conscious Misbehavior Or Recklessness On The Part Of Any Defendant**

In the absence of adequate motive allegations, Plaintiffs must plead "correspondingly greater" allegations of conscious misbehavior or recklessness, *In re Advanced Battery Techs.*, 781 F.3d 638, 644 (2d Cir. 2015), that give rise to a "strong inference" of a fraudulent intent "with respect to each defendant and with respect to each act or omission alleged to [constitute securities fraud]." *Bristol-Myers*, 658 F.Supp.3d at 230.

Rather than plead particularized facts showing an intent to defraud, Plaintiffs proffer a straw man, arguing that Defendants were aware of "concealed risks," ¶¶139-65, that, as discussed above, were disclosed. For example, Plaintiffs argue that Defendants had access to information about, and were aware of, the "diversion of resources and manpower" to Sprinklr Service, ¶¶139-55, but so too were investors. Far from "secretly divert[ing]" resources from other products suites to Sprinklr Service, Defendants disclosed on the first day of the putative class period that Sprinklr had reduced its headcount; that growing the CCaaS business from Sprinklr Service was a priority; and that Sprinklr would rely primarily on "existing headcount" (*i.e.*, remaining personnel) to drive growth. Any reasonable investor would understand from these disclosures that Sprinklr was allocating existing resources to grow the CCaaS business from Sprinklr Service. *See supra* Argument § I.B. Defendants' alleged knowledge of disclosed information does not give rise to any inference of fraudulent intent, much less a strong inference.

Plaintiffs' speculation that Defendants "would have had access to and received information about the impacts of Sprinklr's shift in business plan," ¶145, adds nothing. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). The AC alleges that Sprinklr used Salesforce to "track its sales and growth," ¶152, but does not identify any information in contemporaneous Salesforce or other reports contradicting Defendants' challenged statements. *See Maloney v. Ollie's Bargain Outlet Holdings*, 518 F.Supp.3d 772, 781 (S.D.N.Y. 2021) (no scienter where complaint "fails to specify exactly what information was contained in the [daily sales] report or how said information contradicted Defendants' public statements"); *Inter-Local Pension Fund GCC/IBT v. Gen. Elec.*, 445 F. App'x 368, 370 (2d Cir. 2011) ("vague and general averments" that executives had access to "real-time customer and sales information" insufficient to plead a strong inference of scienter); *In re Barrick Gold Sec. Litig.*, 341 F.Supp.3d 358, 373 (S.D.N.Y. 2018) (defendant's access to "expense and capital cost data" did not support any inference of scienter where plaintiffs failed to identify specific information in data contradicting defendant's statements). "[W]ithout contemporaneous falsity, there can be no fraud." *In re Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 571 (S.D.N.Y. 2014).

Plaintiffs' reliance on CWs suffers from the same defects and more. CW 1 allegedly "affirmed" that there were cancelled contracts, non-renewals, and failed sales in 2003, ¶150, but the AC omits any detail from CW 1 or anyone else about how many contracts were cancelled, what product suites any cancelled contracts were for, or the value of such cancelled contracts, much less how many contracts were cancelled, or how many non-renewals or failed sales there were, due to the "diversion of resources and manpower" to Sprinklr Service. *See Lululemon*, 14 F.Supp.3d at 580 ("general allegations" regarding quality control issues "do not render the

[defendants'] statements described herein, considered in context, false or misleading," where the complaint does not also "contain the . . . required specific factual allegations (by CWs or otherwise)"). Moreover, the AC does not allege that CW 1 had any contact with Sarin and merely alleges that "CW 1 was part of a sales leadership team that worked directly with Defendant Thomas," ¶37, ***without alleging the substance of any communication that CW 1 had with Thomas***. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express*, 724 F.Supp.2d 447, 461 (S.D.N.Y. 2010) (rejecting CW allegations that "do not establish what specific contradictory information the Individual Defendants received"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011). None of the other CWs is alleged to have had any contact with Thomas or Sarin.[11] *See In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *19 (S.D.N.Y. Aug. 19, 2015) (rejecting allegations based on CWs who did not have direct communications with the individual defendants), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).

