UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE SPRINKLR, INC. SECURITIES LITIGATION

Case No. 1:24-cv-06132-LGS

---

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

COOLEY LLP
Aric H. Wu
Sarah M. Topol
Trevor H. O'Bryan
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
stopol@cooley.com
tobryan@cooley.com

Koji F. Fukumura (*pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121
Tel: (858) 550-6000
kfukumura@cooley.com

*Attorneys for Defendants*

June 2, 2025

## TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ................................................................................................ vi

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

    I.    The AC Fails To Adequately Plead Any False Or Misleading Statement Or Omission ... 3

        A.    Sprinklr Disclosed Its Allocation Of Resources To Sprinklr Service........................ 3

        B.    Plaintiffs Fail To Adequately Allege That The Allocation Of Resources
            To Sprinklr Service "Almost Immediately" Put Core Suite In "Distress" ............... 4

        C.    Sprinklr Disclosed Challenges Faced In The CCaaS Market ................................... 5

        D.    Plaintiffs Fail To Identify Facts Showing That Sprinklr Had No Reasonable
            Basis For Its FY2027 Subscription Revenue Projection........................................... 6

        E.    None Of The Other Challenged Statements Are Actionable ................................... 8

    II.    The AC Fails To Plead Facts Giving Rise To A Strong Inference Of Scienter............... 11

        A.    The AC Does Not Adequately Plead A Motive To Defraud ................................. 11

        B.    The AC Does Not Plead Particularized Facts Showing Conscious Misbehavior
            Or Recklessness On The Part Of Any Defendant .................................................. 13

        C.    Any Inference of Scienter Is Not As Compelling As The Opposing Inference...... 15

    III.  The AC Fails To Adequately Plead Loss Causation....................................................... 16

    IV.  Plaintiffs' Section 20(a) Claim Should Be Dismissed ................................................... 16

CONCLUSION...................................................................................................................... 16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Cases**

*Acito v. IMCERA*,
    47 F.3d 47 (2d Cir. 1995)..............................................................................................11

*In re Advanced Battery Techs.*,
    781 F.3d 638 (2d Cir. 2015)..........................................................................................13

*In re Aegean Marine Petroleum Sec. Litig.*,
    529 F.Supp.3d 111 (S.D.N.Y. 2021)........................................................................... 8-9

*Ashland v. Morgan Stanley*,
    652 F.3d 333 (2d Cir. 2011)............................................................................................6

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
    2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) ...........................................................10, 14

*In re Bristol-Myers Squibb Sec. Litig.*,
    658 F.Supp.3d 220 (S.D.N.Y. 2023)........................................................................13, 15

*C.D.T.S. v. UBS AG*,
    2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ...............................................................15

*In re Carbo Ceramics, Inc. Stock & Options Sec. Litig.*,
    2013 WL 3242352 (S.D.N.Y. June 26, 2013) .................................................................6

*In re Comverse Tech., Inc. Sec. Litig.*,
    543 F.Supp.2d 134 (E.D.N.Y. 2008) ..............................................................................6

*In re CRM Holdings Sec. Litig.*,
    2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...............................................................11

*Damri v. LivePerson*,
    2025 WL 863322 (S.D.N.Y. Mar. 19, 2025) .............................................................5, 10

*Fitzer v. Sec. Dynamics Techs.*,
    119 F.Supp.2d 12 (D. Mass. 2000) .................................................................................5

*Galestan v. OneMain Holdings*,
    348 F.Supp.3d 282 (S.D.N.Y. 2018)...............................................................................5

*Gissin v. Endres*,
    739 F.Supp.2d 488 (S.D.N.Y. 2010)...............................................................................9

*Glaser v. The9*,
    772 F.Supp.2d 573 (S.D.N.Y. 2011)..............................................................................15

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Henningsen v. ADT Corp.*,
  161 F.Supp.3d 1161 (S.D. Fla. 2015) .................................................................4

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec.*,
  445 F. App'x 368 (2d Cir. 2011) ........................................................................14

*In re Jiangbo Pharm., Sec. Litig.*,
  884 F.Supp.2d 1243 (S.D. Fla. 2012) ................................................................15

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F.Supp.3d 381 (S.D.N.Y. 2022).....................................................................6

*Lefkowitz v. Synacor*,
  2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019).......................................................7

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express*,
  724 F.Supp.2d 447 (S.D.N.Y. 2010)...................................................................14

*In re Lululemon Sec. Litig.*,
  14 F.Supp.3d 553 (S.D.N.Y. 2014) ....................................................................14

*Maloney v. Ollie's Bargain Outlet Holdings*,
  518 F.Supp.3d 772 (S.D.N.Y. 2021)...................................................................13

*Meyer v. Organogenesis Holdings Inc.*,
  727 F.Supp.3d 368 (E.D.N.Y. 2024) ..................................................................12

*New Orleans Emps. Ret. Sys. v. Celestica*,
  455 F. App'x 10 (2d Cir. 2011) ............................................................................4

*In re Nokia Sec. Litig.*,
  423 F.Supp.2d 364 (S.D.N.Y. 2006).....................................................................3

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................2, 6, 7, 8

*Pearlstein v. BlackBerry*,
  93 F.Supp.3d 233 (S.D.N.Y. 2015) ....................................................................15

*Prime Mover Cap. Partners v. Elixir Gaming*,
  898 F.Supp.2d 673 (S.D.N.Y. 2012)...................................................................16

