UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                  :

IN RE SPRINKLR, INC. SECURITIES      :        24 Civ. 6132 (LGS)
LITIGATION                           :

                                  :       **OPINION & ORDER**

------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

Lead Plaintiff Anthony Marcheschi and Plaintiff Naveed Nawaz, individually and on behalf of all other persons similarly situated, bring this putative securities class action against (1) Sprinklr, Inc. ("Sprinklr" or the "Company") and (2) Ragy Thomas and Manish Sarin (together, the "Individual Defendants"). The operative complaint is the Amended Complaint (the "Complaint"), which alleges that Defendants made materially false or misleading statements and omissions in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). The putative class period runs from March 29, 2023, to June 5, 2024 (the "Class Period"). Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion to dismiss is granted.

I. **BACKGROUND**

The following facts are taken from the Complaint, transcripts of investor calls referenced in the Complaint and Sprinklr's legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"). *See In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 41 (2d Cir. 2025) (considering on a motion to dismiss "any written instrument attached

to the complaint, statements or documents incorporated into the complaint by reference" and "legally required public disclosure documents filed with the SEC").[1] "[A]ll reasonable inferences" are drawn in Plaintiffs' favor as required. *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021). However, "[t]he truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted." *Patel v. Koninklijke Philips N.V.*, No. 21 Civ. 4606, 2024 WL 4265758, at *9 (E.D.N.Y. Sep. 23, 2024), *reconsideration denied*, 2025 WL 3004925 (E.D.N.Y. Oct. 27, 2025); *see Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) ("[A court is] not obliged to accept the allegations of the complaint as to how to construe such documents . . . .").

Sprinklr is a Delaware corporation with its principal offices located in New York, New York. Sprinklr went public on June 23, 2021. Its common stock trades on the New York Stock Exchange under "CXM."

Defendant Ragy Thomas is Sprinklr's founder and served as its Chief Executive Officer ("CEO") before and during the Class Period. Thomas had ultimate authority and oversight over Sprinklr's business and spoke regularly to Sprinklr investors during earnings calls about the Company's operations. Defendant Manish Sarin served as Sprinklr's Chief Financial Officer ("CFO") during the Class Period. Like Thomas, Sarin had access to Sprinklr's sales information and spoke to investors about Sprinklr's operations.

### A.    Sprinklr's Core Business

Sprinklr sells software by subscription to large corporations, a business model known as software-as-a-service ("SaaS"). Under this licensing model, customers pay subscription fees to

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

access a company's cloud-based software platform and applications. Two main lines of business constitute Sprinklr's SaaS offerings. First, Sprinklr offers "Core Suite," a product line that enables companies to manage and analyze social media content, create personalized customer interactions, optimize digital marketing campaigns and analyze data for marketing purposes, among other things. Second, Sprinklr offers a newer SaaS product known as "Sprinklr Service." Sprinklr Service is a contact-center-as-a-service ("CCaaS") platform, which routes inbound customer service interactions to agents in a client's customer service contact center. On earnings calls, Sprinklr referred to Sprinklr Service as its "contact center" business, CCaaS, an "omnichannel customer service solution," "managed services" and the Company's "higher margin" business.

Core Suite offerings generated most of Sprinklr's revenue during the Class Period. For example, in Fiscal Year ("FY") 2023, which ended January 31, 2023, Core Suite contributed approximately 72% of the Company's total revenue and 81% of its subscription revenue. That year, Sprinklr Service contributed approximately 17% of the Company's total revenue and 19% of its subscription revenue. Subscription revenue was Sprinklr's primary revenue source, representing 88%, 87% and 89% of overall revenue for FYs 2021, 2022 and 2023, respectively. Sprinklr's subscription model made revenue largely predictable and easy to forecast a year in advance.

### B.     CCaaS Expansion and Strategic Realignment

The Complaint alleges that Core Suite had limited growth prospects due to its mature market position and reliance on customer renewals. To achieve growth, Sprinklr decided to expand into the CCaaS market by developing Sprinklr Service into a full CCaaS product suite. Unlike Core Suite, which had one-to-three-year sales cycles mainly targeting marketing

3

departments, Sprinklr Service had five-to-ten-year sales cycles and targeted IT or customer service personnel.

On March 29, 2023, the first day of the Class Period, Sprinklr reported its Q4 FY 2023 (as of January 31, 2023) results to investors and discussed this strategic realignment.  On the earnings call, Thomas stated that growing the CCaaS business from Sprinklr Service was a "big focus" for FY 2024, characterizing it as "the year of contact center business."  Thomas also disclosed challenges Sprinklr faced in entering the CCaaS market, stating that Sprinklr was "going to be a disruptive player in CCaaS" and was "challenging some of the well-known legacy players" in a "30, 40-year-old industry."

Regarding workforce and resource allocation, Sprinklr disclosed that it had "recently concluded an internal review across product areas, regions, and support functions" and had "restructured [its] global workforce by about 4%."  Thomas stated that the Company would rely primarily on "existing headcount" to drive growth going forward, explaining, "[W]e anticipate to drive a lot of incremental revenue from existing headcount."

During subsequent earnings calls in June and September 2023, Defendants provided additional details about obstacles in the CCaaS market.  During the June 2023 call, Thomas cautioned that "CCaaS deals take longer" due to "very formal RFP [request for proposal] processes and multiple stakeholders" and "change management" considerations.  During the September 2023 call, Thomas reiterated that the "CCaaS transition is very hard" and that "customer service teams are very risk averse," resulting in "a much more[,] longer thought out, deliberate kind of RFP, RFI [request for information] process that takes time."

C.      **Financial Performance and Projections During the Class Period**

During the Class Period, the Individual Defendants made positive statements about the Company's reported financial results, including in June, July and September 2023.  For Q1 FY 2024 (February through April 2023), Sprinklr reported 24% year-over-year subscription revenue growth.  On June 5, 2023, during the Company's Q1 FY 2024 earnings call, Thomas commented on the use of AI and the Company's business in general, stating that the Company was "very pleased" with its "go-to-market strategy, productivity and execution" and was "excited about the progress" on making it "easier to sell."  Regarding Sprinklr Service, Thomas noted "continued momentum as a disruptor in the CCaaS space" and stated that Sprinklr was "now up and running for CCaaS, with a couple of more key industries, including financial services and airlines."  Regarding his expectations about renewal rates in general, Thomas stated that "once you buy into the Sprinklr approach [of using AI models and analytics], we keep growing," noting that customers were expanding purchases and that the number of customers paying over $10 million annually was "going up as well."