Moreover, as discussed in Argument § I.C., each quarter, Sprinklr reported subscription revenue collected, RPO, and cRPO; it had no duty to further break out subscription revenue by product suite or to report cancelled contracts, non-renewals, and failed sales, or otherwise "depict facts in a negative or pejorative light." *Singh*, 106 F.Supp.3d at 448. Continued YoY growth in subscription revenue is not mutually exclusive with having some cancelled contracts, some non-renewals, or some failed sales. Plaintiffs' mere allegation of cancelled contracts, non-renewals, and failed sales—without putting those cancellations in some context to determine their impact on any period—does not give rise to any inference of fraud, much less a strong inference.

[11] Plaintiffs' allegations based on CWs 2 through 6 also fail to provide particularized facts contradicting Defendants' challenged statements at the time they were made. *See* ¶¶44, 79, 81 (CW2 discussing product pricing and sales strategy); ¶¶44, 78 (CW3 discussing product pricing and sales strategy); ¶64 (CW4 discussing size of CCaaS market); ¶¶68, 70-71, 80 (CW5 discussing sales strategy and Sprinklr Service features and sales cycle length); ¶¶77, 81 (CW6 discussing resource allocation).

Plaintiffs ultimately are reduced to a hodge-podge of theories that, individually or collectively, are too vague and general to give rise to a plausible inference of scienter, much less a strong one.

***Temporal Proximity.*** Plaintiffs purport to rely on the "temporal proximity" between Defendants' challenged statements and the alleged corrective disclosures in December 2023 and June 2024, ¶¶157-58, but even a one-month period of time between an alleged misstatement and corrective disclosure "is too ephemeral a connection to raise a strong inference of scienter." *Pearlstein v. BlackBerry*, 93 F.Supp.3d 233, 247 (S.D.N.Y. 2015); *accord San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris*, 75 F.3d 801, 812-13 (2d Cir. 1996) (disclosure of adverse information three weeks after positive report insufficient to plead falsity or scienter). "[C]ourts in this district have held that temporal proximity alone does not raise a circumstantial inference of fraud. Rather, plaintiffs must specifically allege defendants' knowledge of facts or access to information contradicting their public statements." *Pearlstein*, 93 F.Supp.3d at 247 (cleaned up). This is precisely what the AC fails to do.

***Personnel Moves.*** Plaintiffs characterize the appointment of a co-CEO in June 2024 as "effectively demoting Thomas" and proclaim, without any explanation why, that it reflected that "problems" were "concealed from investors." ¶162. That is nonsense. "[W]ithout some indicia of highly unusual or suspicious circumstances," even an officer's resignation does not provide strong circumstantial evidence of scienter. *See Glaser*, 772 F.Supp.2d at 598; *accord Denny v. Canaan*, 2023 WL 2647855, at *14 (S.D.N.Y. Mar. 27, 2023). Moreover, Thomas' continuing role today as Chair of the Company's Board of Directors, ¶163, undermines any inference of scienter. *See In re Jiangbo Pharm., Sec. Litig.*, 884 F.Supp.2d 1243, 1263 (S.D. Fla. 2012) (no inference of scienter where CFO "stayed on with the Company as a consultant after her resignation").

***Core Operations.*** The core operations doctrine, ¶¶164-65, cannot salvage Plaintiffs' claim. "[I]t is far from clear that the core operations doctrine remains valid in light of the PSLRA." *Bristol-Myers*, 658 F.Supp.3d at 234. Even when it was valid, it could not independently create a strong inference of scienter. *See Glaser*, 772 F.Supp.2d at 595-96. Instead, it can only "bolster[] the strength of the inference of scienter when plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false." *Id.* at 595. Because Plaintiffs have not done so here, the core operations doctrine cannot salvage their claim.

**C. <u>Any Inference of Scienter Is Not As Compelling As The Opposing Inference</u>**

Taking a holistic view of the AC, the more cogent and compelling inference is that Sprinklr's original FY2025 guidance and FY2027 subscription revenue projection were reasonable in light of the double-digit YoY growth in subscription revenue that Sprinklr had experienced since its IPO in June 2021, the "significant demonstrable progress with Sprinklr Service" it had made as of December 2023, Ex. 17 at 9, the reported return of personnel with background experience in the other product suites to "go back and focus" on them, *id.* at 10, and the "high" win rates for CCaaS business reported in March 2024, Ex. 19 at 16. In 1Q FY2025, however, new business was "lower than expected" and there was "increased customer churn." Ex. 20 at 4, 6. The congruence of macroeconomic headwinds, headcount limitations, and elevated customer churn caused Sprinklr to downwardly revise its guidance for FY2025 and subscription revenue projection for FY2027. The competing inference proffered by Plaintiffs—that Sprinklr concealed the diversion of resources from other product suites to Sprinklr Service, while disclosing the Company's reduction in headcount and focus on growing its CCaaS business from Sprinklr Service, and that its June 2024 change in projections was actually due to the adverse impact from the secret diversion of resources to Sprinklr Service—strains credulity.