*Ret. Bd. of the Policemen's Annuity and Benefit Fund v. FXCM*,
  2016 WL 4435243 (S.D.N.Y. Aug. 18, 2016).....................................................13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)................................................................................4

*Robeco Cap. Growth Funds v. Peloton Interactive*,
665 F.Supp.3d 522 (S.D.N.Y. 2023)............................................................. 6-7

*In re Romeo Power Inc. Sec. Litig.*,
2022 WL 1806303 (S.D.N.Y. June 2, 2022) ......................................................14

*Rudani v. Ideanomics*,
2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020)......................................................7

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris*,
75 F.3d 801 (2d Cir. 1996)................................................................................15

*Shreiber v. Synacor*,
832 F. App'x 54 (2d Cir. 2020) ..........................................................................7

*Tellabs v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................................................................6, 11

*In re Teva Sec. Litig.*,
671 F.Supp.3d 147 (D. Conn. 2023)....................................................................6

*Turner v. MagicJack VocalTec*,
2014 WL 406917 (S.D.N.Y. Feb. 3, 2014).........................................................13

*Tyler v. Liz Claiborne*,
814 F.Supp.2d 323 (S.D.N.Y. 2011)..................................................................13

*Van Dongen v. CNinsure*,
951 F.Supp.2d 457 (S.D.N.Y. 2013)..................................................................11

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F.Supp.2d 512 (S.D.N.Y. 2011)....................................................................9

*In re Vroom, Inc. Sec. Litig.*,
2025 WL 862125 (S.D.N.Y. Mar. 18, 2025) ......................................................11

*Wasson v. LogMeln*,
496 F.Supp.3d 612 (D. Mass. 2020) ....................................................................4

*In re Weight Watchers Int'l Sec. Litig.*,
504 F.Supp.3d 224 (S.D.N.Y. 2020)..................................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Statutes**

15 U.S.C. § 78j(b) ...............................................................................................................16

15 U.S.C. § 78t(a) ...............................................................................................................16

Private Securities Litigation Reform Act of 1995, as amended............................................. *passim*

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **AC** | Plaintiffs' Amended Complaint (Dkt. 42) |
| **¶ __** | Paragraphs of the Amended Complaint |
| **Br.** | Defendants' Opening Brief for Motion to Dismiss (Dkt. 47) |
| **CCaaS** | Contact-center-as-a-service |
| **Company or Sprinklr** | Sprinklr, Inc. |
| **cRPO** | Current remaining performance obligation |
| **CW** | Confidential witness |
| **Defendants** | Sprinklr, Inc., Ragy Thomas, and Manish Sarin |
| **Ex. __** | Exhibit to the Declaration of Sarah M. Topol (Dkt. 48) |
| **FY** | Sprinklr's Fiscal Year (February 1 to January 31) |
| **FY2024** | Sprinklr's Fiscal Year 2024 (February 1, 2023 to January 31, 2024) |
| **FY2025** | Sprinklr's Fiscal Year 2025 (February 1, 2024 to January 31, 2025) |
| **FY2027** | Sprinklr's Fiscal Year 2027 (February 1, 2026 to January 31, 2027) |
| **Individual Defendants** | Ragy Thomas and Manish Sarin |
| **IPO** | Initial public offering |
| **Opp. or Opposition** | Plaintiffs' Opposition to Motion to Dismiss (Dkt. 54) |
| **Plaintiffs** | Anthony Marchesi and Naveed Nawaz |
| **PSLRA** | Private Securities Litigation Reform Act of 1995, as amended |
| **RPO** | Remaining performance obligation |
| **SaaS** | Software-as-a-service |
| **Section 10(b)** | 15 U.S.C. § 78j(b) |
| **Section 20(a)** | 15 U.S.C. § 78t(a) |
| **YoY** | Year-over-year |

**INTRODUCTION**

The Opposition reduces the Amended Complaint to four theories of "fraud." But it fails to explain how—under any of these theories—the challenged statements were materially false or misleading.

Plaintiffs' first theory is that Defendants tricked investors by "secretly" diverting resources from its "core" products to Sprinklr Service. Opp. 1. Plaintiffs argue that Defendants' statements gave one impression—that Sprinklr Service would be sold exclusively by a separate, CCaaS-experienced sales force and not existing salespersons—when the "truth" was something different.[1] This theory fails. Defendants *never said* Sprinklr Service would be sold exclusively by a separate sales force or that the Company would not use existing resources. Quite the opposite: Defendants said Sprinklr was going to rely mostly on "existing headcount" to drive growth. Ex. 9 at 15. Plaintiffs cannot base a fraud claim on representations that Defendants never in fact made.

Plaintiffs' second theory is that Defendants hid from investors that the "diversion" of resources to Sprinklr Service "almost immediately resulted in the cancellation of million dollar Core Suite contracts, failed Core Suite sales, and non-renewals." Opp. 1. These supposedly true "facts" are not alleged with anything close to the particularity required under the PSLRA. But even if the Court credited these allegations (and it should not), the existence of an unspecified number of canceled contracts, non-renewals, or "failed sales" is not inconsistent with anything Defendants *actually said*.

---

[1] *See* Opp. 1 ("[W]hen speaking positively about its business strategy and business units, Defendants concealed that…Sprinklr had not then hired the dedicated CCaaS-experienced sales force Defendants told investors was in place"); *id.* at 3 ("[I]nstead of building the dedicated CCaaS-experienced salesforce they told investors had already been hired, Defendants simply diverted Core Suite salespeople..."); *id.* at 13 (Defendants "claim[ed] that a separate, experienced salesforce had been hired for Sprinklr Service.").