On July 12, 2023, during its Investor Day conference, Sprinklr announced a long-term subscription revenue target for FY 2027 (ending January 31, 2027).  At the outset, investors were cautioned that the call would include "forward-looking statements."  Sarin stated that the Company was "comfortable . . . setting $1 billion in subscription revenue as [the] floor for FY 2027."  Sarin explained that this projection would compute to "roughly [an] approximate 16% CAGR [Compound Annual Growth Rate]" over three years and noted that "FY 2027 is really calendar year 2026.  That ends in January 2027.  So it is three [years]."  Sarin noted this projection assumed that "the current environment persists" and stated that, "should the

environment improve, should sales cycles become shorter; all of that would be upside to these numbers."

For Q2 FY 2024 (May to July 2023), Sprinklr reported 23% year-over-year subscription revenue growth.  During the Q2 2024 earnings call on September 6, 2023, Sarin stated that Sprinklr was "seeing strength in renewal activity, as shown in the multi-year RPO renewals, RPO numbers, as well as our sense around overall billings for the year."  RPO -- remaining performance obligation -- reflects expected revenues from multi-year contracts that will be recognized in a future period.  Regarding bookings, Sarin reported that the Company was not "seeing" anything that "would give us any cause for concern."  Thomas also stated that investors were seeing "a consistent trickling impact of our better execution and focus on go-to-market."

The following day, September 7, 2023, Sarin discussed the Sprinklr Service expansion at the Citi Global Technology Conference (the "Citi Conference"), stating that the Company had assembled a "specialist overlay team" hired from "your big CCaaS vendors" who "know how to go about selling the product."  Sarin said that Sprinklr was not making a "cost versus growth trade off" because it had "enough investments in place that should allow [it] to grow" at a consistent rate.

### 1. December 2023 Disclosure

For Q3 FY 2024 (August to October 2023), Sprinklr reported 22% year-over-year subscription revenue growth.  During the Q3 FY 2024 earnings call on December 6, 2023, Defendants acknowledged the impact of Sprinklr's strategic focus on CCaaS.  Thomas stated that Sprinklr had made "slower progress on some of [its] other go-to-market initiatives focused on [its] core product suites" as the Company "diversified the business and focused on scaling [its] CCaaS business."  Sarin stated that the Company's "focus on succeeding in [its] CCaaS business

slowed progress with some of [its] other go-to-market initiatives in [its] core product suites, much more than [Sprinklr] had anticipated." Defendants acknowledged lowered growth expectations, and Sarin announced revised guidance projecting "10% total revenue growth" for FY 2025, compared to the prior expectation.

On the same call, Thomas stated that the "fix" for the "overrotation" toward CCaaS was "quite obvious" and represented what the Company was "doing now." This included adjustments to "internal resource allocation" to allow salespeople with backgrounds in other product suites to "go back and focus on" their areas of expertise. Thomas added that he was "pretty hopeful that in one or two quarters, [Sprinklr would] begin to see some data that would allow" for further updates. Despite this disclosure, Sarin reaffirmed that Sprinklr remained on track to achieve $1 billion in subscription revenue for FY 2027. The next day, December 7, 2023, Sprinklr's stock price fell by $5.74, or approximately 34%, before rebounding to close at $11.11 per share.

### 2. March 2024 Disclosure

For Q4 FY 2024 (November 2023 to January 2024), Sprinklr reported 19% year-over-year subscription revenue growth and total revenue growth of 17%. The Company reported total revenue of $194.2 million and subscription revenue of $177 million for the quarter. On March 27, 2024, Sprinklr held an earnings call to discuss the Q4 FY 2024 results. The Company also issued FY 2025 guidance projecting subscription revenue between $740.5 million and $741.5 million.

During the call, an analyst asked why renewal pressure was expected to persist through the first half of FY 2025 and what supported the view that it would ease later. Thomas answered that the Company had invested substantial effort in understanding the issue and believed "the

majority of it [was] self-inflicted." Thomas said that the problems were "fixable things" and that "it's going to take a few quarters, but right now we're pretty optimistic that we should see our retention go back to our historic norms once our execution and what we can control is addressed."

### 3.  June 2024 Disclosure

On June 5, 2024, the last day of the Class Period, Sprinklr held an earnings call to discuss its Q1 FY 2025 (February to April 2024) results. The Company reported a significant decline in subscription revenue growth -- 12% year-over-year to $177.4 million. Thomas explained that "more measured" customer buying behavior, persistent "budget scrutiny on renewals," "longer" sales cycles and a "challenging macro environment" contributed to the decline. In response, Sarin acknowledged that Sprinklr "continue[d] to experience higher churn in [its] core product suites, driven by reduced marketing spend, elimination of programs, and seat reductions," which he said would continue throughout FY 2025. He also reported a reduction in workforce of approximately 3% in May.

The Company revised its guidance for FY 2025 downward and withdrew its FY 2027 projection entirely. The revised guidance projected subscription revenue between $714 million and $716 million for FY 2025, compared to the prior guidance of $740.5 million to $741.5 million. Sprinklr conceded that its previously announced $1 billion subscription revenue floor for FY 2027 was no longer achievable.

The next day, June 6, 2024, Sprinklr's stock price fell by $2.51 before rebounding to close at $9.20 per share -- down approximately 15.1% from the prior day's close. On the same day, the Company announced that Thomas would be co-CEO and share duties with newly appointed Trac Pham.

## II.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). A complaint's "factual allegations must be enough to raise a right to relief above the speculative level." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 306 (2d Cir. 2022). On such a motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016); *accord Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021). However, a court does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon*, 994 F.3d at 101.