## IV. Plaintiffs' Section 10(b) Claim Should Be Dismissed For Failure To Adequately Plead Loss Causation

Plaintiffs' Section 10(b) claim also should be dismissed for failure to adequately plead loss causation. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch*, 396 F.3d 161, 172 (2d Cir. 2005) (cleaned up). To adequately plead loss causation, a plaintiff must connect the drops in stock prices to particular corrective disclosures, "which revealed an alleged misstatement's falsity." *In re AOL Time Warner Sec. Litig.*, 503 F.Supp.2d 666, 677 (S.D.N.Y. 2007).

Here, Plaintiffs attempt to plead loss causation based on alleged corrective disclosures on December 6, 2023 and June 5, 2024. ¶¶114-17, 131-35. But neither "revealed an alleged misstatement's falsity." *In re AOL Time Warner*, 503 F.Supp.2d at 677. Indeed, as discussed above in Argument § I, the "concealed risks" about which Plaintiffs complain were disclosed prior to the alleged corrective disclosures. Lower-than-expected guidance, revised guidance, or a withdrawn projection reflect a change in estimates for future periods, not the falsity of a prior statement. *See Lentell*, 396 F.3d at 175n.4 (downgrades from "accumulate" to "neutral" and "buy" to "accumulate" were not corrective disclosures "because they do not reveal to the market the falsity of the prior recommendations"); *In re Omnicom Grp. Sec. Litig.*, 541 F.Supp.2d 546, 552 (S.D.N.Y. 2008) ("[W]here a disclosure does not reveal the falsity of the alleged misstatements, it does not qualify as 'corrective.' A decision to reverse course, particularly in a dynamic business environment, does not imply that the earlier business strategy was a subterfuge."). The AC's failure to identify a corrective disclosure that "reveal[s] the falsity of challenged public statements," is "fatal under Second Circuit Precedent." *Janbay v. Canadian Solar*, 2012 WL 1080306, at *14 (S.D.N.Y. 2012) (cleaned up).

## V. Plaintiffs' Section 20(a) Claim Should Be Dismissed

Absent a primary Section 10(b) violation, Plaintiffs' Section 20(a) claim fails. *Bristol-Myers*, 658 F.Supp.3d at 235. The AC also fails to plead facts raising a strong inference that either Thomas or Sarin were culpable participants in any alleged fraud. *See supra* Argument § III; *Venkataraman v. Kandi Techs. Grp.*, 2022 WL 4225562, at *9 (S.D.N.Y. Sept. 13, 2022).

## CONCLUSION

For all these reasons, the Amended Complaint should be dismissed with prejudice.

Dated: New York, New York
March 17, 2025

Respectfully submitted,

COOLEY LLP

By: *\/s/ Aric H. Wu*
Aric H. Wu

Sarah M. Topol
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
stopol@cooley.com

Koji F. Fukumura (*pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121
Tel: (858) 550-6000
kfukumura@cooley.com

*Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

I, Aric H. Wu, certify that Defendants Sprinklr, Inc., Ragy Thomas, and Manish Sarin's ("Defendants") Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint complies with the word count allowed by the Honorable Lorna G. Schofield's March 10, 2025 Order (Dkt. 44). Defendants' Memorandum of Law contains 10,448 words, exclusive of the cover page, table of contents, table of authorities, table of abbreviations, certificates of compliance and service, and signature block. Furthermore, I certify that the accompanying Declaration of Sarah M. Topol, dated March 17, 2025, does not append more than 20 exhibits, which collectively does not exceed 300 pages.

*/s/ Aric H. Wu*
Aric H. Wu

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 17, 2025, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the Court's CM/ECF system, which sends notification of such filing to all counsel on record.

*/s/ Aric H. Wu*
Aric H. Wu