Plaintiffs' third theory is that Defendants concealed "material, known risks" about Sprinklr Service that rendered statements "touting" it misleading. Opp. 1. This theory is directly refuted by the public record. Sprinklr amply disclosed the dynamics it faced in the CCaaS market, including competition from "well-known legacy players," longer sales cycles, and different decisionmakers for purchases. *See* Ex. 9 at 14, 6; Ex. 11 at 6, 11, 17; Ex. 15 at 11, 13; Ex. 17 at 11. There can be no falsity where a defendant repeatedly and clearly disclosed the very information a plaintiff claims was concealed.

Plaintiffs' final theory is that Sprinklr had "no reasonable basis to tell investors to expect $1 billion in annual subscription revenue by Fiscal Year 2027," *years* down the road. Opp. 1. But Sprinklr's FY 2027 projection is twice protected by the PSLRA safe harbor: (i) it was identified as forward-looking and accompanied by meaningful cautionary language; and (ii) the AC does not plead a single fact showing that Defendants had actual knowledge of falsity. And, that prediction is also an opinion. Showing that an opinion lacks a reasonable basis is a tall task: the plaintiff must identify "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have" whose omission renders the statement at issue misleading. *Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194-95 (2015). Plaintiffs have not done so here.

Plaintiffs' scienter and loss causation allegations fail for similar reasons. None of the facts alleged, viewed alone or together, support a strong inference that Defendants made the challenged statements with an intent to deceive. Nor do they plausibly suggest that this imagined "fraud" caused investors to lose money.

The Court should dismiss the AC with prejudice.

2

## **ARGUMENT**

**I.    The AC Fails To Adequately Plead Any False Or Misleading Statement Or Omission**

Plaintiffs' overarching claim is that Defendants failed to disclose that Sprinklr was "secretly" diverting resources from "core" products to Sprinklr Service. Opp. 1. Plaintiffs contend that Defendants' "positive[]" statements about Sprinklr's "business strategy and business units" gave investors the wrong impression. Opp. 1, 3. None of that is correct. Much of the information that Plaintiffs claim was "omitted' was, in fact, disclosed; Defendants simply did not use the words that Plaintiffs would have preferred. Moreover, the statements that Plaintiffs claim were misleading were not. The challenged statements are either not adequately alleged to have been false or inactionable as a matter of law, either because they are puffery or forward-looking statements protected by the PSLRA safe harbor.

### **A.    Sprinklr Disclosed Its Allocation Of Resources To Sprinklr Service**

Plaintiffs claim that Sprinklr misled investors into thinking that "a separate, experienced salesforce had been hired for Sprinklr Service," implying that Sprinklr would not use existing personnel. Opp. 13; *see also* Opp. 1, 3. Defendants said no such thing. Sprinklr did hire some personnel from "traditional contact center companies" to help grow the CCaaS business, and it said as much. Ex. 9 at 16-17. But the Company made clear that it was going to rely primarily on existing personnel to drive growth: "[W]e anticipate to drive a lot of incremental revenue from existing headcount." *Id.* at 15. A reasonable investor would have understood that Sprinklr was allocating existing resources to grow Sprinklr Service. *See In re Nokia Sec. Litig.*, 423 F.Supp.2d 364, 397 (S.D.N.Y. 2006) ("Courts are instructed to consider the total mix of information…[and] not…attribute to investors a child-like simplicity.").[2]

---

[2] Unless otherwise noted, all citations and quotations are omitted, and all emphasis is added.

3

### B.    Plaintiffs Fail To Adequately Allege That The Allocation Of Resources To Sprinklr Service "Almost Immediately" Put Core Suite In "Distress"

Plaintiffs next claim the "diversion" of resources to Sprinklr Service "almost immediately resulted in the cancellation of million dollar Core Suite contracts, failed Core Suite sales, and non-renewals," and that "almost immediately," the "Core Suite" was in "distress." Opp. 1, 10. Because any company that relies on subscriptions will have cancellations, non-renewals, and unsuccessful sales, such generalized allegations are patently insufficient. *See Wasson v. LogMeln*, 496 F.Supp.3d 612, 635 (D. Mass. 2020) ("Even if GoTo's customers were cancelling their subscriptions, that does not necessarily mean that the overall segment…did not grow.").

Additionally, and fatally, Plaintiffs provide no specifics about, *e.g.*, how many contracts were cancelled, their value, or how the value lost from such cancelled contracts compared to value gained from new customer acquisitions. Opp. 10-11. And the AC is extremely vague in identifying when any of the Defendants could or would have known that these "impediments" were likely to have a material impact on Sprinklr's financial results. Such details are essential for the Court to discern whether there was, in fact, a divergence between Defendants' "positive" statements and the actual status of the business, and if so, whether Defendants knew that.[3] *See Henningsen v. ADT Corp.*, 161 F.Supp.3d 1161, 1190 (S.D. Fla. 2015) ("[N]either CW4 nor any other confidential witness specifies the frequency of the [subscription] cancellations...[and] [e]ven the allegation of CW5, who stated that ADT was 'constantly' receiving cancellation requests in

---

[3] Such details are present in the cases Plaintiffs cite. *See Empls.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (specific CW allegation, corroborated by other sources, that "500,000 [units] were loaded onto trucks right before an audit and 'put back in stock' immediately after the auditors left"); *New Orleans Emps. Ret. Sys. v. Celestica*, 455 F. App'x 10, 13-14 (2d Cir. 2011) (three CWs who "provided information about rising inventory levels to [CEO] and [CFO] directly," including "spreadsheets…detailing the extent of excess and obsolete inventory"); *Galestan v. OneMain Holdings*, 348 F.Supp.3d 282, 299 (S.D.N.Y. 2018) ("Plaintiff identifies specific metrics and reports" and "the FEs…identify metrics…[which] showed the negative effects of integration").