The Complaint's principal claim asserts securities fraud under Section 10(b) of the Exchange Act and its implementing rule, Rule 10b-5. That rule makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Federal securities fraud requires "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Gimpel v. Hain Celestial Grp.*, 156 F.4th 121, 136 (2d Cir.), *reh'g*

*denied*, No. 23-7612, 2025 WL 3485174, at *1 (2d Cir. Dec. 2, 2025). "The first two elements must be pled with heightened specificity pursuant to the Private Securities Litigation Reform Act of 1995 [(the "PSLRA")] and Federal Rule of Civil Procedure 9(b)." *Noto v. 22nd Century Grp.*, 35 F.4th 95, 102-03 (2d Cir. 2022). The PSLRA requires a complaint alleging misstatements or omissions to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and Rule 9(b) requires that the plaintiff "state with particularity the circumstances constituting fraud." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021); *accord In re Mobileye Glob. Sec. Litig.*, No. 24 Civ. 310, 2025 WL 1126967, at *7 (S.D.N.Y. Apr. 16), *aff'd*, No. 25-1292, 2025 WL 3640904 (2d Cir. Dec. 16, 2025).

## III.   DISCUSSION

This lawsuit arises from Sprinklr's adoption of a new business strategy to focus on its CCaaS business, referred to as Sprinklr Service. The gravamen of the Complaint is that Defendants misled investors by secretly "diverting" personnel and other resources from the Core Suite business to Sprinklr Service. Specifically, the Complaint alleges material omissions and resulting misstatements because, during the Class Period, the Company failed to disclose (1) the realignment of resources to Sprinklr Service, (2) the risks associated with Sprinklr Service and the Company's realignment and (3) the resulting harm to the Core Suite business. The Complaint also asserts that the Company's $1 billion subscription revenue projection for FY 2027 lacked a reasonable basis.

The Complaint fails to plead a fraudulent misstatement or omission because materials properly considered on a motion to dismiss show that Sprinklr did disclose (1) the realignment of resources, (2) the associated risks and (3) the Company's financial results, as and when required.

10

The alleged misrepresentations that the Complaint identifies are not false or misleading because, when the statements challenged in the Complaint are placed in context, no reasonable investor would have been misled about the state of the Company's business. The Complaint also fails to plead facts showing that Defendants knew that, before it was withdrawn, the FY 2027 revenue projection could not be achieved, or that Defendants omitted facts that made the FY 2027 projection misleading when made.

The Complaint also fails to plead scienter because it does not plead facts showing that Defendants' positive statements about Sprinklr Service were false rather than overly optimistic and ultimately incorrect. The more compelling inference is that the new business strategy was either misguided or poorly executed -- not that Defendants knew from the outset that their plan would harm Sprinklr's Core Suite business. That is not enough to plead securities fraud. Defendants' motion to dismiss is granted.

### A. Section 10(b) Claims Against the Individual Defendants

#### 1. Material Misrepresentation or Omission

##### a. Applicable Law

Under Rule 10b-5(b), it is unlawful to (1) "make any untrue statement of a material fact" or (2) "omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b). "These prongs correspond to two actionable theories under Section 10(b) and Rule 10b-5: (1) a false statement, i.e., an actual statement that is untrue outright, and (2) a half-truth, i.e., a representation that states the truth only so far as it goes, while omitting critical qualifying information." *Gimpel*, 156 F.4th at 138. Under the first theory, a false statement must be "false at the time it was made, and the plaintiff must demonstrate with specificity why the statement is false." *Id*.

A half-truth theory "involves more nuance." *Id*. Whether a statement is misleading is "evaluated not only by literal truth, but by context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). "The test for whether a statement is materially misleading under Section 10(b) is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 295 (2d Cir. 2025).

Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose *all* information. Disclosure is required only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011); *accord Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353-54 (2d Cir. 2022). Even when there is no independent duty to disclose information, "once a company speaks on a topic, it has a duty to tell the whole truth about that topic." *Noto*, 35 F.4th at 105.

#### b. Alleged Concealment of Resource Realignment

The Complaint's first category of misstatements and omissions are statements by Defendants concealing that Sprinklr "secretly diverted significant resources and manpower" from its Core Suite business to Sprinklr Service rather than "building out a sales team for the new product." But in the calls the Complaint references, the Company repeatedly disclosed that Sprinklr Service would be staffed by the Company's existing sales force, augmented by a few newly hired supervisors who were expert in CCaaS.

Plaintiffs' "secret diversion" theory turns on the assertion that Defendants represented Sprinklr Service would be staffed and sold only, or primarily, through newly hired CCaaS specialists, rather than through the "diversion" of existing personnel or reallocation of resources

12

across product lines. But Defendants' statements about staffing, taken as a whole, would not have misled a reasonable investor about the Company's allocation of personnel.

For example, the Complaint describes as misleading Thomas's statement on the March 29, 2023, earnings call that, during the prior year and a half, the Company had hired people from traditional contact center companies and built a "team of dedicated specialists," some with "20-25 years" of contact center experience. However, earlier in the same call, in response to a question about headcount growth in the coming year not quoted in the Complaint, Thomas said, "[W]e anticipate to drive a lot of incremental revenue from *existing headcount*. So at a very high level, you should probably assume sales headcount growth would be lower than overall revenue growth" (emphasis added). Also in the same call, Sarin explained that the Company's "hope" was to enable third-party partners to do more "service delivery" and "other implementation work that historically we've been focused on," so that the Company could "*rededicate our employee base*" to the "higher-margin" "managed services" business (emphasis added). Contrary to Plaintiffs' argument, no reasonable investor would conclude that primarily newly hired employees would staff and sell Sprinklr Service.

The Complaint also quotes and challenges Sarin's September 7, 2023, statement at the Citi Conference describing a "specialist overlay team" and hiring them from CCaaS vendors. However, the quoted statement makes clear that these hires would not be the predominant sales force. Instead, Sarin described them as "a tremendous *addition* to the sales team" that were assigned as "divisional leaders," with "several" in each relevant geographic market (emphasis added). Sarin further explained that these hires "worked hand in glove with the individual reps in the territories to unearth new CCaaS opportunities." Neither statement says, or implies by omission, that Sprinklr Service would be staffed or sold only, or even predominantly, by newly

13

hired specialists or that existing personnel would not be used.  The second statement explicitly says the opposite.  These statements are thus not actionable misstatements or omissions.

### c.  Alleged Concealment of Risks Associated with Realignment

The Complaint's second category of asserted misstatements and omissions are statements that failed to disclose the risks of the new business strategy to grow the Sprinklr Service business and focus more resources on Sprinklr Service to the exclusion of Core Suite.  This second category focuses on alleged misstatements concealing the harms that might develop from the Company's business strategy, while the third category addresses statements that allegedly concealed the harms that did develop.  The statements in this second category do not plausibly support a claim of false statements or half-truths.