2013 and saw deactivated accounts 'all the time' from March 2013 to March 2014...does not provide sufficient factual specificity to demonstrate that ADT understated attrition.").

### C.    Sprinklr Disclosed Challenges Faced In The CCaaS Market

Plaintiffs argue that Defendants were "not candid" about "entrenched competition" in the CCaaS market, and that Sprinklr faced a "much longer sales cycle" in the CCaaS market, which had "different buyers."  Opp. 2-3.  Not so.

- On March 29, 2023, the first day of the class period, Thomas disclosed that Sprinklr was "the new kid on the block with CCaaS" and was "challenging some of the well-known legacy players" in CCaaS.  Ex. 9 at 6, 14; *see also* Ex. 11 at 17.

- Thomas repeatedly cautioned that "CCaaS deals take longer" and detailed the reasons why that was so.  Ex. 11 at 11; Ex. 15 at 13; Ex. 17 at 11; Br. 10.

- Thomas explained that purchasers of CCaaS products are typically IT personnel, who may be different from marketing employees who purchase Sprinklr's other products. Ex. 11 at 6; Ex. 15 at 11.

Such disclosures defeat any argument that Defendants concealed the "risks" of developing Sprinklr Service.[4]   Plaintiffs say these disclosures were insufficiently specific because the Company did not go further and say that it was relying on "salespeople lacking CCaaS experience" and it had "ordered them to sell Sprinklr Service to Core Suite contacts who were not CCaaS purchasers."  Opp. 9.  But even if true those allegations implicate poor management, not fraud. *See Damri v. LivePerson*, 2025 WL 863322, *24 (S.D.N.Y. Mar. 19, 2025); *Fitzer v. Sec. Dynamics Techs.*, 119 F.Supp.2d 12, 31 (D. Mass. 2000) (allegations of "inexperienced and poorly-trained sales and service personnel" are not actionable under the securities laws).

---

[4] Plaintiffs claim these disclosures were made "after Defendants made numerous actionable misstatements." Opp. 9.  The record reflects otherwise.  Thomas warned in June 2023, for example, that "CCaaS deals take longer" and detailed the reasons why that was so. Ex. 11 at 11.  Yet, the earliest challenged statement based on Defendants' purported omission of "longer sales cycles" was in September 2023.  ¶¶107-08.

Defendants are not raising a "truth-on-the-market" defense. Opp. 13. "Truth-on-the-market" is a defense to materiality.[5] Defendants' argument is not that the alleged misstatements were immaterial because the "truth" was already known from some other source. Rather, Defendants argue that they properly disclosed the allegedly omitted information. Courts routinely grant motions to dismiss on this basis. *See, e.g.*, *Ashland v. Morgan Stanley*, 652 F.3d 333, 338 (2d Cir. 2011); *In re Carbo Ceramics, Inc. Stock & Options Sec. Litig.*, 2013 WL 3242352, \*6 (S.D.N.Y. June 26, 2013). Plaintiffs want the Court to ignore the public record, but doing so is contrary to the Supreme Court's instruction that courts consider, for falsity, the full context of the challenged statements, *Omnicare*, 575 U.S. at 190, and, for scienter, facts bearing on culpable and *non-culpable* inferences, *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 322-23 (2007).

**D.    Plaintiffs Fail To Identify Facts Showing That Sprinklr Had No Reasonable Basis For Its FY2027 Subscription Revenue Projection**

Plaintiffs' remaining theory[6] is that Defendants had "no reasonable basis to tell investors to expect $1 billion in annual subscription revenue by Fiscal Year 2027." Opp. 1, 11.

Sprinklr's FY2027 projection is protected by the PSLRA safe harbor—indeed, it is twice protected. *First*, the projection was identified as forward-looking and accompanied by meaningful cautionary language, including it was for "3 years from now"; involved "assumptions, risks, and uncertainties," such as "our ability to attract and retain customers to use our products" and "our ability to drive customer subscription renewals and expand our sales to existing customers"; and that "actual results" could "differ materially." Ex. 13 at 25; Ex. 14 at 2; Ex. 17 at 4; *see Robeco*

---

[5] Plaintiffs' own cases confirm this. *See In re Teva Sec. Litig.*, 671 F.Supp.3d 147, 197-98 & n.32 (D. Conn. 2023) (defense is used to "refute the materiality element"); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp.3d 381, 394-95 (S.D.N.Y. 2022) (same); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F.Supp.2d 134, 150 (E.D.N.Y. 2008) (same).

[6] Plaintiffs have abandoned their claim that Sprinklr's June 2024 revision of its FY2025 guidance was fraudulent. *Compare* ¶¶127-28 (alleging "no reasonable basis" for FY2025 guidance), *with* Opp. 7 n.4 ("Defendants attack ¶¶127-29, but Plaintiffs never alleged those statements to be actionable.").