The Complaint asserts that Defendants failed to disclose possible risks both when the strategy was first announced in March 2023 and in later updates in June, July and September 2023.  Instead, the Complaint asserts, Defendants made only misleadingly positive statements about the progress of the business.  For example, on the June 5, 2023, earnings call, when providing an update on Sprinklr Service, Thomas stated that "[w]e are now up and running for CCaaS," and described the Company as experiencing "continued momentum as a disruptor in the CCaaS space."  Similarly, during the July 12, 2023, Investor Day conference, Sarin stated that "all product suites are growing at a very healthy rate."  These allegations do not support a claim because Sprinklr adequately disclosed its business strategy and the attendant risks.

As an initial matter, many of the challenged statements are generalized expressions of optimism ("momentum," "very healthy" growth, "progress," etc.) that are "too general to cause a reasonable investor to rely upon them" and therefore are inactionable puffery.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016); *accord In re Philip Morris Int'l Inc. Sec. Litig.*, 89

F.4th 408, 417 (2d Cir. 2023); *see In re Nokia Oyj Sec. Litig.*, 423 F. Supp. 2d 364, 397-99 (S.D.N.Y. 2006) (finding inactionable as puffery broad statements like "[w]e expect to see continued momentum," "we want to be present in all the key segments," "the product road map is a very exciting one" and "[o]ur distribution strategy is bearing fruit").

Even taking these statements at face value, in context, they are neither false nor misleading.  On the March 29, 2023, call during which the Sprinklr Service strategy was announced, the Company disclosed that it would use "existing headcount" to staff and sell Sprinklr Service, and Thomas told investors that CCaaS was a "30-, 40-year old industry" with "legacy players."  These statements would make a reasonable investor aware of the Company's strategy and the attendant risks of the Company's entering a mature market.  The Company detailed the risks specific to CCaaS in subsequent earnings calls.  On the June 5, 2023, call, Thomas said, "CcaaS deals take longer.  There are very formal RFP processes and multiple stakeholders outside consultants and lots of people involved.  And change management is a huge deal in that space."  On the September 6, 2023, call, Thomas reiterated that "as we get into CCaaS, you know deal cycles take longer because it's a very thorough process. . . . CCaaS transition is very hard, and . . . customer service teams are very risk averse.  So it's a much more[,] longer thought out, deliberate kind of RFP, RFI process that takes time."  In light of these disclosures, the Company adequately disclosed risks associated with focusing on Sprinklr Service.

### d.  Alleged Concealment of Resulting Harms

The Complaint's third category of misstatements and omissions are statements concealing the harms that occurred when the allegedly concealed risks were realized.  The Complaint presents this theory in two parts:  first, that in September 2023, Defendants were still

15

assuring investors that Core Suite and Sprinklr Service were in good shape when they were not; and second, that from December 2023 through March 2024, Defendants were reassuring investors that they had addressed the problem, when the problem remained unaddressed.

Context matters here.  The challenged statements were made largely on earnings calls, after Sprinklr announced its quarterly financial results to investors.  Sprinklr reported between 17% and 18% in year-over-year revenue growth in Q2, Q3 and Q4 FY 2024, and between 19% and 23% in year-over-year subscription revenue growth during the same period.[2]  Plaintiffs do not allege that those figures were false.  No reasonable investor would have been misled by the Company's generic statements in earnings calls optimistically characterizing the Company's financial metrics when those financial metrics were fully and accurately reported.

### i. September 2023 Earnings Call Statements About the Business

The September 2023 statements do not plausibly support a false statement or half-truth theory.  The Complaint asserts that several misstatements during the September 6, 2023, earnings call painted an overly rosy picture of new subscription sales and renewals for Core Suites: statements that the Company was "seeing strength in renewal activity"; that, regarding Q3, the Company was "not seeing any different behavior this quarter" and that the Company was seeing "a consistent trickling impact of" its business strategies and that renewal activity was "steady" as "we would expect."  The Complaint similarly asserts that a misstatement made at the September 7, 2023, Citi Conference falsely or misleadingly denied the existence of a "cost

---

[2] Dkt. 48-15 at 4, 6 (Sep. 2023) (total:  $178.5 million, subscription:  $163.5 million, up 18% and 23% year over year); Dkt. 48-17 at 4, 7 (Dec. 2023) (total:  $186.3 million, subscription:  $170.5 million, up 18% and 22% year over year); Dkt. 48-19 at 4, 7 (Mar. 2024) (total:  $194.2 million, subscription:  $177 million, up 17% and 19% year over year).

versus growth trade off" in the Company's business strategy.  But, viewed in the context of the reported results and the entirety of the calls, these statements were not false or misleading.

As an initial matter, like the previous category of asserted misstatements, *see supra* Section III.A.1.b, many of the challenged statements in this category -- which contain terms like "strength," "consistent" and "steady" -- are inactionable statements of optimism.  *See In re Vivendi*, 838 F.3d at 245; *In re Philip Morris*, 89 F.4th at 417.  However, even accepting the statements as assertions of fact, these statements are not false or misleading for at least three reasons.  First, the Complaint mischaracterizes statements by plucking isolated words and phrases from the earnings calls and ignoring other statements.  Second, the Complaint does not plead with required specificity how historical statements about reported results were false or misleading.  And third, the forward-looking statements are qualified comments about future quarters, not concrete representations about present fact.

### September 6, 2023, Earnings Call

The Complaint asserts that on the September 6, 2023, earnings call, after Sprinklr disclosed its Q2 FY 2024 results, Thomas and Sarin made misstatements suggesting a higher rate of subscription renewals in the core business than was the case.  The Complaint implies that the statements made "[a]s late as September 2023" must have been false when "just three months later, Defendants sharply changed course."  This theory is unavailing because the challenged statements were consistent with the Q2 financial results, which showed a 23% increase year-over-year in subscription revenue.  These financial results are not alleged to be inflated or false.