6

*Cap. Growth Funds v. Peloton Interactive*, 665 F.Supp.3d 522, 538 (S.D.N.Y. 2023) (applying safe harbor to "statements containing projection of revenues" with caution that "[a]ctual results may differ materially...due to risks and uncertainties associated with our business").

*Second*, Plaintiffs do not plead a single fact showing that Defendants had actual knowledge of falsity. Like in *Lefkowitz v. Synacor*, 2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019), where the plaintiffs failed to plead facts showing that "prioritizing user engagement over monetization meant that Defendants knew that the projected revenues would never be realized," *id.* *9, Plaintiffs here fail to plead facts showing that Sprinklr knew its FY2027 projection *three years out* could not be realized because of its decision to prioritize Sprinklr Service.[7]

Sprinklr's FY 2027 projection was also an opinion. *See Shreiber v. Synacor*, 832 F. App'x 54, 57 (2d Cir. 2020) (statements about expected future revenue are "quintessential opinion statements"). To allege that Sprinklr had no reasonable basis for that opinion, Plaintiffs must identify "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have" whose omission renders the statement misleading. *Omnicare*, 575 U.S. at 194. "That is no small task." *Id.*

Plaintiffs (and their CWs) make only general allegations of "failed sales and renewals." Opp. 12. Such allegations do not show that Defendants did not believe their projection for FY2027. And they certainly do not show that the projection was "baseless." Opp. 11. Every quarter after its IPO in June 2021, Sprinklr had double-digit YoY growth in subscription revenue, including, as reported in December 2023, a 22% YoY increase for 3Q2024, Ex. 17 at 4. With one quarter left in FY2024, Sprinklr already had reported $491.7 million in subscription revenue, *id.*,

---

[7] *Rudani v. Ideanomics* underscores the need for particularized facts showing that defendants knew a projection was impossible to achieve. 2020 WL 5770356, *6 (S.D.N.Y. Sept. 25, 2020) (juxtaposing $300 million guidance for 2017 with specific factual allegations that two business segments "collectively lost $475,000" in 4Q 2016 and another segment "was only operat[ed]...for research purposes").

7

Ex. 15 at 4, Ex. 11 at 4, and ultimately reported $668.5 million for FY2024, Ex. 19 at 7. Thus, with three years to go, Sprinklr was already two-thirds of the way to its $1 billion goal. Plaintiffs claim that in June 2023 "known impediments" were hurting business and "undermining" the prospect of achieving that goal. Opp. 11. But even if the Court credits those conclusory allegations, an opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," as reasonable investors understand that opinions "sometimes rest on a weighing of competing facts." *Omnicare*, 575 U.S. at 189.

### E.    None Of The Other Challenged Statements Are Actionable

The Opposition barely references the specific statements Plaintiffs are challenging and for good reason. Most are inactionable as "puffery" and under the PSLRA's safe harbor. Others are plainly opinions and not adequately alleged to be false.

*Puffery*. Plaintiffs dispute that any challenged statements were puffery, calling them "precise," and "specific." Opp. 15. Even a cursory examination of the actual statements, however, undercuts Plaintiffs' argument. *See* ¶92 ("we are very pleased with how we're managing what's in our control"; "we're excited about the progress we're making"; "IT buyers find Sprinklr to be a great fit for their needs"); ¶94 ("once you buy into the Sprinklr approach, we keep growing"); ¶97 (growth rates are "very healthy"); ¶105 ("strength in renewal activity"); ¶109 ("working really well"); ¶ 111 ("we believe we have enough investments in place that should allow us to grow at the rate that we are growing"); ¶119 ("we're pretty hopeful that in one or two quarters, we'll begin to see some data that would allow us to just update you further").

No reasonable investor relies on such statements of corporate optimism. The cases Plaintiffs cite are readily distinguishable because they involved statements grounded in objectively verifiable facts. *See In re Aegean Marine Petroleum Sec. Litig.*, 529 F.Supp.3d 111, 173 (S.D.N.Y. 2021) (statements about a company's "strong financial position," "strong balance sheet," and

8

"improved financial strength," were actionable because they were grounded in verifiable historical facts—"false revenue numbers"—that the defendants allegedly knew to be false); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.Supp.2d 512, 573 (S.D.N.Y. 2011) (statement about company's "very sound financial footing" was actionable because it was supported by "specific statements of fact" regarding the company's "zero net debt" and "free net cash flow").

***Forward-Looking Statements.***  Plaintiffs refuse to engage with the actual forward-looking statements identified by Defendants, *see* Br. 19-20 & n.8, and instead make strawman arguments regarding other statements concerning "past and present conditions," Opp. 17 (citing ¶88), opinion statements, *id.* (citing ¶¶107, 121), and statements Plaintiffs no longer challenge, *compare* Opp. 18 (discussing ¶86), *with* Opp. 7 n.4 ("Plaintiffs withdraw ¶¶86-87 as an actionable statement.").

Nor do Plaintiffs address the specific cautionary language accompanying the forward-looking statements that is highlighted in Defendants' opening brief. *Compare* Br. 20-21, *with* Opp. 17-19.  Instead, Plaintiffs proclaim it all was "boilerplate" without reference to "known risks specific to Core Suite, Sprinklr Service, or Defendants' decision to shift resources." Opp. 19.  But, as demonstrated in Sections IA-C above, Sprinklr disclosed challenges in the CCaaS market and that it was allocating existing resources to grow Sprinklr Service, and the AC is devoid of facts showing that "Core Suite" was "almost immediately" in "distress" after resources were allocated to Sprinklr Service.