Also, the Complaint ignores the context in which the statements were made.  The excerpt of the September 6, 2023, call quoted in the Complaint makes clear that Sarin's reference to "strength in renewal activity" was not touting renewals in general.  Rather, Sarin was responding

17

to an analyst's question.  As discussed earlier in the call, one feature of the Q2 results was a 19% increase in billings year-over-year.  Sarin explained that this increase was caused in part by earlier-than-anticipated subscription renewals of multi-year contracts by some of the Company's largest customers.  An analyst then asked whether the year-over-year growth rate was inflated by longer contract durations (i.e., more billings but fewer renewed or new contracts).  Sarin responded, in substance:  no, because the Company was billing annually on multi-year contracts.  He added that "if you just step back, we're seeing strength in renewal activity, as shown in the multiyear RPO renewals, RPO numbers, as well as our sense around overall billings for the year."  The RPO number was reported as a "Key Business Metric[]" in the Notes to the Company's quarterly financial statements and referenced future revenues from existing multi-year contracts.  Thus, Sarin's statement about "strength in renewal[s]" was explicitly based on previously described renewals of multi-year contracts and the reported RPO number, neither of which is challenged as inaccurate.

On the same earnings call, Sarin also added two other negative notes about future renewals, countering any overly rosy impression the current numbers might have left.  First, he stated that these earlier-than-expected renewals in the second quarter resulted in higher billings in Q2, but would result in lower billings in Q3, "which is already [the Company's] seasonally slowest billings quarter."  Second, he stated that "we expect NDE [subscription revenue-based net dollar expansion rate] to decline slightly in the coming quarters" as a result of "macroeconomic conditions moderat[ing] renewal rates" and the Company's focus on obtaining new customers.  These statements by Sarin paint a more detailed picture of the Company's situation than the single reference to "strength in renewal activity," and cut against the notion that Defendants overstated the state of the business as measured by renewals.

18

The Complaint similarly mischaracterizes other statements from the September 6, 2023, Q2 earnings call, which occurred when a different analyst, spurred by the Company's "really good execution in the quarter on the renewals and [a] large 8-figure transaction," asked about the potential for similarly large deals in the already ongoing Q3 and in Q4.  Although the Complaint describes Defendants' responses as overly positive, the full quotes -- which are included in the Complaint -- indicate otherwise.  Thomas responded that "we're not seeing any different behavior this quarter or last quarter than we saw before."  He then described continuing *adverse* conditions, stating, "[B]udgets are tight.  There's more CFO scrutiny and all the good things [sarcasm] that come with people being [unsure of] where the market . . . and interest rates are going to be."  Rather than predicting a surge of profitability, he continued, "I think what you're seeing is like a consistent trickling impact of our better execution."  After the analyst re-phrased the question, Sarin gave a similarly measured response, stating that he "wouldn't make any broad assumptions about how Q3 and Q4 would land," and that "[i]t's sort of along the lines that we would expect. . . . [S]teady is what I would say."

Second, the statements about historical results in Q2 cannot be challenged with vague allegations about a failing business, cancelled contracts, failed sales and failed renewals in the Core Suite business.  A complaint must not only describe the alleged misstatements in detail, but also "demonstrate with specificity why and how" the statements are false and misleading.  *Peloton*, 153 F.4th at 295.  As an initial matter, the Complaint does not even allege that the reported Q2 results were false.  But additionally, the Complaint does not provide sufficient detail about the alleged failures in the Core Suite business -- for example, the number and value of contracts that were cancelled, the number and value of sales and renewals that failed or how and when Defendants learned that these failures had occurred and would affect the Company's

19

financial results -- to support an inference that the statements were false or misleading at the time they were made. *See, e.g.*, *In re UiPath, Inc. Sec. Litig.*, 755 F. Supp. 3d 498, 511 (S.D.N.Y. 2024) (holding "vague assertions" in complaint that "customers had stopped renewing and expanding their licenses" were insufficient when allegations did not "quantify the extent to which customers had . . . reduced their business or stopped doing business with [defendant]"); *In re Micro Focus Int'l plc Sec. Litig.*, No. 18 Civ. 6763, 2020 WL 5817275, at *8 (S.D.N.Y. Sep. 29, 2020) (holding insufficient allegations that defendant was "experiencing significant customer [and salesperson] attrition," when complaint "[did] not plead[] facts showing that [at the time of the statements] the risk of customer attrition . . . [or] salesperson attrition had materialized").

And third, the forward-looking statements about Q3 and Q4 are qualified comments about future quarters, not concrete representations about present fact. *See, e.g.*, *Peloton*, 153 F.4th at 296-97 (holding that statements about "strong" and "robust" demand were not misleading where consistent with disclosed financial results and "then-current expectations of further growth"). "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). The Complaint does not adequately allege that the statements made on the September 6, 2023, earnings call were false or misleading.

### *September 7, 2023, Citi Conference*

The Complaint also asserts that during the September 7, 2023, Citi Conference, when asked about the tradeoff between growth and margins, Sarin misleadingly denied that the Company was experiencing such a tradeoff. This statement is similarly a qualified comment

about future potential, not a concrete representation about present fact.  When asked how to think about "the trade-off of growth versus margins as we go forward," Sarin responded that Sprinklr had "enough investments in place" that "should allow us to grow at the rate that we are growing," then explained that "technology solution brokers" and "partners" reduced the need for additional direct CCaaS sales representatives and deployment engineers.  In substance, Sarin conveyed that he did not believe that continued growth would necessarily entail the traditional trade-off of higher costs and lower profit margins, in part because rather than hiring more personnel to sell Sprinklr Service subscriptions, the Company was partnering with third parties to sell the product.

Sarin's statement was neither false nor misleading.  It was not false because it was management's view on future efficiency and growth, not a specific representation that the problems identified by Plaintiffs were absent.  *See Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (opinion liability turns on whether the speaker actually held the expressed view and whether omitted facts about the basis for it made the opinion misleading).  The Complaint does not plead particularized facts showing that Sarin did not believe that view at the time he expressed it, or that internal Company data contradicted Sarin's statement.  Instead, the Complaint infers falsity from later disclosures and weaker results.  That is hindsight, not fraud. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *accord New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 47 (2d Cir. 2024) (amended opinion) (explaining that a later change of opinion, standing alone, does not make the earlier opinion disingenuous, and that a genuinely held opinion that "turned out to be wrong" is not necessarily actionable), *cert. denied sub nom. BDO USA, LLP v. New England Carpenters Guaranteed Annuity & Pension Funds*, 146 S. Ct. 261 (2025).