Because the specific cautionary language "point[ed] to the principal contingencies" that could impact future results, the forward-looking statements are protected by the PSLRA safe harbor. *Gissin v. Endres*, 739 F.Supp.2d 488, 509 (S.D.N.Y. 2010).  They are also protected because the AC does not plead particularized facts showing that Defendants had actual knowledge of their falsity.  Plaintiffs refer to the arguments "outlined in Section III(C)," Opp. 18-19, but

9

Section III(C) of the Opposition contains no discussion of any forward-looking statements identified by Defendants. *Compare* Br. 19-20 & n.8, *with* Opp. 19-29.

**Opinion Statements.** Rather than specifically address any opinion statements identified by Defendants, *see* Br. 22, Plaintiffs aver that "most were articulated as facts." Opp. 16. Again, the actual language of the statements shows otherwise. *See* ¶92 ("we are very pleased with how we're managing what's in our control"; "we're excited about the progress we're making"); ¶94 ("once you buy into the Sprinklr approach, we keep growing"); ¶109 (Sprinklr Service sales strategy is "working really well"); ¶119 ("I think the most obvious explanation for this is the fact that we…kind of overrotated a little bit"); ¶121 ("we don't feel any difference about FY'27 than we did six months ago").

*In re Axsome Therapeutics, Inc. Sec. Litig.,* 2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) does not help Plaintiffs. In *Axsome*, a drug company said it believed that existing suppliers would "be capable of providing sufficient quantities" to "meet [its] clinical trial supply needs," while at the same time, their suppliers were "unable to provide sufficient quantities even for stability studies for the NDA." *Id.* *5-7. The court held that the statement was actionable because the company omitted a critical material fact that conflicted with what a reasonable investor would take from the statement. *Id.* Here, Plaintiffs do not identify *any* particularized facts contradicting *any* specific opinion. Plaintiffs simply repeat their refrain that "Core Suite" was "almost immediately" in "distress" after resources were allocated to Sprinklr Service. That is not enough. *See Damri*, 2025 WL 863322, *16 (dismissing because "[t]he AC does not specifically allege which revenues were double-booked; how, if at all, those revenues were double-booked; which revenue was attributable to anticipated business; how, if at all, the inclusion of anticipated revenue violated reporting requirements; which anticipated business ultimately fell through").

10

## II.      The AC Fails To Plead Facts Giving Rise To A Strong Inference Of Scienter

The AC should also be dismissed for failure to plead particularized facts giving rise to a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 314.

### A.      The AC Does Not Adequately Plead A Motive To Defraud

Plaintiffs argue that "Defendants'" motive to defraud is established by Sarin's stock sales during the class period.  Opp. 25.  Not so.  As an initial matter, the AC fails to allege that *Thomas* sold any shares during the relevant period, which substantially undermines Plaintiffs' claim that Defendants were motivated by an intent to engage in insider trading.  *See Acito v. IMCERA*, 47 F.3d 47 (2d Cir. 1995); *In re Vroom, Inc. Sec. Litig.*, 2025 WL 862125, at *35 (S.D.N.Y. Mar. 18, 2025) ("[T]he fact that [the CEO] is not alleged to have sold Vroom shares during the Class Period further undermines any inference of scienter from [the CFO's] sales").  Plaintiffs argue that "[t]he failure of one defendant to sell his stock does not negate the scienter of a selling defendant." Opp. 26.  But the case they cite for that proposition, *Van Dongen v. CNinsure*, 951 F.Supp.2d 457 (S.D.N.Y. 2013) does not help them.  The court in *Van Dongen* held that "the fact that *multiple*…executives sold stock outweighs the fact that *one*…did not," distinguishing those facts from *Acito*, where "only one executive" sold stock.  *Id.* at 476.  Here, only one executive is alleged to have sold stock.  The facts resemble *Acito*, not *Van Dongen*.

Plaintiffs also fail to plead any facts that suggest Sarin's stock sales were "unusual or suspicious." *In re CRM Holdings Sec. Litig.*, 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012).  In determining whether stock sales are unusual or suspicious, courts consider many factors, including, *e.g.*, the amount of net profits realized from the sales, the percentages of holdings sold, and whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.  *Vroom*, 2025 WL 862125, at *35.  Plaintiffs try to sidestep this analysis by simply referring to two articles that

11

call attention to the volume of Sarin's sales.  Opp. 26.  But even those articles were heavily caveated, noting for example, that "while the insider's recent sell-off may raise eyebrows, it's important for investors to consider the broader context"—*i.e.*, that "insiders may sell shares for personal financial reasons that do not necessarily reflect a lack of confidence in the company, such as diversifying their investment portfolio, tax planning or major life expenses;" and insider selling "can [] be motivated by personal financial planning needs."[8]

Plaintiffs also do not dispute that every one of Sarin's stock sales was made under a Rule 10b5-1 trading plan.  Plaintiffs erroneously contend that the plan was implemented in June 2023, "***after*** Defendants had begun to secretly divert needed resources." Opp. 26 (emphasis in original). Three months earlier in March 2023, however, Sprinklr disclosed its "big focus" on CCaaS, Ex. 9 at 16, and that it was allocating existing resources to Sprinklr Service, *see supra* Section I.A.  "That the stock sales were made pursuant to [a] 10b5-1 plan[] [thus] undercuts Plaintiffs' scienter argument here." *Meyer v. Organogenesis Holdings*, 727 F.Supp.3d 368, 395 (E.D.N.Y. 2024) (no inference from CEO stock sales: "[A]lthough the Amended Complaint alleges that [the CEO] entered into the relevant 10b5-1 plans during the Class Period, the Amended Complaint does not adequately allege that the purpose of the plans was to take advantage of an inflated stock price").