21

The statement also was not misleading because read in context, Sarin did not conceal that the Company was, in addition to seeking efficiencies through third-party partnerships, also using its internal resources to grow the Sprinklr Service segment. In fact, Sarin explicitly stated that the Company was "trying to do more with what we have, which wasn't the focus before," signaling that the referenced efficiency gains were being achieved at least in part through the use of existing resources.

*    *    *

Plaintiffs' contrary framings overread the September 2023 statements. Made in discussions with analysts following the disclosure of unchallenged quarterly results, those remarks did not assure investors that both businesses were in "good shape without any hint of issues," as the Complaint alleges. They were, at most, subjective descriptions of the reported results and qualified comments on future performance. The Complaint does not allege any contemporaneous facts showing that Thomas or Sarin had specific information that rendered those comments misleading when made. General allegations of access to internal data do not suffice. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *accord Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 83 (2d Cir. 2021). The Complaint does not identify what any internal sales report showed, when Thomas or Sarin reviewed it or how the report contradicted the September 2023 statements.

The cases Plaintiffs invoke underscore this point. Unlike in this case, the complaints in *Blanford* and *Celestica* identified specific orders, spreadsheets and operational reviews contradicting the challenged statements. *See Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (detailed confidential-witness allegations linked specific facts to specific statements); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13-14

22

(2d Cir. 2011) (summary order) (complaint identified who prepared the spreadsheets, how often they were prepared and who reviewed them). The Complaint here pleads no comparable facts showing that any internal report or data contradicted the September 2023 statements.

### ii. December 2023 and March 2024 Statements About Addressing the Problem

The December 2023 and March 2024 statements likewise do not plausibly support a false statement or half-truth theory. The Complaint characterizes those statements as reassurances that Sprinklr "had addressed the problems" caused by the shift toward Sprinklr Service. But the language quoted in the Complaint does not indicate that Sprinklr had already fixed the problem. At most, the statements conveyed that management believed it had identified the problem, was taking steps to address it and hoped or expected to see improvement over the next few quarters. Statements of that kind are opinion and prediction and, without more, are not actionable. *See Tongue*, 816 F.3d at 210; *cf. Gimpel*, 156 F.4th at 138 (falsity must be assessed at the time of the statement). Here, too, the Complaint fails to bridge the gap.

On the December 6, 2023, earnings call, after Sprinklr had reported Q3 FY 2024 results, Thomas and Sarin disclosed the problem. Thomas said that Sprinklr had made "slower progress" on some Core Suite go-to-market initiatives as the Company focused on scaling CCaaS, and Sarin said that the Company's focus on CCaaS had slowed progress in the core product suites "much more than [Sprinklr] had anticipated." The alleged misstatement in paragraph 119 of the Complaint -- Thomas's characterization of the problem and the ways to address it -- came only after an analyst asked what steps were needed to refocus on the broader suite and whether doing so would require incremental hiring or internal resource allocation. Thomas answered that the solution would be "more of an internal resource allocation," that Sprinklr had "over-rotated a little bit more on the CCaaS side" and that the "fix" was to return personnel to the product areas

23

from which they came, while adjusting quotas and reorganizing the field.  He stated that the plan was "for the next year," but noted that Sprinklr was "pretty hopeful" that, in "1 or 2 quarters," it would begin to see data that would allow for further updates.  These are statements of diagnosis and qualified optimism, not a representation that the problem had been resolved.  *See Tongue*, 816 F.3d at 210.

The March 27, 2024, earnings call statements are similar.  On that call, after Sprinklr reported Q4 FY 2024 results, an analyst asked why renewal pressure was expected to persist through the first half of FY 2025 and what supported the view that it would ease later.  Thomas answered that the Company had put substantial effort into understanding the issue, believed the majority of it was "self-inflicted" and believed that the problems were "fixable things."  He also said that while it would "take a few quarters," Sprinklr was "pretty optimistic" retention would return to historic norms once the issues were addressed.  Again, nothing in those remarks represented that the fix was complete (or even nearly completed).  Such discussion of the Company's intentions to recover from a misguided or poorly executed strategy are not actionable.  *See, e.g.*, *Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 459-60 (S.D.N.Y. 2025) (holding that statements about "P&L optimization" were not misleading because, in context, they did not claim to provide a complete account of the company's problems or to have already resolved them), *aff'd in relevant part, vacated in part*, No. 25-964, 2026 WL 668890 (2d Cir. Mar. 10, 2026); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 562 (S.D.N.Y. 2014) (rejecting a securities-fraud theory that would "stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *id*. at 571 (emphasizing that "without contemporaneous falsity, there can be no fraud").

The Complaint therefore overreads the December 2023 and March 2024 statements. Accordingly, Plaintiffs do not plausibly allege an actionable misstatement or omission based on realization of risks and resulting harms.

### e.  Lack of Reasonable Basis for FY 2027 Revenue Projection

Finally, the Complaint challenges statements about the Company's $1 billion subscription revenue projection for FY 2027 -- Sarin's July 12, 2023, statement that Sprinklr was "comfortable . . . setting $1 billion in subscription revenue as [the] floor for FY 2027" and his December 6, 2023, assertion that the December disclosure did "not change" the FY 2027 plan and that Sprinklr did not "feel any difference about FY '27 than [it] did six months ago."  These statements are not actionable.  Regardless of whether they are viewed as half-truths or false statements, the Complaint does not plead particularized facts showing that Defendants lacked a reasonable basis for the FY 2027 projection in July 2023 or December 2023, or that Defendants' affirmation that things "d[id] not change" was false when made.

"Projections are opinion statements," *Shanda Games*, 128 F.4th at 46, "but are nonetheless actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor," *U.S. Sec. & Exch. Comm'n v. Amah*, No. 24-2206, 2026 WL 504794, at *1 (2d Cir. Feb. 24, 2026) (summary order).  A plaintiff pressing such a theory "must identify particular (and material) facts going to the basis for the [speaker]'s opinion -- facts about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Tongue*, 816 F.3d at 209.