Finally, Plaintiffs do not dispute that Sprinklr made more than $130 million in share repurchases during the class period.  Opp. 26-27.  Relying on a footnote in a single out-of-circuit decision, Plaintiffs argue that a "stock repurchase plan weighs neither in favor of nor against an inference of scienter." *Id.* (quoting *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, *17 n.5 (D.N.J. July 27, 2018)).  In the Second Circuit, however, "[c]ourts have repeatedly held that

---

[8] The two articles are available at https://www.gurufocus.com/news/2090872/insider-sell-cfo-manish-sarin-sells-20000-shares-of-sprinklr-inc-cxm  and  https://finance.yahoo.com/news/insider-sell-alert-cfo-manish-040455156.html.

substantial share repurchases by a corporate defendant during a class period may negate a finding of scienter." *Tyler v. Liz Claiborne*, 814 F.Supp.2d 323, 337-38 (S.D.N.Y. 2011); *accord Ret. Bd. of the Policemen's Annuity and Benefit Fund v. FXCM*, 2016 WL 4435243, *7 (S.D.N.Y. Aug. 18, 2016); *Turner v. MagicJack VocalTec*, 2014 WL 406917, *12 (S.D.N.Y. Feb. 3, 2014).

> **B.      The AC Does Not Plead Particularized Facts Showing Conscious Misbehavior Or Recklessness On The Part Of Any Defendant**

Absent motive, Plaintiffs must plead "correspondingly greater" allegations of conscious misbehavior or recklessness, *In re Advanced Battery Techs.*, 781 F.3d 638, 644 (2d Cir. 2015), and must raise a strong inference of scienter "with respect to each defendant and with respect to each act or omission alleged to" constitute fraud. *In re Bristol-Myers Squibb Sec. Litig.*, 658 F.Supp.3d 220, 230 (S.D.N.Y. 2023).

Rather than plead particularized facts showing an intent to defraud, Plaintiffs purport to rely on Defendants' knowledge of "concealed" risks that, as discussed in Section I above, were actually disclosed. All of Plaintiffs' various theories fail.

*Defendants' Supposed "Admission."* Plaintiffs claim Thomas and Sarin "admitted" to an "undisclosed strategy to divert needed resources." Opp. 20. To the contrary, Sprinklr disclosed on the first day of the class period that growing Sprinklr Service was a "big focus," Ex. 9 at 16, and that it was allocating existing resources to Sprinklr Service, *see supra* Section I.A.

*Salesforce.* Rather than "specify exactly what information was contained in the [Salesforce] report[s] or how said information contradicted Defendants' public statements," *Maloney v. Ollie's Bargain Outlet Holdings*, 518 F.Supp.3d 772, 781 (S.D.N.Y. 2021), Plaintiffs merely allege a "category of deals" tracked in Salesforce: "Core Suite sales and renewals." Opp. 21. None of the AC paragraphs cited by Plaintiffs specify what information about "Core Suite sales and renewals" was reflected in any Salesforce report or when, much less explain how any

such information contradicted any Defendant's public statements.  *See Inter-Local Pension Fund GCC/IBT v. Gen. Elec.*, 445 F. App'x 368, 370 (2d Cir. 2011) (finding "general averments" of access to "real-time customer and sales information" insufficient).

***Customer Communications.***    Plaintiffs do not identify the substance of any communications Thomas had with customers.  That he was allegedly "in constant communication with customers," Opp. 22-23, is thus meaningless.[9]

***CW Allegations.***    Plaintiffs concede that "only one" of the six alleged confidential witnesses, CW1, is alleged to have had direct contact with an Individual Defendant, Opp. 28, and that the AC fails to allege the substance of any communication that CW1 had with Thomas.  *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express*, 724 F.Supp.2d 447, 461 (S.D.N.Y. 2010) (rejecting CW allegations that "do not establish what specific contradictory information the Individual Defendants received"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011). Moreover, as discussed in Section I above, the AC omits any detail from CW1 or anyone else regarding "cancellations" or "failed" sales or renewals.  *See In re Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 580 (S.D.N.Y. 2014) (dismissing because complaint does not "contain the…required specific factual allegations (by CWs or otherwise)").

***Personnel Moves.***  Rather than "confirm" a "demotion" that was "directly linked to the fallout from the concealed risks," Opp. 24, Thomas lauded the appointment of a co-CEO as an "upgrade," and remains with the Company today as Chair of its Board, ¶¶162-63.  That is not

---

[9] The cases Plaintiffs cite illustrate what the AC here is missing.  *See Axsome*, 2025 WL 965265, *5-9 (complaint pled particularized facts showing that the company was "unable to produce sufficient [product] for at least a year…due to a vendor's manufacturing issues," including details on the specific vendor in the supply chain having equipment issues and how those specific equipment issues were communicated to executives); *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, *5 (S.D.N.Y. June 2, 2022) ("the Romeo Defendants' purported failure to predict supply disruptions does not provide any basis for Romeo to claim that it had four suppliers when it had only one or two").

remotely indicative of fraud. *See C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *7 (S.D.N.Y. Dec. 13, 2013) ("there are a number of other, more plausible reasons why personnel may have been demoted and resigned"); *In re Jiangbo Pharm., Sec. Litig.*, 884 F.Supp.2d 1243, 1263 (S.D. Fla. 2012) (no inference of scienter where CFO "stayed on with the Company as a consultant after her resignation").