The Complaint instead relies on the same alleged operational problems that purportedly underlie the first three categories of misstatements (e.g., diversion from Core Suite, contract

25

cancellations, failed sales, failed renewals and the time required to compensate for the effects of the CCaaS push). Those allegations may explain why Plaintiffs believe the projection was overly optimistic. But they do not identify any internal forecast, report, model or other contemporaneous facts showing that Defendants knew in July 2023 or December 2023 that the FY 2027 target lacked a reasonable basis. *See, e.g.*, *Rudani v. Ideanomics, Inc.*, No. 19 Civ. 6741, 2020 WL 5770356, at *6 (S.D.N.Y. Sep. 25, 2020) (alleging contemporaneous internal forecasts including revenue losses that contradicted public guidance). The Court cannot infer that a long-term projection lacked a reasonable basis at the time it was made merely because the Company's business strategy later encountered difficulties and was revised.

Each call also warned investors that management would make forward-looking statements involving "many assumptions, risks and uncertainties" and that "actual results might differ materially." *See Slayton*, 604 F.3d at 766, 772-73 (explaining that forward-looking statements are protected under the PSLRA if they are identified and accompanied by meaningful cautionary language, or if plaintiff does not show actual knowledge of falsity); *accord Gimpel*, 156 F.4th at 143 & n.15.

The later withdrawal of the FY 2027 projection in June 2024 does not change this result. Nor does Plaintiffs' argument that the December 2023 statement followed disclosure of renewal pressure and therefore mixed present and future considerations. Even treating Sarin's statement that Sprinklr did not "feel any difference about FY '27 than [it] did six months ago" as a present-tense statement rather than a projection, the Complaint does not plead particularized facts showing that the statement was false when made. As Plaintiffs have not plausibly alleged a misstatement or omissions theory under any of the categories above, the Section 10(b) claims are dismissed.

26

### 2. Scienter

Even if the Complaint adequately alleged an actionable misstatement or omission, the Section 10(b) claims still would be dismissed for failure to plead facts sufficient to show scienter. As explained below, even accepting the facts as pleaded, the Complaint does not plausibly support an inference that Defendants knew or were reckless in not knowing the challenged statements were false or misleading when made. Defendants disclosed that Sprinklr shifted resources toward Sprinklr Service in early 2023 and later characterized that tradeoff as an "overrotation." Plaintiffs treat those later remarks as proof of earlier concealment, but the same allegations more naturally describe a course correction after a business strategy proved unsuccessful.

### a. Applicable Law

To establish scienter, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "This standard requires courts to take into account plausible opposing inferences." *Matrixx*, 563 U.S. at 48; *accord Denny v. Canaan Inc.*, No. 21 Civ. 3299, 2023 WL 2647855, at *4 (S.D.N.Y. Mar. 27, 2023). "For an inference of scienter to be strong . . . a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Set Cap.*, 996 F.3d at 78. "In making this determination, the court must review all the allegations holistically." *Matrixx*, 563 U.S. at 48; *Gimpel*, 156 F.4th at 143-44 (explaining that the analysis asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," and requires considering inferences favoring both sides).

27

In the Second Circuit, a plaintiff may establish scienter by alleging facts showing (1) that "the defendants had the motive and opportunity to commit fraud" or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Gimpel*, 156 F.4th at 144.  A plaintiff may also establish scienter with "both motive-and-opportunity and circumstantial allegations, considered collectively." *Id.*; *see New England Carpenters*, 122 F.4th at 49 ("Any allegation of conscious misbehavior or recklessness should be viewed holistically and together with the allegations of motive and opportunity to determine whether the complaint supports a strong inference of scienter.").  The facts alleged in the Complaint do not give rise to a strong inference of scienter as to either Thomas or Sarin.

### b.  Motive and Opportunity

Thomas was CEO, and Sarin was CFO during the relevant period.  High-level insider defendants, such as C-suite executives, are assumed to have the opportunity to commit fraud. *Gimpel*, 156 F.4th at 144.  The relevant question, then, is motive:  whether the individual intended to inflate, or maintain an inflated, stock price by committing fraud and obtained a "concrete and personal benefit," such as selling stock at a price inflated by fraudulent statements. *Id*.

The Complaint attempts to plead that Sarin had a motive to commit fraud as evidenced by his sale of Sprinklr stock during the Class Period.  The Complaint alleges that Sarin sold Sprinklr stock during the Class Period totaling "approximately $2,842,491.31."  But these allegations, standing alone, do not plead motive with the required particularity.  The Complaint does not allege facts that distinguish Sarin's conduct from ordinary sales by a corporate executive -- such as the percentage of Sarin's holdings sold, Sarin's prior trading history or pattern, whether the sales were out of line with his usual practice or other circumstances bearing on whether the sales

28

plausibly reflect a motive to profit from a fraudulently inflated stock price.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001) (explaining that "unusual" insider sales may support scienter and listing relevant factors, including profit, portion of holdings sold, change in volume and number of insiders selling); *accord Gimpel*, 156 F.4th at 145 (relying on *Scholastic*'s factors); s*ee also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (insider trading may support motive when it reflects unusual sales).

Two additional circumstances weigh against inferring a fraudulent motive from Sarin's sales.  First, the Complaint does not allege that Thomas sold any shares during the Class Period.  While the absence of another insider's sales is not required to plead motive, it is a relevant circumstance that undermines an inference that the challenged statements were part of a general scheme to inflate the stock price for insider profit.  *See Acito v. IMCERA Grp.*, 47 F.3d 47, 54 (2d Cir. 1995) ("the fact that the other defendant[] did not sell [his] shares during the relevant class period undermines plaintiffs' claim that defendants" were motivated to defraud); *In re Vroom, Inc. Sec. Litig.*, No. 21 Civ. 2477, 2025 WL 862125, at *35 (S.D.N.Y. Mar. 18, 2025) ("[T]he fact that [the CEO] is not alleged to have sold Vroom shares during the Class Period further undermines any inference of scienter from [the CFO's] sales.").

Second, Sprinklr itself repurchased substantial shares during the Class Period -- approximately $29.6 million of shares in January 2024 and $101.2 million of shares between February and April 2024, as stated in Sprinklr's earnings calls and SEC filings.  These substantial repurchases cut against an inference that management believed the stock price was artificially inflated.  *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) ("[S]ubstantial share repurchases tend to negate a finding of

scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated."), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 338 (S.D.N.Y. 2011) (noting that share repurchases may negate a finding of scienter). Taken together, the pleaded facts and other information that may be considered on a motion to dismiss support the more compelling inference that Sarin's sales reflect ordinary-course trading rather than a scheme to inflate Sprinklr's stock price.