*Temporal Proximity.* Plaintiffs ignore Defendants' March 2023 disclosures, *see* Br. 10-12, when asserting that Defendants first disclosed the "diversion" of resources to Sprinklr Service "in December 2023, just three months after making misleadingly positive statements." Opp. 23. Moreover, Plaintiffs concede that "temporal proximity alone cannot establish scienter," Opp. 24, and do not address the authority holding that even a one-month period "is too ephemeral a connection to raise a strong inference of scienter." *Pearlstein v. BlackBerry*, 93 F.Supp.3d 233, 247 (S.D.N.Y. 2015); *accord San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris*, 75 F.3d 801, 812 (2d Cir. 1996).

*Core Operations.* Even if the core operations doctrine were still valid, *see Bristol-Myers*, 658 F.Supp.3d at 234, Plaintiffs cannot rely on it because they have not otherwise "already adequately alleged facts" showing any Defendant's scienter. *Glaser v. The9*, 772 F.Supp.2d 573, 595-96 (S.D.N.Y. 2011).

C.      **Any Inference of Scienter Is Not As Compelling As The Opposing Inference**

The more compelling inference here is clear: Sprinklr disclosed its "big focus" on, and allocation of existing resources to, Sprinklr Service, and in the context of double-digit YoY growth in subscription revenue and progress in developing Sprinklr Service, the Company made optimistic statements about its business and good faith financial projections for future periods, which eventually needed to be revised due to unexpectedly elevated customer churn, headcount limitations, and persistent macroeconomic headwinds. Plaintiffs contend that Thomas "admitted"

in December 2023 that "macroeconomic conditions did not cause the problem" because he stated that "over-rotation" was "causing the change," Opp. 29, but ignore that, at the very same time, (i) Thomas acknowledged the impact of "consistent" macroeconomic "headwinds", ¶116; (ii) Sarin stated that "an unforgiving macro environment" contributed to slower revenue growth, ¶117; and (iii) analysts agreed, ¶123 (describing "pressure on renewals" as "partially macro driven"). Thomas reiterated the impact of macroeconomic conditions in June 2024, ¶133 ("implementing…changes during what has become a more challenging macro environment has created more short-term volatility"), and analysts again agreed, ¶132 (noting "Deterioration in Macro" among reasons for "Step Down in Growth").

## III.    The AC Fails To Adequately Plead Loss Causation

Plaintiffs do not identify any challenged statement that the alleged corrective disclosures revealed to be false.  Opp. 30.  Instead, they claim the disclosures must "relate" to a "concealed" fraud because there is otherwise "no explanation for the statistically-significant stock price drops." *Id.*  But "not every stock drop is the product of securities fraud." *In re Weight Watchers Int'l Sec. Litig.*, 504 F.Supp.3d 224, 238 (S.D.N.Y. 2020).  Here, as discussed in Section I above, the allegedly "concealed risks" were disclosed prior to the alleged corrective disclosures.  Thus, Plaintiffs' fallback argument that the "[t]he negative financial disclosures preceding the two price drops" were the "materialization" of concealed risks, Opp. 31, also fails. *See Prime Mover Cap. Partners v. Elixir Gaming*, 898 F.Supp.2d 673, 685 (S.D.N.Y. 2012) (rejecting materialization of risk theory for loss causation because "defendants repeatedly warned of [the] risks").

## IV.    Plaintiffs' Section 20(a) Claim Should Be Dismissed

Absent a Section 10(b) violation, Plaintiffs' Section 20(a) claim fails. *See* Br. 32.

## CONCLUSION

For all these reasons, the AC should be dismissed with prejudice.

16

Dated:  New York, New York
        June 2, 2025

Respectfully submitted,

COOLEY LLP

By:  /s/ Aric H. Wu
      Aric H. Wu

Sarah M. Topol
Trevor H. O'Bryan
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
stopol@cooley.com
tobryan@cooley.com

Koji F. Fukumura (*pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121
Tel: (858) 550-6000
kfukumura@cooley.com

*Attorneys for Defendants*

17

## CERTIFICATE OF COMPLIANCE

I, Aric H. Wu, certify that the foregoing Reply Memorandum of Law of Defendants Sprinklr, Inc., Ragy Thomas, and Manish Sarin in Support of Their Motion to Dismiss the Amended Complaint complies with the word count allowed by the Honorable Lorna G. Schofield's March 10, 2025 Order (Dkt. 44). Defendants' Reply Memorandum of Law contains 5,241 words, exclusive of the cover page, table of contents, table of authorities, table of abbreviations, certificates of compliance and service, and signature block.

           */s/ Aric H. Wu*
           Aric H. Wu

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 2, 2025, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the Court's CM/ECF system, which sends notification of such filing to all counsel on record.

                                          */s/ Aric H. Wu*
                                          Aric H. Wu