### c. Conscious Misbehavior or Recklessness

The Complaint does not plead facts that amount to "strong circumstantial evidence of conscious misbehavior or recklessness." *Gimpel*, 156 F.4th at 144. As the Second Circuit has explained,

> scienter based on conscious misbehavior requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure. Recklessness, meanwhile, entails an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.

*New England Carpenters*, 122 F.4th at 49. Measured against those standards, the Complaint's allegations describe, at most, senior-executive oversight of the Company's renewals and sales performance. The Complaint does not plead deliberate misconduct or an extreme departure from ordinary care.

The Complaint alleges that Defendants monitored renewals and sales performance and had access to internal sales information. The Complaint also alleges that Thomas was "extremely hands on," met with customers and discussed those meetings on earnings calls. These allegations do not support a strong inference of scienter.

Allegations of Defendants' access to internal data and involvement with customer relationships do not show that Defendants knowingly implemented a scheme that was "necessarily going to injure" or that amounted to an extreme departure from standards of ordinary care. *Id*. Where Plaintiffs contend that internal information contradicted public statements, the Complaint does not plead what any internal sales report showed, when Thomas or Sarin reviewed them (or failed to) or how any identified data conflicted with any particular challenged statement when it was made. Nor does it identify any specific customer conversation in which Thomas learned information that contradicted his public statements. Without those particulars, the pleading does not bridge the gap between simply having access to information and conscious misbehavior or recklessness. *See Dynex Cap. Inc.*, 531 F.3d at 196; *Novak*, 216 F.3d at 308-09 ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

The Complaint includes an additional scienter allegation that "because SaaS deals are booked upfront with the revenue recognized thereafter, Defendants would have known about any material decline in revenue long before it occurred." But this knowledge was not evidence of any fraudulent intent to hide information, because Defendants publicly disclosed this information in every quarterly SEC disclosure under the heading "Key Business Metrics," as well as in each earnings call. For example, the Form 10-K for the year ended January 31, 2024, stated that "Remaining Performance Obligation ('RPO') represents contracted revenues that had not yet been recognized and includes deferred revenues and amounts that will be invoice and recognized in future periods. As of January 31, 2024, the Company's RPO was $966.6 million." The Form 10-K then reported the portion of that amount that would be recognized in the next twelve

months and what amount thereafter, and included a year-over-year comparison.  In the related earnings call, the comparison was expressed as a percentage (up 23% year-over-year).[3]

Plaintiffs also rely on Defendants' later statements to infer earlier knowledge and intent -- particularly the December 2023 discussion of slower progress on Core Suite initiatives, the described "overrotation" toward Sprinklr Services and the "fix" through reallocation of internal resources.  But later acknowledgments of headwinds and course corrections affecting business strategy do not, without particularized allegations of contemporaneous contradictory information, show that Defendants engaged in deliberate misconduct or recklessness.  *See Novak*, 216 F.3d at 308-09.  Read as a whole, the allegations better fit a competing, nonfraudulent inference:  that Sprinklr pursued a strategy to scale Sprinklr Service, later concluded that the Company had "overrotate[d]" its internal resource allocation and then adjusted course to address the impact on the Core Suite business.  Because an inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent," Plaintiffs' allegations do not satisfy the PSLRA.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007); *accord New England Carpenters*, 122 F.4th at 48.

### d.  Collective Assessment

Considering all of the allegations collectively -- motive and opportunity together with circumstantial evidence -- the Complaint still does not plead a strong inference of scienter as to Thomas or Sarin.  Because the nonfraudulent inference described above is more compelling than Plaintiffs' inference of fraud, the Complaint fails to plead a second element for a claim of securities fraud -- which offers an independent basis to dismiss the claims against Thomas and Sarin.  *See Set Cap.*, 996 F.3d at 78.

---

[3] Sprinklr, Inc., Annual Report (Form 10-K) at 80 (Mar. 28, 2024); Dkt. 48-11 at 8.

### B.    Section 10(b) Claim Against Sprinklr

The Section 10(b) claim against Sprinklr is dismissed for the same reasons as the claims against the Individual Defendants.  First, the Complaint does not plausibly allege that Sprinklr made a material misrepresentation or omission.  Second, even if it had, the Complaint does not plead a strong inference of scienter imputable to the Company.

"Where a defendant is a corporation, [pleading scienter] requires pleading facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).  The Complaint attempts to plead Sprinklr's scienter based on the knowledge and conduct of Thomas and Sarin.  As discussed above, the Complaint does not plead scienter as to either individual.  The pleading also lacks any other basis to infer corporate scienter as to Sprinklr.  *See id.* at 98-99 (noting that "exceedingly rare" cases allow an inference from a sufficiently "dramatic" statement).  Accordingly, the Section 10(b) claim against Sprinklr is dismissed.  *See Nandkumar v. AstraZeneca PLC*, No. 22 Civ. 2704, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023) (summary order) (rejecting corporate scienter where plaintiffs did not plausibly impute scienter from any officer or director, and the challenged statements were not sufficiently "dramatic or egregious as to permit an inference of collective corporate scienter").

### C.    Section 20(a) Claim

The Section 20(a) claim, asserted against the Individual Defendants, is also dismissed.  Section 20(a) imposes joint and several liability on control persons for underlying violations of the Exchange Act.  *See* 15 U.S.C. § 78t(a).  To state a claim, a plaintiff must allege both a primary violation of the Exchange Act and control over the primary violator.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014); *accord City of*

33

*Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*, No. 23 Civ. 1769, 2024 WL 4349289, at *10 (S.D.N.Y. Sep. 30, 2024). Because the primary claim fails, the Section 20(a) claim also fails.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**. If Plaintiffs have additional facts that they believe would cure the deficiencies identified in this Opinion, by **April 21, 2026**, Plaintiffs shall file a letter not to exceed three pages single-spaced seeking leave to replead and explaining how the proposed amendments cure the deficiencies. Any letter shall be accompanied by a proposed Second Amended Complaint marked to show changes from the First Amended Complaint. Defendants shall respond, with the same page limitation, by one week after the filing of any letter from Plaintiffs.

The Clerk of Court is respectfully directed to close the motion at Dkt. 46.

Dated: March 31, 2026
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

34